Shaneeda Jaffer (SBN 253449)
sjaffer@beneschlaw.com
Lily A. North (CA 260709)
lnorth@beneschlaw.com
**BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**
100 Pine Street, Suite 3100
San Francisco, California
Telephone: (628) 600-2250
Facsimile:  (628) 221-5828

Gary A. Bornstein (*pro hac vice* forthcoming)
gbornstein@cravath.com
Yonatan Even (*pro hac vice* forthcoming)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice* forthcoming)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice* forthcoming)
mzaken@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO.  LTD; SAMSUNG ELECTRONICS AMERICA, INC.; and GOOGLE LLC, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

PARTIES ............................................................................................................. 3

JURISDICTION AND VENUE ............................................................................ 4

INTRADISTRICT ASSIGNMENT ...................................................................... 5

FACTS ................................................................................................................. 5

I.    Industry Background ................................................................................... 5

II.   Google Dominates the Market for Third-Party Smartphone Operating Systems. ..................... 6

      A.    Product Market Definition. ............................................................ 6

      B.    Geographic Market Definition. ...................................................... 7

      C.    Google Has Monopoly Power in the Market for Third-Party Smartphone
            Operating Systems. ........................................................................ 8

III.  The Android App Distribution Market. ...................................................... 9

      A.    Product Market Definition. ............................................................ 10

      B.    Geographic Market. ........................................................................ 12

      C.    Google Has Monopoly Power in the Android App Distribution Market. ................... 12

      D.    A High Share of Android App Distribution Occurs on Samsung Smartphones. ........... 14

      E.    Google Has Unlawfully Monopolized and Maintained a Monopoly in the Market
            for Android App Distribution. ........................................................ 14

            i.    Google's Restrictions and Frictions Applied to Direct Downloading and
                  Third-Party App Stores. ....................................................... 15

            ii.   Google Repeatedly Entered into Anticompetitive Understandings with
                  Samsung. ............................................................................. 16

            iii.  Google Is Aware It Will Imminently Be Forced To Change or Eliminate
                  Its Anticompetitive Unknown Sources Install Flow. ..................... 20

      F.    Epic and Others Intend To Disrupt Google's Monopoly. ................................ 21

IV.   Google and Samsung Agreed that Samsung Would Implement Auto Blocker To Protect
      the Play Store's Illegal Monopoly. ............................................................. 22

      A.    The Auto Blocker Feature. .............................................................. 22

      B.    Google and Samsung Have Agreed To Set Auto Blocker to On by Default. ............ 25

            i.    The Auto Blocker Feature Itself Shows It Is the Product of Coordinated
                  Action Between Samsung and Google. .................................. 25

            ii.   The Timing of the Auto Blocker Feature Reflects Collusion. ........... 27

ii

iii.    Samsung and Google Have a Long History of Cooperating to Reduce Competition for App Distribution..................................................................27

iv.    Samsung and Google Engage in a High Number of Atypical Interfirm Communications. ........................................................................................28

v.    Samsung's Conduct Is an Abrupt Departure from Prior Conduct. ..................28

vi.    Samsung's Actions Are Inconsistent with Its Unilateral Economic Self Interest....................................................................................................28

vii.    An Agreement Would Provide Google and Samsung with a Common Motive To Conspire. ...............................................................................29

viii.    Market Conditions and Samsung's Behavior Point to an Agreement. .............29

ix.    There Is No Legitimate Business Purpose in Turning Auto Blocker On by Default.........................................................................................29

V.    Anticompetitive Effects in the Android App Distribution Market. .........................................30

VI.    Through Auto Blocker, Samsung Knowingly Spreads False and Damaging Information to Users Regarding the Epic Games Store and Epic's Apps. ..................................................31

COUNT 1:  Sherman Act § 1 – Against All Defendants (Unreasonable Restraint of Trade) .............32

COUNT 2:  Sherman Act § 1 – Against All Defendants (Unlawful Group Boycott) ........................33

COUNT 3:  Sherman Act § 2 – Against All Defendants (Unlawful Conspiracy to Maintain a Monopoly)..............................................................................................................33

COUNT 4:  California Cartwright Act – Against All Defendants (Unreasonable Restraint of Trade)....................................................................................................................34

COUNT 5:  California Unfair Competition Law – Against All Defendants (Unlawful and Unfair Agreement) ...........................................................................................................35

COUNT 6:  California Unfair Competition Law – Against Samsung Defendants (Unfair Practices)................................................................................................................35

COUNT 7:  California Trade Libel/Commercial Disparagement– Against Samsung Defendants ......36

PRAYER FOR RELIEF ..................................................................................................38

REQUEST FOR JURY TRIAL ........................................................................................38

Plaintiff Epic Games, Inc. ("Epic"), by its undersigned counsel, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.      For years, through a web of anticompetitive agreements and technical impediments and frictions, Google has maintained an illegal monopoly over the distribution of Android apps.  As a result, Google's app store, the Play Store, is pre-installed on the home screen of every single Android phone worldwide (outside China).  Moreover, the Play Store is the source of over 80% of all Android apps downloaded and installed by the around three billion global users of Android phones (outside China).

2.      Samsung—the world's largest Android smartphone maker—is one of the only firms with the potential ability to challenge Google's dominance in app distribution.  But for years, Samsung has declined to compete or allow others to compete with Google for the distribution of Android apps on Samsung smartphones.  In fact, while Samsung's own app store—the Galaxy Store—is pre-installed on over 40% of all Android phones worldwide, it is the source of only approximately 1% of Android app downloads.

3.      The lack of competition between Samsung and Google is no coincidence.  For well over a decade, Google and Samsung have enjoyed an exceptionally close relationship characterized by Google executives as akin to the relationship "between close family members".  As a part of that relationship, Google has paid Samsung billions of dollars.  And Samsung, for its part, has long put its Galaxy Store on the back burner, preferencing Google's Play Store rather than competing with it vigorously.

4.      For example, in early 2019, after Samsung—in a rare show of competitive zeal—entered into an agreement with Epic to distribute *Fortnite* on the Galaxy Store (even though the game was not available on the Play Store), Google offered Samsung a revenue-sharing deal whereby Samsung would forego the independent operation of its Galaxy Store in exchange for hundreds of millions of dollars (this initiative was referred to by Google as "Project Banyan").

5.      In internal communications about Project Banyan, Google executives made clear that any sharing of Google revenues with Samsung would be contingent on Google's ability to "secure confidence" that the Samsung Galaxy Store would not compete with the Play Store on price, or else Google "wouldn't do it".  One of the senior Google executives who headed the negotiations with

1

**COMPLAINT**

Samsung at the time recognized that the degree of confidence Google could "secure" on that issue was "subject to lots of legal advice on what 'securing confidence' can mean".  And indeed, Google and Samsung did not execute the Project Banyan deal, concluding that an explicit written agreement not to compete posed an unacceptable legal risk.  But in 2020, the Defendants did execute a revenue share agreement ("RSA") under which Google agreed to pay billions of dollars to Samsung.  While that deal did not explicitly require Samsung not to compete on app distribution, the Samsung Galaxy Store has not engaged in further competition with the Play Store since the deal was executed: Samsung has kept its headline commissions on the Galaxy Store at parity with Google's Play Store commissions; Samsung has not distributed any meaningful title exclusively; and Samsung has not entered any major deals with additional app or game developers.

6.     In August 2020, Epic filed a complaint against Google to put a stop to Google's monopolistic behavior.  *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD (N.D. Cal.), (*"Epic v. Google"*), Complaint (Dkt. 1).  In December 2023, after a 15-day trial, a jury found that Google violated Sections 1 and 2 of the Sherman Act and the Cartwright Act.  *Epic v. Google*, Jury Verdict (Dkt. 606).  The Court overseeing that trial has now stated its intent to issue remedies that would finally open up the Android App Distribution Market (as defined below), including by enjoining Google from imposing various frictions on third-party distributors that, for years, have made it impossible for any competing store to make inroads into the Android App Distribution Market.

7.     In anticipation of these remedies, Epic launched the Epic Games Store on Android on August 16, 2024.  Other third parties, such as Microsoft, also announced their intent to launch app stores on Android.

8.     On information and belief, when faced with the threat of these remedies and the impending entry of meaningful competition from Epic, Microsoft and others, Google called on its long-time collaborator Samsung to defang these competitive threats and renew the moat protecting the Play Store from competition.  While remedy proceedings against Google were ongoing, Samsung announced that it would be introducing "Auto Blocker" as a new default setting on all new Samsung phones.  Auto Blocker, as its name suggests, blocks all user attempts to download and install Android apps from any source that competes with the Play Store (and the Galaxy Store).

9.      The intended effect of Auto Blocker is clear: it would undo the remedies the Court imposes on Google and doom any attempt to open for competition the market for Android App Distribution.  Indeed, given that Samsung sells more Android smartphones than any other smartphone manufacturer (known as original equipment manufacturers, or "OEMs"), and that Samsung devices are the source of over half of the total revenue Google collects by taxing in-app sales made within Android apps, Auto Blocker is virtually guaranteed to entrench Google's dominance over Android App Distribution, preventing third-party app stores, such as the Epic Games Store, from reaching any sizable audience on Android.

