1  VICTORIA F. MAROULIS, SBN 202603
   victoriamaroulis@quinnemanuel.com
2  Quinn Emanuel Urquhart & Sullivan, LLP
   555 Twin Dolphin Drive, 5th Floor
3  Redwood Shores, CA 94065
   Telephone: (650) 801-5000
4  Facsimile: (650) 801-5100

5  ADAM B. WOLFSON, SBN 262125
   KEVIN Y. TERUYA, SBN 235916
6  adamwolfson@quinnemanuel.com
   kevinteruya@quinnemanuel.com
7  Quinn Emanuel Urquhart & Sullivan, LLP
   865 S. Figueroa St., 10th Floor
8  Los Angeles, CA 90017
   Telephone: (213) 443-3000
9  Facsimile: (213) 443-3100

10 DEBRA BERNSTEIN (*pro hac vice* pending)
   debrabernstein@quinnemanuel.com
11 Quinn Emanuel Urquhart & Sullivan, LLP
   1200 Abernathy Road NE, Building 600, Suite 1500
12 Atlanta, GA 30328
   Telephone: (404) 482-3502
13 Facsimile: (404) 681-8290

14 *Attorneys for Defendants Samsung Electronics*
   *Co., Ltd. and Samsung Electronics America, Inc.*

15

16                   **UNITED STATES DISTRICT COURT**

17                  **NORTHERN DISTRICT OF CALIFORNIA**

18                      **SAN FRANCISCO DIVISION**

19

20 EPIC GAMES, INC.,                      Case No. 3:24-cv-06843-JD

21                      Plaintiff,

22         v.                             **MOTION TO DISMISS BY**
                                          **SAMSUNG DEFENDANTS**
23

24 SAMSUNG ELECTRONICS CO., LTD.;         Judge: Hon. James Donato
   SAMSUNG ELECTRONICS AMERICA,           Action Filed: September 30, 2024
25 INC.; and GOOGLE LLC,

26
                       Defendants.
27

28

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE THAT on April 3, 2025, at 10:00 a.m., or as soon as the matter may be heard, before the Honorable James Donato of the United States District Court, Northern District of California at Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA, Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (together, "Samsung") will and hereby do move to dismiss Plaintiff Epic Games, Inc.'s Complaint (Dkt. 1) under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. This motion is based upon this notice of motion, the supporting memorandum of points and authorities, and such evidence as may be requested or permitted by the Court.

Dated: January 15, 2025         By: */s/ Victoria F. Maroulis*

VICTORIA F. MAROULIS, SBN 202603
victoriamaroulis@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

ADAM B. WOLFSON, SBN 262125
KEVIN Y. TERUYA, SBN 235916
adamwolfson@quinnemanuel.com
kevinteruya@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

DEBRA BERNSTEIN (*pro hac vice* pending)
debrabernstein@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
1200 Abernathy Road NE, Building 600, Suite 1500
Atlanta, GA 30328
Telephone: (404) 482-3502
Facsimile: (404) 681-8290

*Attorneys for Defendants Samsung Electronics Co., Ltd.
and Samsung Electronics America, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

SUMMARY OF RELEVANT ALLEGATIONS ................................................................ 2

ARGUMENT ...................................................................................................................... 4

I.   BECAUSE AUTO BLOCKER IS A PRODUCT IMPROVEMENT, AS A
     MATTER OF LAW, IT CANNOT GIVE RISE TO AN ANTITRUST CLAIM ................ 4

     A.   Auto Blocker Indisputably Provides Enhanced Security to Users ............................ 4

     B.   Epic Fails to Allege Any Associated Conduct That Would Save Its Claims ............ 5

     C.   The Product Improvement Doctrine Applies to Epic's Section 1 Claims.................. 6

II.  THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE A CONSPIRACY ....................... 7

     A.   The Alleged Conspiracy Makes No Economic Sense For Samsung.......................... 7

     B.   Epic Does Not Plausibly Allege Any Agreement........................................................ 8

          1.   Epic Alleges Neither Direct Nor Plausible Circumstantial Evidence........... 8

          2.   Epic's Laundry List of Purported "Plus Factors" Adds Nothing ................ 10

     C.   Epic's Section 2 Conspiracy To Monopolize Claim Fails For The Same and
          Additional Reasons As Its Section 1 Claims ............................................................ 13

     D.   Epic's Cartwright Act Claim Fails For The Same Reasons As Its Federal
          Sherman Act Claims ................................................................................................. 13

III. EPIC FAILS TO STATE A GROUP BOYCOTT CLAIM AND ANY BOYCOTT
     CLAIM IS NOT ENTITLED TO *PER SE* TREATMENT ................................................... 13

IV.  EPIC'S TRADE LIBEL CLAIM FAILS ................................................................................ 14

V.   EPIC FAILS TO STATE A UCL VIOLATION .................................................................... 15

CONCLUSION ................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Cases</u>

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
  141 F.3d 947 (9th Cir. 1998) ............................................................7

*Aguilar v. Atl. Richfield Co.*,
  25 Cal.4th 826 (2001)............................................................ 13

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) .................................... 4, 5, 6, 7

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
  166 F. Supp. 3d 988 (N.D. Cal. 2015) ...............................8, 9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................ 10

*Blatty v. New York Times Co.*,
  42 Cal.3d 1033 (Cal. 1986)............................................. 15

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
  691 F. App'x 389 (9th Cir. 2017)................................... 10

*Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ........................................ 12

*In re Cedar Shakes & Shingles Antitrust Litig.*,
  2020 WL 832324 (W.D. Wash. Feb. 20, 2020)....................... 12