10.      Epic brings this case with the sole purpose of preventing Defendants' anticompetitive actions from undoing Epic's successful antitrust litigation against Google and negating the long overdue promise of competition in the Android App Distribution Market.

## PARTIES

11.      Plaintiff Epic Games, Inc. is a Maryland corporation with its principal place of business in Cary, North Carolina.  Epic developed and operates *Fortnite*, one of the world's largest games, as well as a variety of other games such as *Rocket League* and *Fall Guys*.  Epic also operates the Epic Games Store, which launched on PC and Mac computers in 2018 and on Android devices worldwide on August 16, 2024.  Epic has over 800 million user accounts and over six billion friend connections across *Fortnite*, *Fall Guys*, *Rocket League* and the Epic Games Store.  Epic also creates and distributes the *Unreal Engine*, a powerful software suite that allows the creation of realistic computerized three-dimensional content for use in multiple applications, including video games, architectural modeling, simulators, television shows and movies.

12.      Defendant Samsung Electronics Co., Ltd., is a limited liability company organized under the laws of the Republic of Korea (South Korea), with its principal place of business in Suwon, Gyeonggi, Republic of Korea.

13.      Defendant Samsung Electronics America, Inc., is a New York corporation with its principal place of business in Ridgefield Park, New Jersey.  Samsung Electronics Co., Ltd. owns 100% of Samsung Electronics America, Inc.

14.     Defendant Samsung Electronics Co., Ltd., together with its subsidiary, Samsung Electronics America, Inc. (collectively, "Samsung"), designs, manufactures, markets and sells Samsung Galaxy devices worldwide (including in the U.S. and this District).  It also operates the Samsung Galaxy Store (which is pre-installed on every Samsung smartphone sold worldwide, including in the U.S. and in this District).

15.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.  Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. ("Alphabet").  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC operates the Play Store and is one of the Google entities that enters into agreements and contracts with Samsung.

**JURISDICTION AND VENUE**

16.     This Court has subject-matter jurisdiction over Epic's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Epic's state law claims pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenships of Plaintiff, on the one hand, and of Defendants, on the other, and the amount in controversy exceeding $75,000.

17.     This Court has personal jurisdiction over the Defendants.

a.      Google LLC is headquartered in this District.

b.      Through its subsidiaries, Samsung Electronics Co., Ltd., sells phones containing the relevant Auto Blocker feature in this District and its wholly owned subsidiary Samsung Research America, Inc. is a California corporation headquartered in this District.  Both Samsung Electronics Co. Ltd. and Samsung Electronic America, Inc. have been found to "conduct systematic and continuous local activities in this district" and are therefore "found here".  *In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1036 (N.D. Cal. 2016).

c.      Samsung Electronics America, Inc., has been registered and is authorized to do business in California.  Samsung Electronics America, Inc., sells phones containing the relevant Auto

Blocker feature in this District.

18. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC maintains its principal places of business in the State of California and in this District and because a substantial part of the events or omissions giving rise to Epic's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue.

20. Personal jurisdiction and venue are also proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because each Defendant "acted within any district of the United States or sufficiently caused foreseeable consequences in this country". *See Action Embroidery Corp v. Atl. Embroidery, Inc*., 368 F.3d 1174, 1179-80 (9th Cir. 2004).

## INTRADISTRICT ASSIGNMENT

21. Pursuant to Civil Local Rule 3-2(c) and General Order No. 44, this antitrust case shall not be assigned to a particular Division of this District, but shall be assigned on a District-wide basis.

## FACTS

### I. Industry Background.

22. Smartphones are handheld, portable electronic devices that can connect wirelessly to the internet and are capable of multipurpose computing functions, including, among other things, Internet browsing, using social media, streaming video, listening to music or playing games. Today, many consumers use their smartphone as their primary or only computing device.

23. Smartphones are sold as a bundle of hardware and software. Both hardware and software are critical components of any smartphone, as the software facilitates access by the user to the hardware and its various capabilities.

24. Like laptop and desktop personal computers, smartphones require an operating system, or "OS". A smartphone OS, just like the OS of any computer, is a piece of software that provides basic

functionality to users of smartphones such as button controls, touch commands, motion commands, and the basic "graphical user interface", which includes "icons" and other visual elements representing actions that the user can take. A smartphone OS also manages the basic operations of a smartphone, such as cellular or WiFi connectivity, GPS positioning, camera and video recording, speech recognition and other features. In addition, a smartphone OS facilitates the installation and operation of smartphone applications ("apps") that are compatible with the particular OS and intermediates their use of the device's hardware.

25.     Smartphone apps are software products that allow consumers to access capabilities that are not provided by the OS or the device hardware alone. Apps may be developed by the OEM, by the OS provider or by third parties. Apps are integral to the user experience and contribute to the overall value and attractiveness of smartphones to consumers. Consumers all over the world use smartphones and smartphone apps to video chat with friends, pay bills, stay current with the news, listen to music, watch videos, play games and more.

**II.     Google Dominates the Market for Third-Party Smartphone Operating Systems.**

    **A.     <u>Product Market Definition.</u>**

26.     To ensure that every user can access the basic functions of a smartphone "out of the box"—that is, at the time he/she purchases the device—an OEM must pre-install an OS on each device prior to its sale. This is similar to a personal computer that comes pre-installed with Microsoft Windows for a PC or Apple's macOS for a Mac computer. OEMs design smartphones to ensure the device's compatibility with a particular OS that the OEM chooses for a particular model of smartphone, so that the device may utilize the capabilities of that OS. For OEMs, the process of implementing a smartphone OS requires significant time and investment, making switching to another smartphone OS difficult, expensive and time-consuming.

27.     With the exception of Apple and Google (for its first party Pixel smartphones), no OEM develops its own smartphone OS; instead, OEMs license a third-party OS for installation on smartphones they design. There is therefore a relevant market comprised of smartphone OSs that OEMs can license for installation on the smartphones they manufacture (the "Third-Party Smartphone Operating Systems Market"). The market does not include proprietary OSs that are not available for licensing, such as

Apple's smartphone OS, called iOS. Historically, the Third-Party Smartphone Operating Systems Market has at times included the Android OS, developed by Google; the Tizen smartphone OS, a partially open-source smartphone OS developed by the Linux Foundation and Samsung; and the Windows Phone OS developed by Microsoft. Today, Android is the only OS installed on commercially available smartphones outside of China that use a third-party OS.

28.     Some consumers continue to use cellular phones that do not have multi-purpose, computing functions. These simple phones resemble older "flip phones", for example; they are not part of the smartphone category. These phones do not support smartphone apps such as *Fortnite* or *Rocket League* and are instead typically limited to basic cellular functionality like voice calls and texting. And just as these phones are not reasonable substitutes for smartphones, the simple OSs on these phones, to the extent they are offered for licensing to OEMs, do not support the wide array of features that can be supported by the hardware of smartphones. As a result, such OSs are not part of the Third-Party Smartphone Operating Systems Market.

29.     Electronic devices that are not handheld and portable, that are not capable of multipurpose computing functions and/or that lack cellular connectivity—such as desktop computers, laptops or gaming consoles—are not reasonable substitutes for smartphones, and the OSs that run on electronic devices other than smartphones are not compatible with smartphones and as such are not included in the Third-Party Smartphone Operating Systems Market. Gaming devices like Sony's PlayStation and Microsoft's Xbox are physically difficult to transport, require a stable Wi-Fi or wired connection to operate smoothly, require an external screen for the user to engage in game play, and generally do not provide general computing capability allowing the user to run apps that facilitate non-game activities such as banking, payments, messaging, navigation, email, reading and processing of documents, and more. As such, developers of non-game apps typically do not develop apps for gaming devices and game developers often distribute different versions of their apps for gaming devices and for smartphones.

**B.     Geographic Market Definition.**

30.     OEMs, like Samsung, license smartphone OSs for installation on smartphones worldwide, excluding China. Google's operations in China are limited, and it does not make available many of its products for smartphones sold within China. This is based in part on legal and regulatory

barriers to the distribution of smartphone OS-related software imposed by China. Further, while Google contractually requires OEMs licensing Android outside of China not to sell any devices with competing Android-compatible smartphone OSs, it imposes no such restriction on devices sold within China. Because the OEMs that sell Android smartphones both within and outside China have committed to this contractual restriction, such OEMs must sell, outside of China, devices with Google's Android OS. The geographic scope of the relevant Market for Third-Party Smartphone OSs is therefore worldwide, excluding China.

31.     Moreover, while conditions in Third-Party Smartphone OSs may vary slightly by region, Defendants' anticompetitive conduct spans all regions, except China. Therefore, maintaining a worldwide geographic scope, excluding China, is appropriate for analyzing Defendants' anticompetitive conduct.

**C.     Google Has Monopoly Power in the Market for Third-Party Smartphone Operating Systems.**

32.     Google has monopoly power in the Third-Party Smartphone Operating Systems Market through its Android OS. The Android OS as licensed to OEMs by Google is installed on nearly 100% of all smartphones sold by OEMs utilizing a third-party smartphone OS. Android OS is installed on nearly 75% of all smartphones sold by all OEMs, including even those OEMs that use a proprietary smartphone OS they developed exclusively for their own use (such as Apple's iOS). Nearly 100% of all new smartphones with third-party OSs sold worldwide, excluding China, use Android OS.