*City of Oakland v. Raiders*,
  20 F.4th 441 (9th Cir. 2021).........................................13, 14

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
  92 F.4th 381 (2d Cir. 2024)...........................................8, 9

*Cobb v. JPMorgan Chase Bank, N.A.*,
  2013 WL 6201414 (N.D. Cal. Nov. 27, 2013) ...................... 11

*ComputerXpress, Inc. v. Jackson*,
  93 Cal. App. 4th 993 (2001) ......................................... 14

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) ......................................... 3

*Dimidowich v. Bell & Howell*,
  803 F.2d 1473 (9th Cir. 1986) ....................................... 14

*Distance Learning Co. v. Maynard*,
    2020 WL 2995529 (N.D. Cal. June 4, 2020) ................................................................. 8

*Dreamstime.com LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) ........................................................................... 4, 5

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust
    Litig.*,
    28 F.4th 42 (9th Cir. 2022) ........................................................................... 11, 12

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ........................................................................... 9, 10

*Epic Games, Inc. v. Apple Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................................................. 6

*Facebook, Inc. v. BrandTotal Ltd.*,
    2021 WL 662168 (N.D. Cal. Feb. 19, 2021) ............................................................ 15

*Films of Distinction, Inc. v. Allegro Film Productions, Inc.*,
    12 F. Supp. 2d 1068 (C.D. Cal. 1998) .................................................................. 15

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ................................................................................. 4

*Frenzel v. AliphCom*,
    76 F. Supp. 3d 999 (N.D. Cal. 2014) .................................................................... 9

*FTC v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020) ................................................................................. 6

*Garon v. eBay, Inc.*,
    2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) ........................................................ 15

*Hardley v. Kellogg Sales Co.*,
    243 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................ 15

*Hinds County, Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) .................................................................... 9

*HomeLight, Inc. v. Shkipin*,
    694 F. Supp. 3d 1242 (N.D. Cal. 2023) ................................................................ 13

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023) ............................................................................... 14

*Hu Honua Bioenergy, LLC v. Hawaiian Elec. Indus., Inc.*,
    2018 WL 5891743 (D. Haw. Nov. 9, 2018) ........................................................... 13

*Jones v. Micron Tech. Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................................................7, 9

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .....................................................................................................7

*Krehl v. Baskin-Robbins Ice Cream Co.*,
    664 F.2d 1348 (9th Cir. 1982) ...................................................................................................14

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd* 741 F.3d 1022 (9th Cir. 2014) ..........................11

*Mann v. Quality Old Time Service, Inc.*,
    120 Cal. App. 4th 90 (2004) ......................................................................................................14

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
    200 Cal. App. 4th 480 ................................................................................................................13

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) .........................................................................................................8

*Medical Marijuana Inc. v. ProjectCBD.com*,
    46 Cal. App. 5th 869 (2020) ......................................................................................................15

*Medina v. Microsoft Corp.*,
    2014 WL 4243992 (N.D. Cal. Aug. 25, 2014) ..........................................................................13

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .........................................................................................10, 11, 12

*Mylan Pharma. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
    838 F.3d 421 (3rd Cir. 2016) .......................................................................................................6

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
    795 F.3d 1124 (9th Cir. 2015) ...................................................................................................13

*Nguyen v. Encologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ......................................................................................................8

*In re Optical Disk Drive Antitrust Litig.*,
    2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ..............................................................................9

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .....................................................................................................7

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .....................................................................................................13

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) .....................................................................................15

*Retail Prop. Trust v. United Broth. of Carpenters & Joiners of Am.*,
    768 F.3d 938 (9th Cir. 2014) ........................................................................................ 4

*Seagood Trading Corp. v. Jerrico, Inc.*,
    924 F.2d 1555 (11th Cir. 1991) ................................................................................. 13

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ..................................................................................... 15

*Staley v. Gilead Sci., Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ......................................................................... 5

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ................................................................................. 7, 8

*United States v. Brewbaker*,
    87 F.4th 563 (4th Cir. 2023) ..................................................................................... 14

*ZF Micro Sols. v. TAT Capital Partners*,
    82 Cal. App. 5th 992 (2022) ................................................................................ 14, 15

### **Statutes**

California Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq*. ............................................ 13

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq* .............................. 15

Sherman Act, 15 U.S.C. § 1 ................................................................................................. 6, 7, 13

Sherman Act, 15 U.S.C. § 2 ............................................................................................ 2, 6, 7, 13

# INTRODUCTION

Epic alleges that Samsung: is the second-largest Android app store provider in the world; has remained in that position for years, despite repeated calls from Google to "get out of the store business"; refused these repeated calls; and has no revenue share or other agreement with Google to receive a portion of Google's Play Store revenues or profits. Nevertheless, Epic alleges that Samsung saw the Court was about to open up competition for Android app distribution with a series of injunctive remedies—an action that would undoubtedly benefit Samsung as the second-largest competitor in that alleged market—yet then decided, for zero compensation or other benefit, to "conspire" with Google to "defang" those incredibly beneficial injunctive remedies.

And how? By updating a preexisting security feature called Auto Blocker so that it is "on" by default for new phone purchasers only. Epic does not allege Auto Blocker had any anticompetitive effects when it was an opt-in feature or when users voluntarily turned it on. And Epic ignores that new phone users can easily switch the default "on" to "off" during their phone's initial setup process. It also ignores that Auto Blocker's status has not changed for preexisting Samsung phone users (the vast majority today) — if they never turned it on before, it remains off unless they choose to turn it on.