33.     A smartphone ecosystem typically develops around a smartphone OS, such as Android OS. The "Android ecosystem" is a system of mobile products (such as devices, apps and accessories) designed to be inter-dependent and compatible with each other and the Android OS. Ecosystem participants include an array of participating stakeholders, such as Google, OEMs that make Android-compatible devices, developers of Android-compatible apps, Android App Distribution platforms, including app stores, and others.

34.     Smartphone ecosystems benefit from substantial indirect network effects, which means that the value consumers obtain from using a smartphone depends on (and increases with) the number of available apps that are compatible with the smartphone's OS, while the value an app developer obtains

from developing an app for a particular OS depends on (and increases with) the number of consumers with smartphones that run that particular smartphone OS. Courts have recognized and economic literature substantiates that these indirect network effects mean that new entrants to an OS market will face significant barriers to entry, sometimes referred to as an applications barrier to entry (*see United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000)) or the "chicken and egg problem". Specifically, consumers will only desire a device running a new operating system once a broad variety of apps become available for that OS, but software developers will only develop apps to run on the new OS once the OS has managed to attract a large base of consumers.

**III.    The Android App Distribution Market.**

35.     Smartphone apps make smartphones more useful and valuable because they add functionality to the smartphone that caters to the specific interests of each smartphone user. For example, they facilitate video chats with friends and family, banking online, shopping, job hunting, photo editing, reading digital news sources, editing documents or playing a game like *Fortnite*.

36.     OEMs cannot anticipate all the various apps a specific consumer may desire to use. Moreover, many consumers have different preferences as to which apps they want, and it would be undesirable for OEMs to load the devices they sell with unwanted apps that take up valuable space on the smartphone. And many apps that consumers may ultimately use on their device will be developed after they buy the device. Accordingly, consumers who seek to add new functions and use cases to a smartphone to customize the device for their own use need to obtain and install smartphone apps themselves after purchasing their device.

37.     On Android smartphones, app developers can distribute their apps to consumers: (1) through app stores; (2) by partnering with OEMs or cellular carriers (such as Verizon or T-Mobile) to pre-install their apps onto smartphones distributed by the specific OEM or carrier; and (3) by allowing consumers to download their apps directly from a website, a method known as "direct downloading" (or, pejoratively, as "sideloading").[1]

---

[1] The term "sideloading" is intended to suggest (incorrectly) that direct downloading is somehow inferior (*i.e.*, inherently less safe and secure) than downloading apps from the Play Store (or another pre-installed app store).

38.     App stores organize and catalog apps and facilitate the discovery of those apps by consumers.  Smartphone users have grown used to obtaining their apps from app stores, and app stores are therefore by far the most popular way for developers to distribute their smartphone apps. Specifically, on Android smartphones, as a result of Google's years-long anticompetitive conduct (which a jury in this District has already determined to be illegal), the Play Store currently enjoys a monopoly position in the distribution of Android apps, accounting for more than 80% of all Android app downloads globally (excluding China) and over 95% of all Android app downloads in the United States.

39.     Pre-installation, also referred to as pre-loading, is the process by which OEMs and carriers have certain apps installed on a consumer's device before or at the time the consumer first takes delivery of a new device.  All OEMs using Android are required by Google to preload the Play Store on the home screen of every Android device they sell.  Some OEMs also pre-install their own app stores on their devices.  For example, Samsung pre-installs the Galaxy Store on virtually all Samsung devices.

40.     Direct downloading refers to the process by which a consumer can use a browser to download an app from a website, such as www.epicgames.com.  Although the process of direct downloading of apps from a website is perfectly common and easy to execute on PC and Mac computers, Google has made the process both cumbersome and scary for users of Android smartphones. Specifically, Google defines every app downloaded from the web as coming from an "Unknown Source" and requires users to click through a series of scare screens and implement changes to their device's settings before they can complete a typical installation of an app from any such "Unknown Source".  For example, in 2018, when Epic made *Fortnite* available for direct downloading on Android, the process required the user to go through 17 different steps, a user experience Google executives gleefully described in internal emails as "abysmal".  Google's Unknown Sources install flow greatly decreases the likelihood that any consumer will complete a direct download from any website, including the direct download of any app store that was not pre-installed on the device.

A.      **Product Market Definition.**

41.     There is a relevant market for the distribution of apps compatible with the Android OS to users of smartphones (the "Android App Distribution Market").  This Market includes all the channels by which smartphone apps may be distributed to the hundreds of millions of users of smartphones

running the Android OS.  The Market primarily includes Google's dominant Play Store, as well as much smaller stores such as the newly released Epic Games Store, the Amazon Appstore, Aptoide and Samsung's Galaxy Store.  The direct downloading of apps without using an app store is also within this market.

42.     OEMs find it commercially unreasonable to ship a smartphone to a consumer without at least one app store pre-installed, as a consumer's ability to obtain new smartphone apps is a critical part of the value provided by smartphones.

43.     Apps are OS-specific, and as a result app stores selling mobile apps are generally OS-specific, meaning they distribute only apps that are compatible with the specific smartphone OS on which the app store is installed.  A consumer who has a smartphone running the Android OS cannot use apps created for a different smartphone operating system.  An owner of an Android OS device will therefore use an Android-compatible app store, and such app stores distribute only Android-compatible smartphone apps.  Consumers may not substitute an Android app store with, for example, Apple's App Store, as that app store is not available to be installed on an Android smartphone and does not offer apps that are compatible with the Android OS.  Non-Android smartphone app distribution platforms—such as the Apple App Store—are therefore not part of the Android App Distribution Market defined herein.

44.     Likewise, stores distributing personal computer or gaming console software are not compatible with the Android OS and do not offer Android compatible apps: the Microsoft Windows store distributes software compatible with the Windows OS, for example, whereas the Microsoft Store for Xbox distributes software compatible with the Xbox game consoles.  A user cannot download smartphone apps for use on his/her Android device by using such non-Android, non-smartphone software distribution platforms.  They therefore are not part of the Android App Distribution Market.

45.     The same is true even when an app like *Fortnite* is available for different types of platforms running different operating systems, because only the OS-compatible version of that software can run on a specific type of device or computer.  Thus, the *Fortnite* Android app cannot run on any gaming console, a PC, or an iPhone, and vice versa.  Accordingly, as a commercial reality, an app developer who wishes to reach the billions of Android users must develop and distribute an Android-specific version of the app and avail itself of the Android App Distribution Market.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      Geographic Market.**

46.      The geographic scope of the Android App Distribution Market is worldwide, excluding China.  Outside of China, app distribution channels, including app stores, are developed and distributed on a global or regional basis; OEMs, in turn, make app stores, such as the Play Store, available on Android devices on a worldwide basis (except in China).  China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Play Store, within China.  Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

47.      Moreover, while conditions in Android App Distribution may vary slightly by region, Defendants' anticompetitive conduct spans all regions, except China.  Therefore, maintaining a worldwide geographic scope, excluding China, is appropriate for analyzing Defendants' anticompetitive conduct.

**C.      Google Has Monopoly Power in the Android App Distribution Market.**

48.      Google has monopoly power in the Android App Distribution Market.

49.      Google's monopoly power can be demonstrated by, among other things, Google's massive market share in terms of apps downloaded.  As of December 2020, more than 80% of Android app downloads globally (excluding China) have been completed through the Play Store.  In the U.S., that figure was over 95%.  A 2017 internal Google report confirmed that "[the Google] Play Store dominates in all countries", including the United States.

50.      Other existing Android smartphone app stores do not discipline Google's exercise of monopoly power in the Android App Distribution Market.  Google uses its dominance in the Third-Party Smartphone Operating System Market, through agreements with OEMs, to ensure that the Play Store is pre-installed by OEMs on all Android smartphones sold outside of China.  No other Android app store is pre-installed on anywhere near the number of devices on which the Play Store is pre-installed.

51.      Google has also used its monopoly power to prevent OEMs—the primary entities capable of pre-installing app stores on their devices—from pre-installing their own or third-party app stores.  Specifically, Google entered into RSAs with most major OEMs where it paid each OEM a portion of Play Store revenue in exchange for store exclusivity on the OEM's smartphones.  As a result, with the

12

**COMPLAINT**

exception of the Samsung Galaxy Store, no Android app store is pre-installed on more than 10% of Android devices or accounts for more than 1% of Android app downloads.

52.     Defendant Samsung is the owner of the only non-Google Android app store with significant scale; it is pre-installed on roughly 40% of Android smartphones.  But as further explained below, Samsung has repeatedly entered into agreements and understandings with Google not to meaningfully compete against the Play Store.  As a result, the Samsung Galaxy Store only accounts for about 1% of Android app downloads.

53.     Because of Google's success in maintaining its monopoly in Android App Distribution, there is currently no viable substitute for distributing Android apps through the Play Store.  As a result, the Play Store offers over three million apps—far more than any other app store.  The Play Store thereby benefits from extensive network effects based on the large number of participating app developers and users; the large number of apps on the Play Store attracts a large number of users who value access to a broad range of apps, and the large number of users attracts app developers who wish to access more Android users.