Moreover, Epic does not allege that the vast majority of the Auto Blocker feature is anticompetitive. For example, Epic is fine with the portions that block unwanted commands or stealth installations from USB cables, which blocks malware from links in messaging apps (such as from spam text messages). Under the Ninth Circuit's *Allied Orthopedic* precedent, a design change such as this is presumptively immune from antitrust scrutiny. When there is an unquestioned product improvement and no associated abuse of monopoly power (which Epic concedes Samsung does ***not*** have, *see* Compl. ¶¶2, 52),[1] the Ninth Circuit instructs that courts cannot weigh a design change's anticompetitive effects against its benefits because doing so would unnecessarily stifle innovation. So it is here; all of Epic's antitrust and related claims are unactionable as a matter of law.

But, even if that were not the case, Epic cites no direct evidence of conspiracy, so the Court

---

[1] Unless otherwise noted, "¶" refers to Epic's September 30, 2024 Complaint. Dkt. 1.

must look to whether there was "rational motivation [for Samsung] to conspire." There is none. Epic does not explain why the second-largest competitor in the relevant market would conspire to neuter injunctive remedies that would greatly benefit it, all for no economic or monetary gain. Nor does Epic explain how a conspiracy could be plausible after allegation upon allegation showing Samsung **refused** Google's requests to, in Samsung's own words, "get out of the [app] store business." ¶75.

These problems are fatal to all of Epic's federal and state antitrust claims, each of which is predicated on the existence of a conspiracy. Its Section 2 conspiracy to monopolize claim also fails because Epic does not plausibly allege a specific intent to monopolize (as opposed to a desire to increase profits, which is insufficient). Similarly, its "group boycott" claim (which also does not describe a *per se* violation) independently fails because Epic alleges that only **Samsung** engaged in a "boycott." But a "group" boycott requires at least two companies boycotting another.

Epic's trade libel claim fails because it does not: plausibly allege the statements cause damage; identify customers Epic lost due to the statements; identify an actually-false statement; nor identify any statement directed at **Epic** (as opposed to a group of "unauthorized sources" of apps).

Finally, Epic's UCL claims fail for these same reasons, and for not alleging legal remedies are inadequate, thus violating the Ninth Circuit's *Sonner* decision.

## SUMMARY OF RELEVANT ALLEGATIONS

Epic alleges that Google maintains a monopoly over the distribution of Android apps. ¶¶1-2. Over the years, "Google entered into RSAs with most major OEMs where it paid each OEM a portion of Play Store revenue in exchange for store exclusivity on the OEM's smartphones." ¶51. The **one** exception was Samsung, which Epic concedes "pre-installs [Samsung's competing] Galaxy Store on virtually all Samsung devices." ¶39. The only RSA between Samsung and Google relates to revenues from Google **Search**. ¶78. Samsung refused, as "unacceptable," a proposal from Google that would have included a non-compete requirement regarding Play Store and Galaxy Store. ¶5. In the Complaint, despite extensive discovery from Google in the 2021 *Epic Games v. Google* lawsuit, Epic does not identify a single instance where Google shared revenues with Samsung from the Play Store or provided Samsung any form of compensation relating to the Play Store.

Fast forward to 2024. Epic alleges that Samsung saw this Court was about to enjoin Google

to open up competition for Android app distribution. ¶91. Samsung then allegedly conspired with Google to "defang" injunctive remedies that would benefit Samsung as the second-largest Android app distributor. ¶8. Epic does not identify any RSA, compensation, or preferred treatment that would have incentivized Samsung to enter this conspiracy. *See generally* Compl. Epic attempts to establish a "long" running Google-Samsung "partner[ship]," ¶ 69, but its alleged supporting examples end in 2020, with the Google *Search* RSA, ¶¶70-79—well before Samsung introduced Auto Blocker, ¶97.

The mechanism of this supposed conspiracy was an update to a security feature on Samsung smartphones called Auto Blocker. Epic concedes Samsung first implemented Auto Blocker—an "***enhanced security option***" that could be turned on voluntarily—in 2023. ¶90. Epic does not allege it was anticompetitive for Samsung to introduce this feature, nor that there are any anticompetitive effects stemming from users voluntarily turning Auto Blocker on. *Id.* Epic also does not allege that the vast majority of Auto Blocker's features have (or could have) anticompetitive effects. As the Auto Blocker materials Epic cites demonstrate,[2] when turned on, Auto Blocker will, *inter alia*, block commands from USB cables or software updated by USB cable (both of which can be used surreptitiously to install malware), and will also block malware images or links in messaging apps (which users often click on and then unwittingly install malware). ¶91 n.3. Auto Blocker will also block the installation of apps from unauthorized sources, which is the portion of the feature Epic contends has anticompetitive effects, but it self-evidently has a security functionality. ¶¶8, 90-93.

In July 2024, Samsung updated its user interface software for its new phones so Auto Blocker is "on" by default. ¶91. Epic contends this update was anticompetitive. ¶¶8, 90-93. As the materials the Complaint cites make clear, however, users are able to change this default "on" setting to "off" during the phone's setup. ¶91 n.3 (citing website explaining that "The default setting for Auto Blocker is set to On in the phone's initial setup wizard, but you can also change this setting to Off during the initial setup."). Although Epic contends Auto Blocker is now "on" by default for *all* users, that is facially untrue. The Complaint's citation actually states that "the setting value for Auto Blocker ***remains the same as you previously set***" for users updating to the latest version of

---

2 *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (on a motion to dismiss, it is proper to consider content of website the complaint directly references).

Samsung's user interface software. *See* ¶91 n.3 (emphasis added). Epic never explains why Samsung would join a "conspiracy" to restrain competition via Auto Blocker, yet not change it to default "on" for preexisting Samsung phones, which make up the *vast* majority of Samsung phones in the market.