54.     Google acknowledged the power of these network effects in a 2017 presentation discussing competition from the Amazon Appstore in Japan, where the Amazon Appstore accounted for only about 2% of downloads.  Google listed as "Good News" the fact that "Amazon is yet to establish critical mass", contrasting it with the Play Store, which "[b]enefits from network effects".  *Epic v. Google*, Trial Exhibit 682 at 2, 14 (Dkt. 622-50).  Google also noted that "Amazon will struggle to break those network effects" and as a result "[u]sers won't go to Amazon because their catalog of apps/games is very limited" and "[d]evelopers won't focus on Amazon because they don't have users".  *Id.* at 14.  Google recognized, however, that "[o]nce they have their own critical mass of users and developers, they'll also benefit from network effects".  *Id.*  Google's anticompetitive practices, including the frictions it imposed on direct downloading (including direct downloading of third-party stores) and agreements with OEMs to preference the Play Store, ensured that threat never materialized.

55.     As further proof of its monopoly power, Google imposes a supracompetitive commission of 30% on in-app purchases of digital goods made in apps downloaded from the Play Store.  These rates

are far higher than the rates Google could charge if it faced meaningful competition, and allow Google to reap exceedingly high profit margins that are indicative of monopoly power.

**D.     A High Share of Android App Distribution Occurs on Samsung Smartphones.**

56.     Samsung has the largest share of any OEM of Android smartphones sales, comprising roughly 40% of Android devices worldwide.  In 2022, 1.57 billion Android devices were sold, and around three billion people use Android worldwide. Samsung's share of Android devices is more than twice the share of the OEM with the next highest share.

57.     Samsung has a particularly high share of premium Android devices and of Android devices in the U.S.  Samsung has a 71% share of premium Android devices (defined by Google as Android devices sold for over $600) and a 57% share of all Android smartphones in the U.S.

58.     Users of Samsung devices represent more than one half of Google's revenue from Google Play.

59.     Access to Samsung devices is therefore critical for any third-party app store or developer who wishes to participate in the Android App Distribution Market.  Because of its high share, Samsung exercises significant influence over the distribution methods available on Android.  If Samsung prevents a third-party store or developer from accessing its phones, they will be foreclosed from over half of the revenue available from app distribution on Android, and from roughly 40% of all Android devices.

**E.     Google Has Unlawfully Monopolized and Maintained a Monopoly in the Market for Android App Distribution.**

60.     On August 13, 2020, Epic filed a complaint against Google in this District alleging that Google violated Sections 1 and 2 of the Sherman Act and the California antitrust and unfair competition laws.  Following a 15-day trial, a jury found that Google willfully and unlawfully maintained its monopoly in the Android App Distribution Market through a series of anti-competitive acts that have substantially foreclosed competing ways of distributing apps to Android users.  Epic proved that Google engaged in two types of illegal conduct particularly relevant here:  (1) Google imposed frictions on apps installed through direct downloading and third-party stores and (2) Google repeatedly agreed with Samsung not to compete in the Android App Distribution Market and to prevent third-parties from competing with the Play Store.

      **i.**    **Google's Restrictions and Frictions Applied to Direct Downloading and Third-Party App Stores.**

61.    Epic proved at trial that Google monopolized the Android App Distribution Market by (among other things) imposing a series of anticompetitive frictions on app distribution via direct downloading or third-party app stores.

62.    Google designed Android to allow users to download and install apps from the Play Store and pre-installed app stores, such as the Samsung Galaxy Store, seamlessly, with a single click of a button; no warnings are presented, and the user need not leave the store or change any settings on their device.

63.    By contrast, direct downloads from any website or from any store that is not pre-installed are subject to the Unknown Sources install flow described above.

64.    As noted above, for well over a decade, Google has ensured that the Unknown Sources install flow is technically complex, confusing and threatening, requiring users to contend with dire warnings and a lengthy process.  While the flow has changed over time, the following is an illustrative process:

    a.    A user must first navigate to a developer's website to download the app.

    b.    Upon downloading the app, the user will receive a warning about the app file type being an executable file.

    c.    The user will then be asked to open the downloaded file.

    d.    The user will then be asked if they want to install the app.

    e.    If the user clicks the install option, a pop up will appear stating that the device is not allowed to install "unknown apps".

    f.    The user must then navigate to the device's settings and allow installation of unknown apps.

    g.    Finally, the user will need to confirm the installation, and only then will the third-party app be installed.

65.    Google understands this process would deter most users from completing the installation, and Google employees have acknowledged internally that the difficulty Google imposes on consumers

who wish to directly download apps leads to a "[p]oor user experience", in that there are "15+ steps to get [the] app [via direct download] vs 2 steps with Play or on iOS".

66.     Google also imposes the Unknown Sources install flow the first time a user wishes to download an app through a third-party store, even after the user manages to successfully download the store itself from the web.  For example, a user who downloads the Epic Games Store onto their phone will have to again allow installation from unknown sources (through the Epic Games Store) before proceeding to install anything from the store.

67.     In order to ensure the anticompetitive effects of the Unknown Sources install flow, Google imposes anti-competitive constraints on Android OEMs through a web of ties and anticompetitive agreements.  Specifically, Google conditions OEMs' licensing of the Android trademark and a host of essential Google apps and services on OEMs' agreements to enter into a Mobile Application Distribution Agreement ("MADA"), which requires—among other things—that the Play Store be on the default home screen  on any Android smartphone the OEMs design.  Google then conditions continued access to the Android trademark and the Google essential services and apps on the OEMs' committing to have their devices meet certain compatibility criteria, which prohibit the OEMs from modifying the Unknown Sources install flow or otherwise providing frictionless processes for distributing apps outside Google Play.

68.     Based in part on the above, the jury found that Google unlawfully monopolized the Android App Distribution Market, and the District Court is considering appropriate injunctive relief to prevent and rectify Google's conduct in this respect.

### ii.     <u>Google Repeatedly Entered into Anticompetitive Understandings with Samsung.</u>

69.     Google and Samsung have long operated as partners, rather than competitors.  According to Hiroshi Lockheimer, Senior Vice President of Platforms and Ecosystems at Google, Samsung is Google's biggest partner in Android.  *Epic v. Google*, Trial Tr. 1459:24-1460:3 (Lockheimer) (Dkt. 582). Jamie Rosenberg, former Vice President of Strategy and Operations for Platform and Ecosystems at Google, described Google and Samsung's relationship "like a relationship between close family members", and testified that the two are "very close collaborators".  *United States v. Google LLC*, Case

No. 20-cv-3010 (D.C.C.), Trial Tr. ("Search Trial Tr.") 9466:2-13 (Rosenberg) (Dkt. 1001).  This cozy relationship meant that Samsung often tried to appease Google, even at the expense of its dealings with other firms.  For example, Jon Tinter of Microsoft testified that in Microsoft's negotiations with Samsung, there is a "massive overhang" of "Samsung's concern about we don't want to make Google mad, we are highly dependent on them for product collaboration on Android, we need them to do these things for us over here, this over there."  Search Trial Tr. 3238:9-17 (Tinter) (Dkt. 951).

70.     At trial, Epic showed that for years Google has reached understandings with Samsung whereby Samsung does not vigorously compete with Google in the Android App Distribution Market.

71.     Google has long sought to ensure the Samsung Galaxy Store does not compete with the Play Store.  In 2011, Google tried to convince Samsung to operate what it referred to as a "hybrid model" where the Samsung Galaxy Store simply linked to the Android Market (the predecessor to the Play Store).  In internal emails from the time, Eric Chu, head of the Android developer ecosystem at Google, explained that he had been "having discussions with Samsung to get them to stop distributing apps through Samsung App store" and that "if we can get Samsung to completely move to a model where Samsung App store is just merchandising and they deep link to Android Market, that's a big win for us".  *Epic v. Google*, Trial Exhibit 312 at 1-2 (Dkt. 622-23).

72.     In 2015, Google again proposed to Samsung that the Samsung Galaxy Store would become a store within the Play Store.

73.     In communications between the two companies from the same period, Google and Samsung repeatedly expressed their mutual desire to avoid competition between the two companies.  For example, in a 2014 discussion between executives of the two companies, Samsung assured Google that "[w]e definitely *don't want to compete* with Play Store".  *Epic v. Google*, Trial Exhibit 1380 at 1 (Dkt. 622-87) (emphasis added).  In the same year, when Samsung told Google it was intending to introduce a new search feature, Google proposed telling Samsung that it was developing a similar feature and that Samsung launching a similar feature would be "counter to the desire between the parties *to reduce competing services*".  *Epic v. Google*, Trial Exhibit 1378 at 1 (Dkt. 622-86) (emphasis added).