Even when Auto Blocker is "on," it can easily be turned off; the feature itself provides users with clear, simple, and intuitive instructions for the three-step process to do so. ¶¶93, 96.

## ARGUMENT

## I.    BECAUSE AUTO BLOCKER IS A PRODUCT IMPROVEMENT, AS A MATTER OF LAW, IT CANNOT GIVE RISE TO AN ANTITRUST CLAIM

"[A] design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-99 (9th Cir. 2010). Accordingly, "if a monopolist's design change is an improvement, it is 'necessarily tolerated by the antitrust laws' unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product." *Id.* at 1000 (quoting *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983)). Under this law, Samsung's alleged conduct is presumptively immune from antitrust liability because Samsung's Auto Blocker update undisputedly improved that feature and Epic has not alleged any associated anticompetitive conduct.

### A.    Auto Blocker Indisputably Provides Enhanced Security to Users

The Complaint and its citations note that Auto Blocker blocks apps from unknown sources, stalls voice phishing attacks, blocks malware images in messaging apps, detects and prevents the installation of malware, and prevents harmful commands by USB cable. ¶¶90 n.2, 91 n.3. Auto Blocker thus provides enhanced data security benefits (*i.e.*, "new levels of device protection") to Samsung phone users. ¶90 n.2. Samsung's change to Auto Blocker automatically applies these benefits to more users. ¶123 (alleging users are unlikely to turn off a default setting). As this Court is bound to accept Epic's allegations and incorporated facts regarding Auto Blocker as true, it is indisputable that Auto Blocker indeed provides new security benefits to users. *See Retail Prop. Trust v. United Broth. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014) (noting the Court "must accept as true all factual allegations in the complaint"); *see also Dreamstime.com LLC v.*

1   *Google LLC*, 54 F.4th 1130, 1140 (9th Cir. 2022) (framing case is responsibility of the parties).

2       In *Allied Orthopedic*, the defendant manufactured pulse oximetry sensors (which attach to a

3   patient's body) and monitors (which receive and interpret signals from the sensor and then display

4   the patient's blood oxygenation). *Id.* at 994. The defendant introduced a new generation of sensors

5   that moved certain components previously housed in the monitors to the sensors themselves, which

6   indisputably harmed sensor competitors' positions. *Id.* at 994-95. Because the sensors provided new

7   benefits to consumers, they were a product improvement and thus immune from antitrust scrutiny,

8   absent some associated abuse of monopoly power. *Id.* at 1000-02. The same analysis applies here:

9   although Auto Blocker (according to Epic) may impede third-party app downloads, it also provides

10  new security benefits to users and thus is a product improvement. ¶¶90 n.2, 91 n.3. Accordingly,

11  Samsung is immune from antitrust scrutiny related to the Auto Blocker feature.

12      **B.**      **Epic Fails to Allege Any Associated Conduct That Would Save Its Claims**

13      Epic has not alleged any associated conduct that would render its claims actionable.

14  Associated conduct must "constitute[] an anticompetitive abuse or leverage of monopoly power, or

15  a predatory or exclusionary means of attempting to monopolize the relevant market." *Allied*

16  *Orthopedic*, 592 F.3d at 1000. Epic alleges neither. To the contrary, Epic admits that Samsung is

17  ***not*** a monopolist and thus has no monopoly power to leverage. ¶48 (alleging that Google, ***not***

18  Samsung, has monopoly power in the relevant market). Epic likewise concedes that any Samsung

19  phone user who wants to install the Epic Games Store (or any other app store) can turn off Auto

20  Blocker using the three-step process identified in Auto Blocker's pop up screen. ¶¶ 93, 96.

21      Moreover, while associated conduct may take many forms, some kind of anticompetitive

22  abuse, such as consumer coercion[3] or the forced adoption of new technology,[4] must accompany the

23  product innovation—neither of which are (or could be) present here. Consumer coercion—distinct

24  from persuasion—arises when consumers have no choice but to bend to a monopolist's scheme. *See*

25

---

26      [3] *See, e.g.*, *Staley v. Gilead Sci., Inc.*, 446 F. Supp. 3d 578, 613-15 (N.D. Cal. 2020)
    (coercing the adoption of a new drug by degrading the safety and quality of an old drug in order to

27  prevent generic competition).

28      [4] *Allied Orthopedic*, 592 F.3d at 1002 (discontinuing old technology to force adoption of
    new technology can be anticompetitive conduct alongside product improvement).

1    *Allied Orthopedic*, 592 F.3d at 1002 (finding no coercion because plaintiffs were not completely

2    foreclosed from competing in the relevant market); *Mylan Pharma. Inc. v. Warner Chilcott Pub.*

3    *Ltd. Co.*, 838 F.3d 421, 438-39 (3rd Cir. 2016) (same).

4          Here, Epic's allegations show that, even when Auto Blocker is on, a user can disable it at

5    any time by following a short, three-step process the feature itself identifies. ¶93. That means Epic,

6    just like the plaintiffs in *Allied Orthopedic* and *Mylan*, is not completely foreclosed from the alleged

7    market. Auto Blocker also remained ***off*** for all preexisting users who never turned it on—even when

8    they updated to the latest software in or after July 2024. ¶91 n.3. The three-step "hurdle" Epic claims

9    is anticompetitive thus does not even approach the level found insufficient as a matter of law in

10   *Allied Orthopedic,* 592 F.3d at 1002 (where *all* competitors had to redesign their products to be

11   compatible with defendant's), or *Mylan,* 838 F.3d at 438-39 (where *all* competitors had to repeatedly

12   seek subsequent FDA approval (hardly a three-step process)). The allegations and noticeable facts

13   thus render implausible any inference that Samsung coerced consumers or completely excluded

14   competitors—even if Samsung had monopoly power to do so (which Epic alleges it does ***not*** have).