74.     In the summer of 2018, in a rare show of competitive zeal, Samsung agreed to distribute *Fortnite* on the Galaxy Store, even though Epic was not offering the game on the Play Store.  Google

immediately moved to crush that modest attempt at competition, and Samsung willingly relented. Indeed, within hours of learning that the Galaxy Store would host the *Fortnite* launcher, Jamie Rosenberg sent urgent messages to his Samsung contacts to voice his concern that Samsung would allow *Fortnite* to be distributed outside the Play Store without the attendant, Google-manufactured Unknown Sources frictions. *Epic v. Google*, Trial Exhibit 8564 (Dkt. 624-42). Samsung's representative apologetically responded that this "was done by the service team without my knowledge" and that he would immediately "look[ ] into it". *Epic v. Google*, Trial Exhibit 8568 (Dkt. 624-44). Rosenberg then made sure that "Samsung knew that Google was not happy with what they did with Epic" and obtained "assurances from Samsung that exclusive game launches would not be a part of their core strategy going forward". *Epic v. Google*, Trial Tr. 1233:24-1234:15 (Rosenberg) (Dkt. 581).

75.     In 2019, fresh off the *Fortnite* launch on the Galaxy Store, Google initiated Project Banyan. At the time, Google recognized that "Samsung is the only OEM with sufficient share to plausibly build its own store in key Play markets". *Epic v. Google*, Trial Exhibit 8523 (Dkt. 624-37). An explicit goal of Project Banyan was therefore "to have a single voice to the ecosystem, and so that the [Google and Samsung] teams were not out competing with each other". *Epic v. Google*, Trial Exhibit 783 (Dkt. 622-58). In Samsung's words, Google was "basically asking [Samsung] to get out of the store business". *Id.*

76.     Samsung was receptive to Google's non-compete proposals and in June of 2019 sent Google a term sheet with a counter-offer. In the term sheet counter-offer, Samsung stated that the goal of the deal was to "[p]revent unnecessary competition" between the Galaxy store and with Google Play, and to "[s]top distributing 3rd Party app/game installer via Galaxy Store". *Epic v. Google*, Trial Exhibit 652 (Dkt. 622-49). Ultimately, no written agreement was signed.

77.     In internal discussions of Project Banyan, Sameer Samat, head of Android and the Play Store at Google, noted that "[a]ssuming we did not do a deal with Samsung for their store, we should think about how to compete". *Epic v. Google*, Trial Exhibit 787 (Dkt. 622-60). Jamie Rosenberg responded:

> [t]he one risk I continue to worry about is the scenario in which Samsung comes
> out with a very public and disruptive rev[enue] share model (*i.e.*, it just decides that

it will only take 5% and use its app store for purposes of building [forms of payments] and user profiles and differentiating devices). […] [i]f Samsung wins the hearts and minds of developers on this, it could create enormous pressure on us to unblock their opportunity one way or the other. *Id.* at 5.

Rosenberg wanted to ward off that hypothetical threat, recognizing that an agreement with Samsung would only make sense if Google and Samsung could "achieve structural alignment on business model". *Id.* at 1-2. In other words, Google wanted to "secure confidence that [Samsung] won't drive down [its revenue share to] 5 [percent]". *Id.* at 2. However, Google understood that what it could explicitly put in an agreement to "secure confidence" that Samsung would not compete "subject to lots of legal advice on what 'securing confidence' can mean". *Id.* at 1-2.

78.     While Google and Samsung did not eventually execute a written agreement terminating all competition between their respective app stores, in 2020, Google and Samsung did sign an RSA promising Samsung billions of dollars from Google Search revenues flowing from Samsung devices. During those negotiations, Google proposed to Samsung that they "more and more [to] . . . start *acting as one unit* to the market". Search Trial Tr. 844:5-8 (Kolotouros) (Dkt. 919) (emphasis added). And following that 2020 RSA deal, Samsung indeed has not competed with the Play Store: Samsung has not entered into any exclusive deals with any major game developers to launch titles on the Galaxy Store; Samsung continues to have an extremely small share of app downloads, despite the Galaxy Store being pre-installed on close to 40% of phones; Samsung continues to charge developers the same 30% revenue share that Google charges, and has never lowered that headline rate, as Rosenberg feared it might do. In short, Samsung has done nothing to compete with Play in the market for Android App Distribution, instead ceding to Google its monopoly position in exchange for a cut of Google's monopoly rents.

79.     Jamie Rosenberg testified that if there were a handshake agreement between Google and Samsung to reduce competition between their two stores as a part of the 2020 RSA, "we wouldn't see it in the documents". *Epic v. Google*, Trial Tr. 1250:22 (Rosenberg) (Dkt. 561). And Google has in fact entered into unwritten agreements with third parties to avoid leaving a paper trail. For example, during the Banyan negotiations, Google discussed using a Google Play revenue share to fund the payments to Samsung but said "we might prefer to hide it in some way". *Epic v. Google* Trial Exhibit 588 (Dkt. 622-

38).  As another example, Google came to an agreement with *The Wall Street Journal* to redesign their app to integrate Google's in-app payment solution, Google Play Billing ("GPB"), in exchange for favorable terms from Google.  When a Google employee asked Rosenberg to sign the agreement, he resisted, noting that Google "shouldn't be putting stuff like this in writing" because "there are at least three things in here that I would definitely not want to be public".  *Epic v. Google*, Trial Tr. 1189:15-1192:4 (Rosenberg) (Dkt. 561); *Epic v. Google*, Trial Exhibit 801 at 2 (Dkt. 622-63).  Following this admonition by Mr. Rosenberg, *The Wall Street Journal* did adopt Google Play Billing but no written agreement showing the *quid pro quo* the parties had agreed to was ever signed.

### iii.   Google Is Aware It Will Imminently Be Forced To Change or Eliminate Its Anticompetitive Unknown Sources Install Flow.

80.     As noted above, Google's Unknown Sources install flow was a key part of the moat Google constructed to protect the Play Store against competition.  But legal developments beginning in 2023 have made it clear to Google that it would have to greatly reduce or outright eliminate the anticompetitive frictions imposed by the Unknown Sources install flow.

81.     On October 12, 2023, Google entered into a proposed settlement with a coalition of 53 attorneys general and consumer plaintiffs (the "State Settlement") that partially constrains the frictions Google previously imposed through the Unknown Sources install flow.  Under the State Settlement, Google committed that for a period of five years, it would revise and reduce the warnings that appear on an Android device if a user attempts to download a third-party app from outside the Play Store.  Specifically, Google committed to combine two of its then-current scare screens into a single warning and agreed to specific changes to the text of that warning to make the language more neutral.  The State Settlement is pending approval.

82.     On December 11, 2023, in *Epic v. Google*, a jury in this District found Google to have illegally monopolized the Android App Distribution Market.  On April 11, 2024, Epic filed with the Court a proposed injunction that would, among other things, prevent Google from imposing the frictions associated with the Unknown Sources install flow and instead require parity between downloading from Play and downloading for third-party app stores.  A final injunction from the Court is expected to be issued this fall.

**F.**     **Epic and Others Intend To Disrupt Google's Monopoly.**

83.     Epic has long operated the Epic Games Store on PC.  The Epic Games Store offers a variety of games, as well as certain non-game apps, from Epic and third-party developers.

84.     Epic has offered on its store several terms that are far more competitive than the terms offered on most mobile stores, including the Play Store.

85.     Google requires all apps distributed on its store to pay a fee to Google, in perpetuity, on all in-app sales of digital goods such as game features, game currency, subscriptions and more.  Google's fees historically have been 30%.  Following the filing of Epic's lawsuit, Google reduced its fee to 15% on subscriptions and on the first $1 million of annual revenues collected by a developer across all their apps.  Google collects these fees by illegally tying the use of the Play Store to distribute an app to the app's use of GPB for all in-app transactions involving the sale of digital goods.  By requiring developers to use GPB for their in-app digital transactions, Google is able to process all such transactions, collect its fee first, and then remit to the developer the developer's share of the in-app sale's proceeds.

86.     Unlike Google, Epic allows developers who distribute their apps on the Epic Games Store to choose whether or not to use Epic's payment solution, Epic Direct Pay ("EDP"), to handle in-app transactions within their apps.  When a developer uses EDP to handle in-app transactions, the developer pays Epic a 12% fee; but when the developer uses another payment solution, the developer does not pay Epic any fee.

87.     In anticipation of the entry of an injunction against Google, Epic launched the Epic Games Store for Android on August 16, 2024.  Although the store currently carries only Epic's own games, the store will soon expand to offer third-party apps.  Once it does, like the Epic Games Store on PC, the Epic Games Store for Android will offer developers the same low 12% fees, as well as the freedom to incorporate into their apps the payment solutions that work best for them.  As on its PC store, Epic will charge developers a fee on in-app transactions only if the developer chooses to use EDP to handle those transactions.

88.     Epic represents a competitive threat to Google.  Epic has a hugely successful title (*Fortnite*) that attracts users to its store.  Epic intends to invest in exclusive distribution arrangements with developers of major games so as to quickly establish a large user base.  And Epic has a track record

of disrupting markets dominated by incumbents. For example, when Epic launched its PC store, the PC gaming space was dominated by Steam, a games store that accounted for over 90% of all third-party content sales. Today, the Epic Games Store for PC offers over 2,900 titles and has over 75 million monthly active users and 270 million PC customers. Customers spent over $950 million on the Epic Games Store in 2023. And Epic's entry into the distribution space has forced other stores to compete, to the benefit of developers and consumers alike. For example, in anticipation of Epic's launch of its PC store, Steam announced it would reduce its commission to large developers from 30% to 25% or 20%, depending on their volume of sales. And after the Epic Games Store launched on PC, other PC stores lowered their fees; for example, the Microsoft store lowered its fees first to 15% and then to 12%.