15         **C.    The Product Improvement Doctrine Applies to Epic's Section 1 Claims**

16         Even though *Allied Orthopedic* applied the product improvement doctrine to a Section 2

17   claim, the doctrine and its reasoning necessarily apply to Section 1 claims. The Ninth Circuit has

18   repeatedly made clear in recent years that "[r]egardless of whether the alleged antitrust violation

19   involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under

20   § 2, the three-part burden-shifting test under the rule of reason is essentially the same." *FTC v.*

21   *Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020). Thus, if a plaintiff brings both Section 1 and 2 claims

22   based on the same facts, a factfinder must perform the same balancing test for both types of claims.

23   *See*, *e.g.*, *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 983-94, 998 (9th Cir. 2023) (analyzing Epic's

24   Section 1 and 2 claims under the same balancing test); *see also Mylan*, 838 F.3d at 441 (product

25   design was not anticompetitive under Section 2, so no anticompetitive effect under Section 1).

26         No matter which claim it addresses, a factfinder would need to weigh any of Auto Blocker's

27   alleged anticompetitive effects against the procompetitive benefits of enhanced phone security. That

28   is the exact type of balancing *Allied Orthopedic* prohibited. *See* 592 F.3d at 1000. Accordingly,

*Allied Orthopedic* and its reasoning necessarily apply in the Section 1 context. Furthermore, this is not just a technical, theoretical argument. Here, if a factfinder determines that there is no associated conduct under Section 2—a situation in which *Allied Orthopedic* expressly prohibits applying the balancing test, *id.* at 1000—they could still proceed to the balancing test under Section 1. That would render the Ninth Circuit's product improvement doctrine toothless.

## II.    THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE A CONSPIRACY

To state a Sherman Act Section 1 claim, a plaintiff must plead "not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States … ; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (citations omitted). Similarly, a conspiracy to monopolize claim under Section 2 requires that a plaintiff adequately allege four elements: (1) the existence of a conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) specific intent to monopolize; and (4) causal antitrust injury. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).

Allegations that "could just as easily suggest 'rational, legal business behavior by the defendants as they could suggest an illegal conspiracy' are insufficient." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 914-15 (N.D. Cal. 2019) (citation omitted).

### A.    The Alleged Conspiracy Makes No Economic Sense For Samsung

"Antitrust claims must make economic sense." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998). In particular, a plaintiff alleging an anticompetitive conspiracy must identify an alleged conspirator's "rational motivation to conspire." *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1091 (9th Cir. 2015). If the "potential benefit of this scheme for [the defendant] is just not apparent," the court should dismiss the claim. *Id.*

Epic alleges Samsung pre-installs its own Galaxy Store on every smartphone it manufactures, ¶39, and is the second-largest app store provider in the alleged market, ¶¶2, 56. Epic also alleges Samsung knew in the summer of 2024 that the Court was about to issue injunctive remedies against Google aimed at opening up competition in the alleged relevant market. ¶¶91, 101.

1  Above any other competitor, Samsung thus stood to benefit most from the Court's injunction. Yet,

2  Epic offers no reason why Samsung would nevertheless limit its own competitive options.

3        To this point, the Complaint does not identify a single economic benefit to Samsung from

4  conspiring with Google. The only RSA between the parties has to do with Google *Search*, ¶79, and

5  Samsung is the *only* smartphone OEM to *not* enter an RSA relating to Play Store revenues (which

6  Epic alleges Google entered with other OEMs in exchange for app store exclusivity). ¶51. Epic thus

7  asks the Court to bless a complaint that provides no "rational motivation to conspire," alleging that

8  Samsung would conspire with Google—thereby affirmatively harming Samsung's ability to grow

9  its second-largest competitive position in the alleged relevant market—for no compensation or

10  economic benefit. That makes no sense, let alone economic sense. Dismissal should follow.

11  *Stanislaus*, 803 F.3d at 1091; *see also Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F.

12  Supp. 3d 988, 996 (N.D. Cal. 2015) ("Plaintiffs' antitrust theory does not make economic sense"

13  where the plaintiffs' "economic theory … is not supported by the Complaint and instead consists

14  purely of attorney argument"); *cf. Nguyen v. Encologix, Inc.*, 962 F.3d 405, 408, 415 (9th Cir. 2020)

15  (affirming dismissal of a claim that "does not make a whole lot of sense").

16        **B.    Epic Does Not Plausibly Allege Any Agreement**

17        Even if Epic alleged a plausible motive for Samsung to conspire, because the "ultimate

18  existence of an 'agreement' under antitrust law" is "a legal conclusion, not a factual allegation," a

19  "plaintiff's job at the pleading stage…is to allege enough *facts* to support the inference that a

20  conspiracy actually existed." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d

21  129, 135-36 (2d Cir. 2013) (emphasis added). When attempting to allege an unlawful conspiracy,

22  an antitrust plaintiff may rely on both direct and circumstantial evidence. *See Distance Learning*

23  *Co. v. Maynard*, 2020 WL 2995529, at *3, 9 (N.D. Cal. June 4, 2020).