89.     Like Epic, other developers also welcomed the promise of the *Epic v. Google* case and have announced their intent to enter into the Android App Distribution Market. Most prominently, in March 2023, Microsoft announced that it intended to launch its own app store on Android devices in 2024. Microsoft presents a meaningful threat to Google as it is well funded, has a large number of users on its Xbox console and its Windows platform and, following its acquisition of Activision, has a catalog of highly popular games, such as *Call of Duty*, as well as its Office suite of apps.

## IV.     Google and Samsung Agreed that Samsung Would Implement Auto Blocker To Protect the Play Store's Illegal Monopoly.

### A.     The Auto Blocker Feature.

90.     On October 31, 2023, Samsung announced the release of a new feature known as Auto Blocker. The Auto Blocker feature, characterized by Samsung as an enhanced security option, was made available for users to opt into as part of the then-current version of Samsung's One UI. One UI is Samsung's proprietary user interface layer, which Samsung installs on top of Android on all Samsung phones.[2]

91.     On July 11, 2024, as the District Court presiding over *Epic v. Google* was considering the appropriate injunction against Google, Samsung reversed course on Auto Blocker being an opt-in feature and announced that beginning with the next version of One UI, version 6.1.1, "[t]he default setting for

---

[2]   *Protect Your Way with Samsung Auto Blocker*, SAMSUNG, (Oct. 31, 2023) https://news.samsung.com/us/protect-device-your-way-samsung-auto-blocker/.

Auto Blocker is set to On in the phone's initial setup wizard".[3]  As explained below, this means that despite the District Court's stated intent to open up the Android App Distribution Market to competition, Auto Blocker will entrench the Play Store as the *de facto* exclusive source of Android apps on all Samsung smartphones.

92.    When Auto Blocker is set to "on", it disables the installation of apps from any and all sources other than the Play Store and the Samsung Galaxy Store; these are the only sources Auto Blocker deems "authorized sources" for apps, to the exclusion of all other stores as well as direct downloading of apps from the web.  Samsung does not offer an avenue for third-party store operators, such as Epic, to qualify their stores as "authorized sources", irrespective of the safety and security of these third-party stores.  In fact, Samsung has not undertaken, and does not propose to undertake, any assessment of the safety and security of any third-party store to determine how it compares to the safety and security of the Play Store or the Samsung Galaxy Store.

93.    If a user does attempt to install an app from an "unauthorized" source, they are presented with a pop-up alert, and Auto Blocker prevents the user from continuing with the installation.



94.    This prompt is misleading in at least the following ways: *First*, the prompt states installation would be allowed from authorized sources "such as" the Play Store and the Galaxy Store,

---

[3]  *Protect Your Galaxy Device with the Auto Blocker Feature*, SAMSUNG, (July 11, 2024) https://www.samsung.com/latin_en/support/mobile-devices/protect-your-galaxy-device-with-the-new-auto-blocker-feature/.

suggesting these two stores are mere examples of authorized sources, when in fact these two stores are the only "authorized" sources; no other source is or can be recognized by Auto Blocker as authorized. *Second*, the pop-up alert invariably states that the relevant app is an "unknown app", even if the app is in fact well known to Samsung, Google, or both.  For example, Auto Blocker would block the installation of *Fortnite* from the Epic Games Store, even though *Fortnite* was available on the Galaxy Store for years and, moreover, is well known to both Samsung and Google.  The same would be true for any other app, no matter how reputable its developer might be: *Call of Duty*, Photoshop, Instagram, Kindle, Word, Spotify and Netflix—all would be deemed "unknown apps" by Auto Blocker should they be distributed directly or through any third-party store, even though the very same apps are not deemed unknown if distributed through the Play Store or the Galaxy Store.  To be clear, Auto Blocker conducts no testing to determine whether an app is reputable and/or known to Samsung, Google or both before declaring it an "unknown app".  Nor does Auto Blocker conduct any scan or other security assessment of the app before claiming the installation is blocked "to keep your phone and data safe".

95.     There is no way for a developer to prove to Samsung that its app is safe so as to avoid being blocked by Auto Blocker; Samsung does not offer any process by which a developer can submit an app for review before distributing it through the web or a third-party store.

96.     If a user wants to disable Auto Blocker, they must navigate through three different screens.  *First*, they must go into Settings.  *Second*, they must go into security and privacy.  *Third*, they must go into the Auto Blocker menu.  When the user is in the Auto Blocker menu, the settings present the user with a scare screen stating that Auto Blocker "keeps [their] phone safe by blocking threats and other suspicious activity" even though—as noted above—Auto Blocker conducts no assessment of the safety or security of any specific source or any specific app before blocking an installation.

97.     At the time Auto Blocker was first released in October 2023, Samsung acknowledged that sideloading could be beneficial and that the feature was therefore off by default.  Specifically, the press release announcing the introduction of Auto Blocker stated:  "[t]here are many benefits to intentional sideloading, such as enhanced customization and control over a device's functionality.  Those

who love to safely sideload will experience no change as the feature is off by default."[4]  But a month later, Google was deemed an illegal monopolist, and by July 2024, it became abundantly clear that Google itself would be enjoined from continuing to impede competing stores as it has done for decades.

98.     It is against this backdrop that Samsung announced, for the first time in its 15-year history as an Android OEM, that it would effectively block all app distribution other than through the Play Store and the uncompetitive Galaxy Store on all its phones.

99.     Samsung's stated plan is to roll out One UI 6.1.1, and then make Auto Blocker the default on all Samsung phones capable of running One UI 6.1 or higher.  To date, One UI 6.1.1 has been rolled out for at least the following Samsung devices:  Galaxy Z Fold 6, Galaxy Z Flip 6, Galaxy S24, Galaxy 24+, Galaxy S24 Ultra, Galaxy S23, Galaxy S23+, Galaxy S23 Ultra, Galaxy S23 FE, Galaxy S22, Galaxy S22+, Galaxy S22 Ultra, Galaxy Z Fold 5, Galaxy Z Flip 5, Galaxy Tab S9, Galaxy Tab S9+, Galaxy Tab S9 Ultra.

100.     Samsung provided no explanation for the sudden change reflected in its decision to make Auto Blocker on by default.  It provided no explanation why it now objects to direct downloading, which months ago it condoned as beneficial.  And it provided no explanation why now, for the first time ever, it intends to block all third-party stores—just as a federal court announced its intention to open the Android App Distribution Market to competition, and just as third parties such as Epic and Microsoft have announced the launch of new Android app stores.

**B.     Google and Samsung Have Agreed To Set Auto Blocker to On by Default.**

101.     On information and belief, the decision to turn Auto Blocker on by default was a coordinated decision by Google and Samsung to circumvent the injunction that the United States District Court for the Northern District of California will likely soon issue in *Epic v. Google*.

**i.     The Auto Blocker Feature Itself Shows It Is the Product of Coordinated Action Between Samsung and Google.**

102.     The design of Auto Blocker including the decision to implement it by default shows it is the product of coordinated action between Samsung and Google.

---

[4]  *Protect Your Device Your Way with Samsung Auto Blocker*, SAMSUNG, (Oct. 31, 2023) https://news.samsung.com/us/protect-device-your-way-samsung-auto-blocker/.

103.    As noted above, Auto Blocker allows the installation of apps only from the Play Store and the Samsung Galaxy Store—a store Samsung has never attempted to turn into a competitive force. Auto Blocker thus builds a moat around the incumbent monopolist, Play Store, ensuring its continued monopoly.

104.    While Samsung half-heartedly claims Auto Blocker is a security feature, its operation is to block *all* competing stores, regardless of how safe and secure they may be—and without any assessment of their safety or security or any path for other stores to achieve "authorization".  For example, Auto Blocker prevents installation of all apps from the Epic Games Store, even though the Epic Games Store currently facilitates the installation of *Fortnite*, *Rocket League Sideswipe* and *Fall Guys*, the first two of which were previously on the Samsung Galaxy Store and all of which are as safe or safer than many of the apps on the Play Store.  Moreover, Google and Samsung already implement a variety of features to ensure that consumers are protected from malicious apps.  Google Play Protect scans every app prior to its installation on an Android phone regardless of source.  Samsung also has an app scanner powered by McAfee that scans a user's phone for malware and suspicious activity.

105.    The Auto Blocker pop-up scare screen lists the Play Store as the first authorized source, before it lists the Galaxy Store, and for good reason; Auto Blocker protects, first and foremost, Google's illegal monopoly—not Samsung's Galaxy Store, which Samsung has never tried to make competitive.

106.    The Auto Blocker feature bears close resemblance to Google's anticompetitive Unknown Sources install flow.  Just like Google's Unknown Sources install flow, which has now been deemed illegal, Auto Blocker: (1) under the guise of a security feature, indiscriminately imposes friction on any method of distribution that competes with Google (or Samsung, had it decided to compete), regardless of any particularized security assessment; (2) presents a scary pop-up that warns the user of unsubstantiated (indeed, unassessed) security risks; (3) requires the user to go through multiple, convoluted steps and scare screens to allow installations from competing distribution channels, ensuring that most users never go through with such installations; and (4) does not include any method by which other stores may be deemed "authorized" or apps from other stores may be deemed "known".  Once enabled by default, Auto Blocker accomplishes the same goals as Google's illegal Unknown Sources

install flow, largely by the same means—except it is presented publicly as a Samsung-initiated feature, rather than a Google-initiated one.