24        **1.    Epic Alleges Neither Direct Nor Plausible Circumstantial Evidence**

25        "Direct evidence factual allegations are explicit and require no inferences to establish the

26  existence of a conspiracy." *Distance Learning*, 2020 WL 2995529, at *3. For example, direct

27  evidence includes a recorded phone call detailing price fixing or an admission by a conspirator's

28  employee about the conspiracy. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,

92 F.4th 381, 391 (2d Cir. 2024) (cleaned up). Epic alleges nothing of the kind.

The question therefore falls to circumstantial evidence, which is evidence that "require[s] the court to infer that an impermissible agreement to restrain trade exists." *Jones*, 400 F. Supp. 3d at 915. Such inferences cannot be based on vague or superficial allegations, and must be plausible. *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1005 (N.D. Cal. 2014) (proper for court "to reject, as implausible, allegations that are too speculative to warrant further factual development"); *Bay Area*, 166 F. Supp. 3d at 995-96 (dismissing claim for failure to allege "sufficient facts" for a conspiracy).

Epic vaguely alleges that "Samsung has repeatedly entered into agreements and understandings with Google not to meaningfully compete against the Play Store," ¶52, but never identifies these "agreements and understandings"—their terms, when they were entered, what restrictions they impose, or any other basic, non-speculative, non-conclusory information about them and their very existence. Instead, the Complaint references, in a highly conclusory manner, "understandings" between Samsung and Google "whereby Samsung does not vigorously compete with Google in the Android App Distribution Market." ¶70. As a matter of law, such speculative assertions cannot support a plausible inference of conspiracy, mandating dismissal. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 (9th Cir. 2014).

The only actual agreement the Complaint identifies (beyond innuendo) is the parties' Google Search RSA. ¶78. But Epic concedes that RSA does ***not*** require Samsung to refrain in any way from competing on app distribution; indeed, Samsung deemed such a requirement "unacceptable." ¶5.

Notably, even if Samsung and Google had a track record of anticompetitive agreements—which the Complaint does not actually allege—that still would not support a plausible agreement in a separate context. *See In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (dismissing antitrust claim where allegations of other instances in which defendants engaged in anticompetitive conduct was "provocative, but" did not itself show "commonalities between those circumstances" and the conspiracy alleged); *see also Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (allegation that defendants had the opportunity to conspire does not nudge a complaint across the line from conceivable to plausible).

Moreover, Epic tells a story that is *inconsistent* with any agreement not to compete in the

app distribution market. Epic alleges that Samsung did **not** enter an RSA for Play Store revenues in exchange for app store exclusivity, ¶51, but "pre-installs the Galaxy Store on virtually all Samsung devices," ¶39; that Google failed to convince Samsung to link its Galaxy Store to the Play Store's predecessor, ¶71; that Samsung rejected a proposal to subsume the Galaxy Store within the Play Store, ¶72; that Samsung scuttled Google's alleged proposal not to compete in the app store space, ¶¶77-78; that Samsung agreed with Epic to distribute Epic's game, Fortnite, on the Galaxy Store, ¶4, but refused to pull Fortnite from the Galaxy Store when Google complained, ¶¶ 4, 74, 94; and that Samsung refused Google's alleged requests to "get out of the store business," ¶¶2, 56, 75.

These vague, speculative, and conclusory allegations, coupled with those inconsistent with the alleged conspiracy, demonstrate it is entirely implausible to conclude Samsung suddenly stopped its history of competition out of the blue and with no benefit. *See Eclectic Props.*, 751 F.3d at 998 (affirming dismissal where allegations were "consistent" with misconduct, but did "not tend to exclude a plausible and innocuous alternative explanation" present in "Plaintiffs' own complaint").

## 2. Epic's Laundry List of Purported "Plus Factors" Adds Nothing

A plaintiff can establish an unlawful agreement through circumstantial evidence by alleging both (1) "consciously parallel conduct" **and** (2) "plus factors"—*i.e.*, "further circumstance[s] pointing toward a meeting of the minds" of the alleged conspirators. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (citing *Twombly*, 550 U.S. at 570).

Epic fails the first step because it does not plead parallel conduct—it only alleges **Samsung** acted by turning Auto Blocker on by default. "'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants." *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) (citing *Musical Instruments*, 798 F.3d at 1193-94). In any event, Epic's kitchen sink approach to plus factors does not render the claims plausible. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1194 (holding that just alleging several "plus factors" did not cumulatively amount to "nonconclusory facts sufficient to state a claim").

For example, it is wholly unsurprising that the "Auto Blocker feature itself" would list the Play Store as an "authorized source" for apps when Epic's trial made public that Google required OEMs to install the Play Store and make it a default option for installing apps on Android phones.

¶¶39, 67. And a three-step process for Auto Blocker is hardly something that bears "close resemblance" to Google's allegedly seventeen-step Unknown Sources install flow. ¶106.

Similarly, the Ninth Circuit is clear that only blatant and "extreme action against self-interest" is suggestive of conspiratorial agreement. *See Musical Instruments*, 798 F.3d at 1195; *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 50 (9th Cir. 2022) (rejecting allegations as not satisfying "extreme action against self-interest" where "it was economically rational" for defendant to take challenged actions). Samsung protecting its customers in a way that allows them to *voluntarily* use both the most popular app store and its own competing app store is hardly "extreme action against self-interest" explicable only by collusion.

Next, Epic identifies no "common motive" because Samsung would be motivated to promote Google's Play Store profits *only if* there was "an agreement under which Samsung is compensated for allowing the Play Store to retain its dominance." ¶118. But the Complaint identifies no such agreement—it only identifies an RSA for Google *Search* and recognizes that Samsung is the *only* OEM *not* to enter an RSA relating to Play Store revenue. In any event, the Ninth Circuit has rejected this "plus factor" as circular. *See Musical Instruments*, 798 F.3d at 1194. If it were not circular, "every company in every industry could be accused of conspiracy because they all would have such a motive." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd* 741 F.3d 1022 (9th Cir. 2014). And, as noted, joining this conspiracy would *hurt* Samsung's competitive position and provide no offsetting benefit, meaning it has no common motive.