### ii.    The Timing of the Auto Blocker Feature Reflects Collusion.

107.   The timing of the changes to the Auto Blocker feature makes clear the coordination between Google and Samsung.

108.   Samsung has been an Android OEM for roughly 15 years.  Throughout this time, Samsung has never imposed additional frictions—let alone outright blocked—direct downloading or third-party stores on any of its devices.

109.   Merely 10 months ago, prior to the jury pronouncing Google an illegal monopolist, Samsung set Auto Blocker to "off" by default, noting publicly that this was done to preserve the ability of users to engage in safe direct downloading.

110.   Samsung set Auto Blocker to "on" by default just as the District Court in *Epic v. Google* announced its intent to enjoin Google from continuing to illegally monopolize the Android App Distribution Market and regulations in Europe were likewise forcing Google to remove the illegal Unknown Sources frictions in the EU.

111.   Samsung announced it would set Auto Blocker to "on" by default just as Epic and Microsoft announced their intent to launch their own competing Android app stores to take advantage of the remedies that the District Court overseeing the *Epic v. Google* case would likely impose, as well as the changes in regulatory attitudes towards Google's monopolistic conduct.

### iii.    Samsung and Google Have a Long History of Cooperating to Reduce Competition for App Distribution.

112.   Google's and Samsung's coordinated efforts to entrench the Play Store monopoly and share in its spoils is nothing new.  As described in Section III.E. above, Google and Samsung have a long history of negotiating and entering into agreements to prevent competition in Android App Distribution.

iv.   **Samsung and Google Engage in a High Number of Atypical Interfirm Communications.**

113.   As described in Section III.E. above, Samsung and Google have engaged in a high number of atypical interfirm communications that go well beyond the "standard fare" of business and trade-association practice.  For example, Google employees have described the companies as "close family members" and "very close collaborators".  They discussed how they "definitely don't want to compete" and the "desire between the parties to reduce competing services".  *See* Section III.E.ii.  Google reached out to Samsung to discuss the level of friction to impose on downloads of *Fortnite* on the Samsung Galaxy Store.  These atypical communications are the perfect vehicle for an anticompetitive agreement.

v.   **Samsung's Conduct Is an Abrupt Departure from Prior Conduct.**

114.   Samsung's decision to implement Auto Blocker by default is an abrupt change from its prior position of 15 years to allow direct downloading on all Samsung devices.  It is also in direct contradiction to its statement in October 2023 that "[t]here are many benefits to intentional sideloading, such as enhanced customization and control over a device's functionality".  *See* Section IV.  That Samsung changed this longstanding policy with no explanation is further evidence of an agreement with Google.

vi.   **Samsung's Actions Are Inconsistent with Its Unilateral Economic Self Interest.**

115.   Samsung's decision to implement Auto Blocker by default would not have occurred without an agreement between Samsung and Google.

116.   As noted above, the direct beneficiary of Samsung's blocking of all alternative distribution channels is Google, not Samsung; Samsung's Galaxy Store is miniscule, and Samsung has never tried to make it into a viable competitor to the Play Store.  As a result, Auto Blocker simply builds a moat around the Play Store monopoly.

117.   Absent an agreement between Samsung and Google, it would be irrational for Samsung (or any company in its position) to entrench the Play Store monopoly.  To the contrary, absent an agreement, Samsung could be expected to try and benefit its own Galaxy Store at the expense of the Play

Store (particularly in light of the Court's impending remedies decision); to remain neutral on stores so as to provide its users a wide choice of competing stores; or to promote those third-party stores that were willing to pay for preferential placement and installation privileges on hundreds of millions of Samsung phones. Samsung has implemented none of these approaches, claiming only an entirely pretextual security justification for its sudden decision to block all competitive distribution channels other than Play. Samsung's conduct would be logical only as part of a quid pro quo between Samsung and Google, consistent with the two companies' long history of agreements not to compete in the Android App Distribution Market.

### vii. An Agreement Would Provide Google and Samsung with a Common Motive To Conspire.

118.    While it is against Samsung's unilateral economic interest to set Auto Blocker on by default, an agreement under which Samsung is compensated for allowing the Play Store to retain its dominance would provide both parties with the motive to "achieve structural alignment on business model". *Epic v. Google*, Trial Exhibit 787 at 1-2 (Dkt. 622-60). Google is motivated to receive monopoly profits on its store, and Samsung is motivated to maximize Google's profits, thereby maximizing the share of payments from Google.

### viii. Market Conditions and Samsung's Behavior Point to an Agreement.

119.    Samsung's decision not to compete with Google further underscores the presence of agreements between the parties. Rather than undercutting Google, as Google had feared when it was negotiating Project Banyan, Samsung has failed to compete with the Play Store on its headline rate, on exclusives, on catalog size or on any other metric.

### ix. There Is No Legitimate Business Purpose in Turning Auto Blocker On by Default.

120.    While Samsung claims that Auto Blocker was enacted for security reasons, this justification is pretextual. Auto Blocker lists only the Play Store and the Galaxy Store as authorized sources, but both stores are known to contain malware. Other well known and reputable stores such as the Amazon Appstore, Microsoft App Store and Epic Games Store are all blocked. If Samsung's

decision was based on security, Samsung would have provided an opportunity for other stores to prove their safety and become authorized.

**V.    Anticompetitive Effects in the Android App Distribution Market.**

121.    Samsung's decision to make Auto Blocker on by default on Samsung Galaxy devices is having and will continue to have anticompetitive effects in the Android App Distribution Market.

122.    Auto Blocker effectively prevents competing stores from being installed on phones that have it enabled.  Because of Samsung's large share of Android smartphones (40%)—and even larger share of app-related revenue (over 50% of Play Store revenues)—Auto Blocker forecloses competing app stores from a large portion of the relevant market, meaningfully limiting the ability of competing stores to achieve scale and gain network effects that would allow them to compete meaningfully with the Play Store.

123.    Ample economic literature concludes that consumers are unlikely to switch a default setting off, even setting aside scare tactics such as those used by Auto Blocker to deter users from making such a change.  Google's CEO, Sundar Pichai, testified that "the more steps you add to a user flow, users become less likely to complete that flow".  *Epic v. Google*, Trial Tr. 1360:19-22 (Dkt. 582).  In fact, even encountering a single warning message that requires a user to change a setting is likely to result in a large drop off in users completing an installation process.  For example, when examining the effects of the Unknown Sources install flow on its ability to distribute *Fortnite* through direct downloads, Epic observed that 35% of users abandoned the installation flow after encountering the first Unknown Sources warning.  Donn Morrill, director of developer relations, Amazon Entertainment Devices and Services, testified that only 11% of users completed the process of sideloading the Amazon Appstore in 2020. *Epic v. Google*, Deposition Designations at 110 (Morrill) (Dkt. 635-1).

124.    As a result, competitive alternative app stores such as the Epic Games Store will be prevented from getting traction on Samsung smartphones.  Android app developers, who need to distribute their apps to users of Samsung smartphones, will be forced to distribute their apps via the Play Store on Samsung phones, and likely would then default to distributing their apps through the Play Store also on all other devices.  Indeed, developers do not currently have the option to distribute their apps via the Play Store, but limit that distribution to Samsung devices only.  As such, the Auto Blocker feature

will serve to maintain and entrench Google's illegal monopoly over the Android App Distribution Market, depriving competing app stores and consumers alike of the fruits of competition promised by the *Epic v. Google* jury verdict and forthcoming injunctive relief.

**VI.    Through Auto Blocker, Samsung Knowingly Spreads False and Damaging Information to Users Regarding the Epic Games Store and Epic's Apps.**

125.    Samsung's Auto Blocker provides users with information about the Epic Games Store and Epic's other apps that Samsung knows is not true.

126.    If a user attempts to directly download the Epic Games Store or an Epic app when Auto Blocker is set to on, they are presented with a pop-up alert that tells them the app is "Unknown" and has been blocked to "[t]o keep your phone and data safe".  The Settings menu likewise tells users that "Auto Blocker helps keep you safe from security threats, suspicious activity, and privacy risks" by, among other things, "[b]lock[ing] apps from unauthorized sources".  A similar message is provided to users when initially setting up their smartphone.

127.    If a user attempts to download an app from the Epic Games Store when Auto Blocker is set to on, they receive nearly identical messages.

128.    These prompts are false and misleading because they state that the relevant app is an "unknown app", even if the app is well known to Samsung.  Moreover, they say that the app is blocked for security reasons without conducting any tests to determine whether it is safe.

129.    This is particularly true in the case of Epic, whose apps are both known to Samsung and known (including to Samsung) not to be harmful.  For example, Auto Blocker would block the installation of *Fortnite* from the Epic Games Store and suggest to the user it is "unknown" and is being blocked in order to keep the user "safe from security threats, suspicious activity, and privacy risks", even though *Fortnite* was available on the Galaxy Store for years and is well known to Samsung as a safe app.