As for the supposed lack of "legitimate business purpose," Epic concedes that "Google Play Protect scans every app prior to its installation on an Android phone regardless of source[, and that] Samsung also has an app scanner powered by McAfee that scans a user's phone for malware and suspicious activity." ¶104. The "authorized sources" identified by Auto Blocker thus have built-in, recognized security features. Epic cannot seriously dispute the obvious point that downloading files randomly from the internet can expose a user to myriad security risks. The legitimate security rationales for Auto Blocker's selection of two, well-known, security-laden sources for apps are thus obvious, particularly for a smartphone manufacturer. *See Cobb v. JPMorgan Chase Bank, N.A.*, 2013 WL 6201414, at *13 (N.D. Cal. Nov. 27, 2013) (dismissing claim at pleading stage since

1  "equally plausible to infer" legitimate conduct); *see also DRAM*, 28 F.4th at 49-50 (affirming

2  dismissal where challenged conduct—the "focus on profitability"—was "economically rational").

3      Moving to Samsung's and Google's "history of cooperating," ¶112, the Complaint identifies

4  no such "long history" and instead identifies numerous instances where Samsung ***rejected or defied***

5  such alleged attempts at capture or control by Google. *See supra* at II.B.1.

6      Next, Epic does not support its contention that Samsung made an "abrupt change" with its

7  Auto Blocker update. ¶114. As noted, Auto Blocker contains numerous aspects Epic concedes

8  provide security benefits. And Epic never suggests Auto Blocker is anticompetitive if off by default.

9  Samsung did not turn Auto Blocker on for all phones—just new ones, and the feature is on only if

10  the user did not turn it off during activation of the phone or if the user chose to not turn it off after

11  activation. If an action is fully consistent with a non-collusive explanation, this plus factor adds

12  nothing to the plausibility of agreement. *See DRAM*, 28 F.4th at 52. Turning Auto Blocker on in the

13  way Samsung did clearly has such non-collusive explanations.

14      As for the timing of the Auto Blocker update, ¶107—and as discussed above—Epic

15  essentially alleges that Samsung conspired to maintain Google's monopoly power for no economic

16  benefit, at a time when it knew it had the best ability in years to capture more market share. That

17  makes no sense, and a plus factor must show the benefit of ***coordinated action***.

18      With respect to interfirm communications, Epic provides no details of such communications

19  and essentially concedes it only alleges an ***opportunity*** to collude, given the companies' broader

20  communications over the years. *See* ¶113. But merely having an opportunity is not itself indicative

21  of illegal agreement—particularly with no motive to conspire. *Musical Instruments*, 798 F.3d at

22  1196; *see also Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537,

23  545 (2d Cir. 1993) (opportunity alone does not support inference of illegal conspiracy).

24      For "market conditions," Epic alleges that the structure of the alleged relevant market must

25  (for some reason) be due to collusion. ¶119. This is circular: the (contradicted) allegation of lack of

26  competition is merely repurposed as "market conditions." But "[t]he lesson of *Twombly* and its

27  predecessors is clear: industry structure alone cannot get the complaint across the finish line." *In re*

28  *Cedar Shakes & Shingles Antitrust Litig.*, 2020 WL 832324, at *10 (W.D. Wash. Feb. 20, 2020).

**C.**  **Epic's Section 2 Conspiracy To Monopolize Claim Fails For The Same and Additional Reasons As Its Section 1 Claims**

Epic's failure to plausibly plead any anticompetitive agreement between Samsung and Google equally dooms its Section 2 claim for conspiracy to monopolize. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1576 (11th Cir. 1991) (without "the existence of an agreement to restrain trade," Section 1 and Section 2 conspiracy claims fail); *Hu Honua Bioenergy, LLC v. Hawaiian Elec. Indus., Inc.*, 2018 WL 5891743, at *2 (D. Haw. Nov. 9, 2018) (same); Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶809. (5th Ed. 2025) ("Any arrangement that could be considered a 'conspiracy' to monopolize [under § 2] must necessarily also be an unreasonable … restraint of trade offending § 1.").

Moreover, Epic must also plausibly allege a "specific intent" to monopolize, *i.e.*, the intent "to control prices or unreasonably destroy competition." *See HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1253 (N.D. Cal. 2023). Generic allegations of profit motive are insufficient under the law for Section 2, *see Hu Honua*, 2018 WL 5891743, at *4, as is a mere willingness to agree and go along with a monopolist's plan. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 n.8 (9th Cir. 1995). Nevertheless, that is all Epic alleges. ¶¶ 71-78, 118.

**D.**  **Epic's Cartwright Act Claim Fails For The Same Reasons As Its Federal Sherman Act Claims**

California's antitrust statute, the Cartwright Act, is analogous to Section 1 of the Sherman Act. *See Aguilar v. Atl. Richfield Co.*, 25 Cal.4th 826, 838-39 (2001). Where, as here, a complaint lacks "factual allegations of specific conduct in furtherance of the conspiracy to eliminate or reduce competition," it fails as a matter of law. *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 493, 499-500; *see also Medina v. Microsoft Corp.*, 2014 WL 4243992, at *3 (N.D. Cal. Aug. 25, 2014). Epic's redundant Cartwright Act claim therefore fails. *See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015).