130.    By turning Auto Blocker on by default, Samsung is intentionally exposing users of Samsung devices, who attempt to download and install the Epic Games Store and Epic's apps, to these false and misleading statements.

131.    This conduct has and will result in reputational and financial harm to Epic because users may mistakenly believe that the Epic Games Store and Epic's apps are unsafe and/or not download them after seeing the message.

**COUNT 1:  Sherman Act § 1 – Against All Defendants**

**(Unreasonable Restraint of Trade)**

132.    Epic restates, realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

133.    Samsung's and Google's conduct violated Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 1.

134.    Samsung and Google have entered into an agreement that unreasonably restricts competition in the Android App Distribution Market.

135.    This agreement serves no legitimate or pro-competitive purpose that could justify its anti-competitive effects, and thus unreasonably restrains competition in the Android App Distribution Market.

136.    Samsung's and Google's conduct affects a substantial volume of interstate as well as foreign commerce.

137.    Samsung's and Google's conduct has substantial anti-competitive effects, including increased prices, reduced innovation and quality of service, reduced choice for developers and consumers alike, and lower output.

138.    As a competing app distributor and as an app developer that consumes app distribution services, Epic is being harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Epic is suffering and will continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anti-competitive conduct issues.

## COUNT 2:  Sherman Act § 1 – Against All Defendants
### (Unlawful Group Boycott)

139.     Epic restates, realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

140.     Samsung and Google are competitors in the Market for Android App Distribution.

141.     Samsung's and Google's agreement to set Samsung's Auto Blocker feature as the default constitutes a group boycott against independent app store developers without any legitimate rationale, and thus the Defendants' actions are a *per se* antitrust violation.

142.     Even if analyzed under the Rule of Reason, the agreement between Defendants and the resulting actions by Samsung serve no legitimate or pro-competitive purpose that could justify its anti-competitive effects, and thus unreasonably restrains competition in the Android App Distribution Market.

143.     As a competing app distributor and as an app developer that consumes app distribution services, Epic is being harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anti-competitive conduct issues.

## COUNT 3:  Sherman Act § 2 – Against All Defendants
### (Unlawful Conspiracy to Maintain a Monopoly)

144.     Epic restates, realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

145.     Google's and Samsung's concerted actions violate Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

146.     The Android App Distribution Market is a valid antitrust market.

147.     Google holds monopoly power in the Android App Distribution Market.

148.     Samsung and Google have acted in concert to maintain Google's illegal monopoly.

149. Samsung and Google have undertaken overt acts in furtherance of the monopoly, including changing Auto Blocker to on by default.

150. Samsung and Google had the specific intent to maintain Google's monopoly.

151. Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

152. Samsung's and Google's conduct has substantial anti-competitive effects, including increased prices, reduced innovation and quality of service, reduced choice for developers and consumers alike, and lower output.

153. As a competing app distributor and as an app developer that consumes app distribution services, Epic is being harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Epic is suffering and will continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anti-competitive conduct issues.

## COUNT 4: California Cartwright Act – Against All Defendants
### (Unreasonable Restraint of Trade)

154. Epic restates, realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

155. Defendants' acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

156. Samsung and Google have entered into an agreement that unreasonably restricts competition in the Android App Distribution Market.

157. This agreement serves no legitimate or pro-competitive purpose that could justify its anti-competitive effects, and thus unreasonably restrains competition in the Android App Distribution Market.

158. Samsung's and Google's conduct affects a substantial volume of interstate as well as foreign commerce.

159.    Samsung's and Google's conduct has substantial anti-competitive effects, including increased prices, reduced innovation and quality of service, reduced choice for developers and consumers alike, and lower output.

160.    As a competing app distributor and as an app developer that consumes app distribution services, Epic is being harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Epic is suffering and will continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anti-competitive conduct issues.

**COUNT 5:  California Unfair Competition Law – Against All Defendants**

**(Unlawful and Unfair Agreement)**

161.    Epic restates, realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

162.    Defendants' conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*., which prohibits any unlawful, unfair or fraudulent business act or practice.

163.    Epic has standing to bring this claim because it has suffered injury in fact and lost money as a result of Defendants' unfair competition.  Specifically, it develops and distributes apps for the Android mobile platform and also develops a competing Android app store, and Defendants' conduct has unreasonably restricted Epic's ability to fairly compete in the relevant markets with these products.

164.    Defendants' conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

165.    Defendants' conduct is also "unfair" within the meaning of the Unfair Competition Law.

166.    Defendants' conduct harms Epic which, as a direct result of Defendants' anti-competitive conduct, is unreasonably prevented from freely distributing mobile apps.

**COUNT 6:  California Unfair Competition Law – Against Samsung Defendants**

**(Unfair Practices)**

167.    Epic restates, realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

168.   The Samsung Defendants' conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*., which prohibits any unlawful, unfair or fraudulent business act or practice.

169.   Epic has standing to bring this claim because it has suffered injury in fact and lost money as a result of the Samsung Defendants' unfair competition.  Specifically, when Auto Blocker is set to on and users attempt to download the Epic Games Store or other Epic apps, Samsung falsely states that those apps are "unknown" even though Samsung is aware of these apps and has listed some of them on the Samsung Galaxy Store for years.  Samsung also falsely categorizes those apps as unsafe without having performed any security check on them and despite knowing that they are safe.

170.   The Samsung Defendants' untruthful scare screens have caused reputational and financial harm to Epic.  As an app developer, Epic is harmed by Samsung's untruthful statements that its apps are unknown and unsafe.  These false statements not only harm Epic's reputation, but also lead some users to abandon the installation of Epic apps.  As the owner of the Epic Games Store, Epic is also harmed by Samsung's false statements that the apps it distributes are unknown and unsafe.

171.   The Samsung Defendants' false statements regarding apps downloaded through direct downloading or third-party app stores threaten or harm competition in Android app distribution by unreasonably deterring users from using alternative Android app distribution methods.

172.   Any alleged benefits of the Samsung Defendants' Auto Blocker feature are outweighed by the harm to users from the false statements and diminished competition.

173.   Defendants' conduct is "unfair" within the meaning of the Unfair Competition Law.

**COUNT 7:  California Trade Libel/Commercial Disparagement – Against Samsung Defendants**

174.   Epic restates, realleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

175.   The Samsung Defendants' conduct, as described above, is trade libel in violation of California common tort law, which prohibits "intentional disparagement of the quality of property, which results in pecuniary damage".  *See Aetna Cas. & Sur. Co. v. Centennial Ins. Co, Inc.*, 838 F.2d 346, 351 (9th Cir. 1988) (quoting *Erlich v. Etner*, 224 Cal. App. 2d 69, 73 (Ca. Ct. App. 1964)).

176.     When Auto Blocker is set to on and users attempt to download the Epic Games Store or other Epic apps, Samsung falsely states that those apps are "unknown" even though Samsung is aware of these apps and has listed some of them on the Samsung Galaxy Store for years.  Samsung also falsely categorizes those apps as unsafe without having performed any security check on them and despite knowing that they are safe.

177.     The Samsung Defendants' untruthful scare screens have caused reputational and financial harm to Epic.  As an app developer, Epic is harmed by Samsung's untruthful statements that its apps are unknown and unsafe.  These false statements not only harm Epic's reputation but lead to identifiable instances of users abandoning the installation of Epic apps, resulting in the lost profits that would have resulted from purchases made by those users.

178.     As the owner of the Epic Games Store, Epic is also harmed by Samsung's statements that the apps it distributes are unknown and unsafe.  These false statements not only harm Epic's reputation but lead to identifiable instances of users abandoning the installation of apps available on the Epic Games Store, resulting in the lost profits that would have resulted from purchases made by those users.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Epic and against Defendants:

A.    Issuing an injunction prohibiting Samsung's and Google's anti-competitive and unfair conduct and mandating that Samsung take all necessary steps to cease such conduct and to restore competition;

B.    Awarding a declaration that the restraints complained of herein are unlawful and unenforceable;

C.    Awarding as monetary relief, compensatory, consequential, and punitive, (including treble) damages for injuries directly and proximately caused to Epic by Samsung and Google, as described herein, according to proof, as well as attorneys' fees and costs, including the costs of suit incurred herein;

D.    Awarding any other equitable relief necessary to prevent and remedy Samsung's and Google's anti-competitive conduct; and

E.    Granting such other and further relief as the Court deems just and proper.

**REQUEST FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this complaint that are so triable.

Dated:                                  Respectfully submitted,

September 30, 2024

                                        By:      _/s/ Shaneeda Jaffer_____


                                        **BENESCH FRIEDLANDER COPLAN &
                                        ARONOFF LLP**

                                        Shaneeda Jaffer (SBN 253449)
                                        Lily A. North (CA 260709)

                                        **CRAVATH, SWAINE & MOORE LLP**

                                        Gary A. Bornstein (*pro hac vice* forthcoming)
                                        Yonatan Even (*pro hac vice* forthcoming)
                                        Lauren A. Moskowitz (*pro hac vice* forthcoming)
                                        Michael J. Zaken (*pro hac vice* forthcoming)

                                        *Attorneys for Plaintiff Epic Games, Inc.*