**III.**  **EPIC FAILS TO STATE A GROUP BOYCOTT CLAIM AND ANY BOYCOTT CLAIM IS NOT ENTITLED TO *PER SE* TREATMENT**

A group boycott is when "*two or more competitors* ... refuse to do business with one firm." *City of Oakland v. Raiders*, 20 F.4th 441, 454 (9th Cir. 2021) (citation omitted). Epic, however,

alleges that Samsung and Google supposedly agreed "to set **Samsung's** Auto Blocker feature as the default," and that only Auto Blocker "boycott[ed]" third-party apps stores. ¶141 (emphasis added). Epic does not allege that Google boycotted Epic or other app stores, such as through Android OS or other features. Thus, "although [Epic] has alleged an individual boycott, [it] has not alleged a group boycott," requiring dismissal of this count. *Oakland*, 20 F.4th at 454.

Even if Epic could avoid this fatal flaw, it does not plausibly plead a *per se* group boycott. *First*, the alleged group boycott has a vertical component, *i.e.*, Samsung as a phone manufacturer and Google as an app store provider. *See, e.g.*, ¶¶17, 99. It is thus, at most, a "hybrid" restraint subject to the rule of reason. *See United States v. Brewbaker*, 87 F.4th 563, 583 (4th Cir. 2023) (citing *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986)). *Second*, Auto Blocker provides security, *see supra* I.A, so it has a "purpose other than disadvantaging the target" and therefore cannot be *per se* illegal. *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 820 (9th Cir. 2023).

## IV.    EPIC'S TRADE LIBEL CLAIM FAILS

Epic does not plausibly allege several elements of its trade libel claim (Count 7). *See ZF Micro Sols. v. TAT Capital Partners*, 82 Cal. App. 5th 992, 1002 n.5 (2022) (listing elements).

*First*, Epic must plead that the **statements at issue** caused special damages. *Id.* at 1002 n.5. Epic does not allege the statements in the Auto Blocker screens cause any harm when a consumer voluntarily turns Auto Blocker on. Thus, it is not the **statements** that cause harm, but the **default "on" setting**. ¶123. This fails the first requirement for a trade libel claim.

*Second*, Epic must "identify particular customers and transactions of which it was deprived as a result of the libel." *Mann v. Quality Old Time Service, Inc.*, 120 Cal. App. 4th 90, 109 (2004). It identifies none, thus failing a second of the claim's four requirements.

*Third*, Epic has not identified a "false" statement, as it must. *See ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (2001). Epic claims that the statement "Auto Blocker prevents the installation of unknown apps" constitutes trade libel. ¶¶93, 176. But this statement is literally true; Auto Blocker blocks apps that are "unknown" to it. ¶92 (alleging Auto Blocker "disables the installation of apps from … sources other than" "authorized" app stores). Next, a "trade libel claim

must be based on specific statements." *Films of Distinction, Inc. v. Allegro Film Productions, Inc.*, 12 F. Supp. 2d 1068, 1081 n.8 (C.D. Cal. 1998) (cleaned up). Auto Blocker's pop-up screen does not state any app is "unsafe." ¶93. The allegation that apps are "categorize[d]" as "unsafe," ¶176, fails because no such "statement" was "published." *ZF Micro Sols.*, 82 Cal. App. 5th at 1002 n.5.

*Fourth*, Epic has not identified a statement that is "of and concerning" **Epic**. Auto Blocker's pop-up message appears for "any other app" outside the Play Store or Galaxy Store. ¶94. "When, as in this case, the statement that is alleged to be injuriously false concerns a group … — in general, any group numbering over twenty-five members — … plaintiffs cannot show that the statements were 'of and concerning them.'" *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1046 (Cal. 1986) (citations omitted). It is implausible that the apps and app stores that Auto Blocker affects are less than twenty-five when there are "hundreds of millions of users of smartphones running the Android OS." ¶41. The "statements" at issue are, accordingly and fatally, not "of and concerning" Epic.

## V.    **EPIC FAILS TO STATE A UCL VIOLATION**

Because Epic fails to plead a violation of the antitrust laws, its "unlawful" UCL claim also fails. *See Hardley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017); *Garon v. eBay, Inc.*, 2011 WL 6329089, at *6 (N.D. Cal. Nov. 30, 2011). Even for "incipient" violations, a plaintiff must still allege "at a minimum" that the actions were anticompetitive or have a comparable effect to an antitrust violation. *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110-12 (N.D. Cal. 2022). Here, not only is the conduct at issue—the Auto Blocker design change—immune from liability, there is also no plausible conspiracy nor "group boycott." Thus, the UCL claim must be dismissed for the same reasons as the antitrust claims. *See Facebook, Inc. v. BrandTotal Ltd.*, 2021 WL 662168, at *10 (N.D. Cal. Feb. 19, 2021). And because Epic's Count 6 ("unfair practices") UCL claim is derivative of, *i.e.*, based on the same allegations as, its trade libel claim (Count 7), *compare* ¶169 *with* ¶176, it fails, too. *See, e.g.*, *Medical Marijuana Inc. v. ProjectCBD.com*, 46 Cal. App. 5th 869, 896 (2020). Finally, the "complaint does not allege that" the plaintiff "lacks an adequate legal remedy," as it must. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

## CONCLUSION

For the foregoing reasons, Samsung respectfully requests dismissal of the Complaint in full.

1   Dated: January 15, 2025

By: */s/ Victoria F. Maroulis*
VICTORIA F. MAROULIS, SBN 202603
victoriamaroulis@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

ADAM B. WOLFSON, SBN 262125
KEVIN Y. TERUYA, SBN 235916
adamwolfson@quinnemanuel.com
kevinteruya@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

DEBRA BERNSTEIN (*pro hac vice* pending)
debrabernstein@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
1200 Abernathy Road NE, Building 600, Suite 1500
Atlanta, GA 30328
Telephone: (404) 482-3502
Facsimile: (404) 681-8290

*Attorneys for Defendants Samsung Electronics Co., Ltd.
and Samsung Electronics America, Inc.*