Shaneeda Jaffer (SBN 253449)
sjaffer@beneschlaw.com
Lily A. North (CA 260709)
lnorth@beneschlaw.com
**BENESCH FRIEDLANDER COPLAN &
ARONOFF LLP**
100 Pine Street, Suite 3100
San Francisco, California
Telephone: (628) 600-2250
Facsimile:  (628) 221-5828

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EPIC GAMES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO.  LTD; SAMSUNG ELECTRONICS AMERICA, INC.; and GOOGLE LLC, <br><br> Defendants. | Case No. 3:24-cv-06843-JD <br><br> **PLAINTIFF EPIC GAMES, INC.'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Hon. James Donato <br><br> Hearing:   April 3, 2025 <br> 10:00 a.m. <br> Courtroom 11 |

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................1

**FACTUAL BACKGROUND**............................................................................3

**ARGUMENT**....................................................................................................7

    I.  Epic Has Plausibly Alleged Sherman Act Claims. ........................................7

        A.  Epic Has Plausibly Alleged an Agreement to Restrain Trade Under Section 1................................................................7

        B.  Epic Has Plausibly Alleged a Conspiracy to Monopolize Under Section 2................................................................18

        C.  Epic Has Plausibly Alleged a Group Boycott Claim Under Section 1................................................................19

        D.  Auto Blocker Is Not Immune from Antitrust Scrutiny. ...................21

    II.  Epic Has Plausibly Alleged a Trade Libel Claim. ........................................23

    III. Epic Has Plausibly Alleged Cartwright Act and UCL Claims. ...................24

**CONCLUSION**................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ..............................................................21, 22

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988).............................................................................22

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
900 F.3d 623 (9th Cir. 2018) ...............................................................7

*Beaver v. Tarsadia Hotels, Corp.*,
816 F.3d 1170 (9th Cir. 2016) .............................................................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................7, 8, 18

*Blatty v. New York Times Co.*,
42 Cal. 3d 1033 (1986) .......................................................................24

*Cason-Merenda v. Detroit Med. Ctr.*,
862 F. Supp. 2d 603 (E.D. Mich. 2012)................................................10

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ........................................................................25

*City of Long Beach v. Standard Oil Co. of Cal.*,
872 F.2d 1401 (9th Cir. 1989) .............................................................11

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ...............................................................19

*Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*,
2013 WL 3337676 (C.D. Cal. June 28, 2013) ................................17, 18

*D'Augusta v. Am. Petrol Inst.*,
117 F.4th 1094 (9th Cir. 2024) ............................................................18

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986) .............................................................13

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023)............................................................22, 25

*Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*,
2023 WL 4677017 (9th Cir. July 21, 2023)...........................................14

*Franklin Fueling Sys., Inc. v. Veeder-Root Co.*,
  2009 WL 2462505 (E.D. Cal. Aug. 11, 2009) ........................................................24

*Gopher Media LLC v. Melone*,
  2023 WL 8790266 (S.D. Cal. Dec. 19, 2023) ........................................................24

*Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*,
  48 F.4th 656 (6th Cir. 2022) .........................................................................14, 15

*Honey Bum, LLC v. Fashion Nova, Inc.*,
  63 F.4th 813 (9th Cir. 2023) ................................................................................19

*In re Capacitors Antitrust Litig.*,
  106 F. Supp. 3d 1051 (N.D. Cal. 2015) .................................................................8

*In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) .................................................................................7

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
  28 F.4th 42 (9th Cir. 2022) ........................................................................... *passim*

*In re Ferrero Litig.*,
  794 F. Supp. 2d 1107 (S.D. Cal. 2011) ...............................................................25

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ........................................................ *passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ........................................................................9, 10

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ....................................................................8, 9, 17

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
  990 F. Supp. 2d 996 (N.D. Cal. 2013) .................................................................21

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ....................................................................13, 15, 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...........................................................12, 16

*In re Wholesale Grocery Prods. Antitrust Litig.*,
  752 F.3d 728 (8th Cir. 2014) ...............................................................................12

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ...............................................................................8

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................................6

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959)................................................................................................20

*Lambrix v. Tesla, Inc.*,
    737 F. Supp. 3d 822 (N.D. Cal. 2024) .................................................................24

*Lumber Liquidators, Inc. v. Cabinets To Go, LLC*,
    415 F. Supp. 3d 703 (E.D. Va. 2019) ..................................................................20

*Markson v. CRST Int'l, Inc.*,
    2019 WL 6354400 (C.D. Cal. Mar. 7, 2019) .......................................................9

*Murphy v. Olly Pub. Benefit Corp.*,
    651 F. Supp. 3d 1111 (N.D. Cal. 2023) ..............................................................25

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ...............................................................11, 14, 18

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) .........................................................................10, 20

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) .........................................................................16, 17

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .........................................................................24, 25

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ..............................................................................11

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) ................................................................................10

*United States v. Andreas*,
    216 F.3d 645 (7th Cir. 2000) ................................................................................13

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973).................................................................................................8

*United States v. Google LLC*,
    --- F. Supp. 3d ----, 2024 WL 3647498 (D.D.C. Aug. 5, 2024)........................22

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .........................................................................21, 22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)................................................................................................22

**Statutes & Rules**

Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.* ............................................24

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* .................24, 25

Sherman Act § 1, 15 U.S.C. § 1 .......................................................... *passim*

Sherman Act § 2, 15 U.S.C. § 2 .......................................................... *passim*

1

**INTRODUCTION**

2      While this Court was holding hearings about how to remedy Google's anticompetitive

3  conduct, Google and Samsung conspired to evade that remedy and thereby maintain Google's

4  illegal monopoly.  The allegations in Epic's Complaint are straightforward.  After a jury found

5  that Google illegally foreclosed competing app distribution methods, Samsung agreed with

6  Google to perpetuate that foreclosure by turning Auto Blocker "on" by default on all new

7  Samsung phones.  This agreement was part of a longstanding anticompetitive partnership

8  between Google and Samsung:  Samsung committed not to compete with Google in Android app

9  distribution; Google paid Samsung billions of dollars in exchange.  Taken as true, these

10 allegations state a claim against both Google and Samsung.  Defendants' motions to dismiss

11 imagine a different complaint, improperly ignoring or outright contradicting these allegations.

12 They do not raise any serious arguments requiring dismissal of the Complaint Epic actually filed.

13     *First*, Defendants contend it is implausible, under Epic's alleged facts, that they could

14 have reached an agreement relating to Auto Blocker.  (Samsung Br. Section II.A–B; Google Br.

15 Section I.A–B.)  But the Complaint alleges more than enough facts to plausibly plead a

16 conspiracy.  As this Court observed at the case management conference, the parties are not

17 "writing on a clean slate".  Dkt. No. 55 at 6.  In *Epic v. Google*, the jury found that for years

18 Google has maintained an illegal monopoly over the distribution of Android apps through a web

19 of anticompetitive agreements, technical impediments and frictions.  Case No. 3:20-cv-05671-JD

20 (N.D. Cal.) ("*Epic v. Google*").  Importantly, Epic showed—and the Complaint now alleges—

21 that Samsung *agreed with Google* to put its own app store on the backburner in preference to

22 Google's Play Store.  In turn, Google has committed to pay Samsung billions of dollars.  The

23 Complaint further alleges that the Court's injunction threatens to kill the golden goose;

24 impending competition in the Android app distribution market would jeopardize Google's

25 monopoly rents and thus future non-compete payments to Samsung.  It was in both Defendants'

26 economic interests to protect Google's monopoly.  Samsung's decision to turn Auto Blocker

27 "on" by default aligns exactly with that interest.  Auto Blocker prioritizes Samsung users' access

28 to the Play Store even over their access to Samsung's Galaxy Store, and the change to default

"on" was timed to undermine the Court's decision to open up competition that could threaten Google's monopoly. And Samsung changed the Auto Blocker setting less than a year after promising users they would remain free to directly download competing app stores—a practice Samsung had permitted for over a decade because it recognizes direct downloading has many benefits. Given the Complaint's allegations of Defendants' past agreements to suppress competition in Android app distribution, Samsung's financial interest in the continued sharing of Google's monopoly rents, the timing of the Auto Blocker decision and the stark departure it represents from Samsung's past practices, it is more than plausible that Defendants have again colluded to stifle competition. (*See* Section I.A, *infra*.)

*Second*, Defendants argue that Epic's conspiracy to monopolize claim fails for a lack of specific intent to monopolize. (Samsung Br. Section II.C; Google Br. Section III.) But the Complaint alleges that Google had the intent to maintain its monopoly and Samsung agreed to implement Auto Blocker by default to maintain that monopoly (the gains of which it shares). That is plausible specific intent. (*See* Section I.B, *infra*.)

*Third*, Defendants argue that Epic's group boycott claim should be dismissed because Google itself has not refused to do business with independent app store developers. (Samsung Br. Section III; Google Br. Section II.) That is wrong. A group boycott is an agreement between two or more firms to exclude other firms. Auto Blocker gives Samsung users friction-free access to only two app stores—Google's and Samsung's. It excludes all others because Google and Samsung agreed it should. Google's participation in an *agreement* amounting to a concerted boycott is enough. (*See* Section I.C, *infra*.)

*Fourth*, Samsung maintains that Auto Blocker must be immune from any scrutiny because it has "undisputed" security features and must therefore benefit users. (Samsung Br. Section I.) Not so. Epic's Complaint disputes those security justifications, which are irrelevant, pretextual or both. Regardless, the law does not protect a product when it is implemented as part of an anticompetitive scheme. (*See* Section I.D, *infra*.)

*Fifth*, Samsung contends the trade libel claim should be dismissed because Auto Blocker's pop-up screen is not a statement, not false or not specific to Epic. (Samsung Br.

1  Section IV.)  All of that is wrong.  Auto Blocker's false statement about unsafe stores and apps is

2  presented to potential Epic users at the very moment they try to download Epic's products.

3  Given this context, it is reasonable to infer that these users will understand Samsung's false

4  statement to relate to the Epic product they are trying to download, not to some other product

5  they are not trying to access.  Auto Blocker thus harms Epic by preventing users from

6  downloading Epic products.  (*See* Section II, *infra*.)

7      *Lastly*, Defendants do not dispute that Epic's Cartwright Act and UCL claims survive if

8  any of its antitrust claims survive.  (Samsung Br. Sections II.D and V; Google Br. Section IV.)

9  And even independent of its antitrust claims, Epic has pleaded that Defendants' conduct violates

10  the UCL because it is unfair.  Further, Epic's UCL claims properly seek injunctive relief;

11  damages will not fully redress Defendants' ongoing attempt to flout this Court's injunction.  (*See*

12  Section III, *infra*.)

13                    **FACTUAL BACKGROUND**

14      Google is a monopolist that has used its control over the Android operating system to

15  dominate the market for Android app distribution, thwarting competition and extracting

16  monopoly rents from developers and consumers.  (Compl. ¶¶ 60–68.)  The jury in *Epic v. Google*

17  determined, and the Complaint alleges, that Google has a monopoly over the distribution of

18  Android apps through its Play Store and has maintained that monopoly through a series of

19  unlawful practices and agreements, including agreements with Samsung.  (*Id.* ¶¶ 26–60.)

20      One way that Google monopolized the Android App Distribution Market was by

21  injecting a series of anticompetitive frictions into the process of distributing apps via direct

22  downloading or third-party app stores.  (*Id.* ¶ 62.)  Google designed Android to allow users to

23  download and install apps from the Play Store and pre-installed app stores, such as the Samsung

24  Galaxy Store, seamlessly.  (*Id.*)  A user clicks a single button, no warnings are presented, and the

25  user need not leave the store or change any settings on their device.  (*Id.*)  By contrast,

26  downloads from a website or any other store that is not pre-installed are subject to the Unknown

27  Sources install flow—a series of at least fifteen cumbersome "scare screens" and extra steps that

28  a user must complete before downloading.  (*Id.* ¶¶ 40, 63–66.)

1    Google has cut off competition from Samsung—its biggest potential rival in Android app

2    distribution—by entering into a series of understandings.  The two companies have described

3    themselves as having a "relationship between close family members" and have agreed they are

4    "very close collaborators".  (*Id.* ¶ 69.)  As far back as 2014, Samsung assured Google that "[w]e

5    definitely *don't want to compete* with Play Store".  (*Id.* ¶ 73.)  And Google has repeatedly sought

6    commitments that Samsung would either close the Samsung Galaxy Store or, in the alternative,

7    not compete.  (*Id.* ¶¶ 69–79.)  In 2019, Google launched Project Banyan, an attempt "to have a

8    single voice to the ecosystem, and so that the [Google and Samsung] teams were not out

9    competing with each other".  (*Id.* ¶ 75.)  Samsung described Project Banyan as "basically asking

10   [Samsung] to get out of the store business" and to "prevent unnecessary competition on app

11   store".  (*Id.* ¶¶ 73–76.)  That agreement was not officially signed because Defendants recognized

12   that if they were to explicitly "secure confidence" that Samsung would not compete, they would

13   face legal jeopardy.  (*Id.* ¶¶ 77–79.)  Nevertheless, in 2020 Google agreed to pay Samsung

14   billions of dollars through a so-called revenue share agreement ("RSA").  (*Id.*)  Internally,

15   Google recognized that an agreement with Samsung "would only make sense" if the latter would

16   not compete on price.  (*Id.*)  Samsung kept its end of the bargain.  Its Galaxy Store has not

17   competed against Google's Play Store on headline rate, app exclusives, catalog size or any other

18   metric.  (*Id.* ¶ 119.)

19       As a result of this and other anticompetitive conduct, the Play Store has gone virtually

20   unchallenged.  It comes pre-installed on every Android phone worldwide (outside China).  (*Id.*

21   ¶ 1.)  It is the source of over 80% of Android apps downloaded and installed by around three

22   billion Android users globally.  (*Id.*)  In contrast, Samsung's Galaxy Store is essentially an empty

23   storefront.  Despite being available on almost half of all Android phones, it accounts for a

24   miniscule share (about 1%) of Android app downloads.  (*Id.* ¶ 2.)

25       For the first time in over a decade, Google's monopoly position may be challenged.

26   Following the *Epic v. Google* verdict, Epic sought an injunction that would restore competition,

27   undoing years of network effects created and perpetuated by Google's unlawful practices so that

28   third-party app stores can compete on the merits.  (*Id.* ¶ 82.)  In anticipation, Epic launched its

own app store, the Epic Games Store ("EGS"), on Android.  (*Id.* ¶ 87.)  EGS offers developers lower fees and the freedom to decide whether to use Epic's payment solution or to use a different payment solution without paying a fee.  (*Id.*)  Other competitors, such as Microsoft, have similarly announced plans to launch app stores on Android that would compete with the Play Store.  (*Id.* ¶ 89.)  The Court has now issued a final injunction that, although temporarily stayed, stands poised to open competition for Android app distribution.  Once the injunction is in effect, those new stores could represent a serious competitive threat to Google.  (*Id.* ¶ 88.)

As it became clearer the Court would implement an injunction to stop Google from thwarting competing stores, Samsung and Google agreed that Samsung would change the setting on a Samsung feature called "Auto Blocker" so that it would effectively achieve the same goals as the Unknown Sources flow.  (*Id.* ¶¶ 8–9, 101.)  Auto Blocker is a feature on Samsung's new One UI 6.1.1 (a version of Samsung's proprietary user interface software installed on Samsung Android phones) that blocks users from installing apps from any source except the Play Store or the Samsung Galaxy Store.  (*Id.* ¶¶ 91–94.)  Whenever a user tries to download an app from *any* other source, Auto Blocker steps in to "warn" the user that the source is not "safe", regardless of its actual safety.  (*Id.*)  For example, Auto Blocker would block the installation of *Fortnite* from EGS even though *Fortnite* was itself available on the Galaxy Store for years and is well known to both Samsung and Google.  (*Id.*)  Auto Blocker conducts no testing to determine whether an app is reputable and/or known to Samsung, Google or both before declaring it an "unknown app".  (*Id.*)  Nor does Auto Blocker scan or otherwise assess an app's security before blocking installation and representing that it did so "to keep your phone and data safe".  (*Id.*)  And Samsung has indicated that it has no process and no plan to authorize any other app store.  (*Id.* ¶ 95.)  If users attempt to turn "off" Auto Blocker—which requires them to navigate through at least three stages on the device's settings menu—they are presented with a scare screen asserting that Auto Blocker is a "security" feature.  (*Id.* ¶ 96.)[1]  This scare tactic will lead many users to

---

[1] Defendants point to Samsung announcements regarding Auto Blocker that are cited in the Complaint and urge the Court to take portions of those announcements relating to "security" as true.  (Samsung Br. 3 n.2; Google Br. 2 n.3.)  But the Complaint disputes the truth of those announcements' contents and alleges that "security" is a pretext for anticompetitive friction.  (Compl. ¶¶ 94, 104, 106, 117, 120.)  Defendants' own citation instructs that "it is improper to

1  abandon their attempts to download apps, including competing app stores.  (*Id.*)  Samsung

2  provided no explanation for the sudden change reflected in its decision to make Auto Blocker

3  "on" by default.  (*Id.* ¶ 100.)

4     The surrounding circumstances lead to the plausible conclusion that setting Auto Blocker

5  "on" by default was the result of an agreement between Samsung and Google:

6  • Auto Blocker allows for installation from two sources:  the Play Store and the Galaxy

7     Store.  It nakedly excludes all competitors besides Google, and even lists Google's

8     store ahead of Samsung's.  (*Id.* ¶¶ 92–93.)

9  • Auto Blocker closely resembles Google's Unknown Sources flow, which likewise

10    creates anticompetitive friction under the guise of scare screens and serial installation

11    steps.  (*Id.* ¶¶ 102–06.)

12 • Google paid Samsung billions of dollars in the past few years alone.  (*Id.* ¶ 78.)

13 • Auto Blocker is timed to counteract the remedies in *Epic v. Google*.  Samsung

14    unveiled Auto Blocker during the trial.  Samsung then switched it "on" by default

15    during the remedy proceedings, just three months after Epic sought an injunction

16    preventing Google from imposing its Unknown Sources flow.  (*Id.* ¶¶ 107–111.)

17 • Google and Samsung have historically jointly undercut competition by agreeing that

18    Samsung would not compete with the Play Store to distribute competitors' products.

19    (*Id.* ¶ 112.)

20 • Google and Samsung communicate abnormally and frequently.  They have described

21    themselves as "close family members" and admitted in their communications that

22    they "definitely don't want to compete".  (*Id.* ¶ 113.)

23 • Samsung's conduct abruptly ended 15 years of allowing users to directly download

24    apps to their Samsung devices.  As recently as October 2023 Samsung touted this

25    longstanding practice as a feature: "[t]here are many benefits to intentional

26

27 assume the truth of an incorporated document if such assumptions only serve to dispute facts
   stated in a well-pleaded complaint".  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999
28 (9th Cir. 2018).

1    sideloading, such as enhanced customization and control over a device's

2    functionality." (*Id.* ¶ 114.)

3    • Samsung's actions are inconsistent with its unilateral self-interest. The direct

4    beneficiary of Samsung's blocking of alternative distribution channels is Google, not

5    Samsung—the Galaxy Store's market share is minuscule, and Samsung has never

6    tried to build it into a viable competitor to the Play Store. All Auto Blocker does is

7    build a moat around Google's Play Store monopoly. Absent an agreement between

8    Samsung and Google, it would be irrational for Samsung (or any company in its

9    position) to entrench the Play Store monopoly—just as this Court is poised to

10    dismantle that monopoly. (*Id.* ¶¶ 115–17.)

11    • Samsung does not compete on its headline rate, exclusives, catalog size or any other

12    metric, suggesting an agreement with its competitor Google. (*Id.* ¶ 117.)

13    The anticompetitive effects of the Auto Blocker agreement are widespread. Samsung

14    devices account for more than 40% of Android phones and an even larger share of app-related

15    revenue. (*Id.* ¶ 122.) Through friction, Auto Blocker substantially forecloses competing app

16    stores like EGS from the market and from reaching a sizable audience on Android. (*Id.* ¶ 124.)

17    And the false statements in Auto Blocker's pop-up—that Epic's store and apps are "unknown"

18    and "unauthorized" and therefore unsafe—actively harm Epic's business. (*Id.* ¶¶ 125–31.)

19    **ARGUMENT**

20    **I.    Epic Has Plausibly Alleged Sherman Act Claims.**

21    **A.    Epic Has Plausibly Alleged an Agreement to Restrain Trade Under Section 1.**

22    To plead a Section 1 claim, a plaintiff must allege "enough factual matter (taken as true)

23    to suggest that an agreement was made". *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

24    "It is not necessary to find an express agreement, either oral or written, in order to find a

25    conspiracy" to restrain trade. *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623,

26    634 (9th Cir. 2018) (citation omitted). In fact, "direct evidence will rarely be available" to prove

27    an antitrust conspiracy. *In re Coordinated Pretrial Proc. in Petroleum Prods. Antitrust Litig.*,

28    906 F.2d 432, 439 (9th Cir. 1990). That is why "circumstantial evidence is the lifeblood of

1    antitrust law." *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13 (1973).[2]

2           Courts look to the totality of the circumstances, including a non-exclusive list of "plus

3    factors", to determine the plausibility of an anticompetitive agreement. "Plus factors are often

4    economic actions and outcomes that are largely inconsistent with unilateral conduct but largely

5    consistent with explicitly coordinated action." *In re Dynamic Random Access Memory (DRAM)*

6    *Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) (quotation omitted).

7    Crucially, plus factors are weighed holistically, not as a checklist. "[T]he law requires that the

8    character and effect of a conspiracy are not to be judged by dismembering it and viewing its

9    separate parts, but only by looking at it as a whole." *In re Nat'l Football League's Sunday Ticket*

10   *Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (quotation omitted). That means courts

11   "must give plaintiffs the full benefit of their proof without tightly compartmentalizing the

12   various factual components and wiping the slate clean after scrutiny of each". *Id.* (quotation

13   omitted). And "there simply is no requirement that an antitrust plaintiff draw the boundaries of

14   the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter."

15   *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1063 (N.D. Cal. 2015).

16          Epic's Complaint surpasses the pleading threshold. It alleges that Samsung and Google

17   changed Auto Blocker's default setting to reduce competition for Android app distribution just as

18   *Epic v. Google* threatened to open up competition, so Google can continue to receive monopoly

19   rents from the Play Store and Samsung can continue to receive billions of dollars in exchange.[3]

20

21          [2] In several submissions, Samsung has harped on an article it characterized as "an
     interview with Epic's CEO, Tim Sweeney, where he was quoted as admitting that 'he doesn't yet
22   have proof that Google and Samsung colluded—he's hoping that comes out in the legal
     discovery process'." *See* Dkt. Nos. 48, 50. Samsung mischaracterizes the article—it does not
23   present the language above as a quotation from Mr. Sweeney. But in any event, Samsung has it
     backwards. The entire reason for a plausibility threshold at this stage is to confirm a "reasonable
24   expectation that *discovery will reveal* evidence of illegal agreement". *Twombly*, 550 U.S. at 556
     (emphasis added). Indeed, Google's employees have confirmed that they are not likely to have
25   inked any conspiracy with Samsung in writing, much less announce it to the public. As one
     executive testified, if there were a handshake agreement between Google and Samsung to reduce
26   competition between their two app stores, "we wouldn't see it in the documents", while another
     wrote that the parties "might prefer to hide" their cooperation. (Compl. ¶ 79.)

27          [3] Defendants rely on *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008), to
     argue an exacting pleading standard whereby plaintiffs must allege "who, did what, to whom (or
28   with whom), where, and when?". (Samsung Br. 7; Google Br. 3–4.) Epic's Complaint meets
     that standard, even though "*Kendall* only required such specifics after Plaintiffs had conducted

1    Epic has also pleaded an array of plus factors showing that Samsung's actions are

2  inconsistent with unilateral conduct. *DRAM*, 28 F.4th at 47. As explained below, the Complaint

3  alleges that Samsung and Google share a long history of anticompetitive collusion, that they

4  communicate in a highly unusual manner, that the change to Auto Blocker's default setting was

5  sudden and unexplained, and that the change shores up the wall around a competitor's product

6  (which Samsung refrains from competing with). Defendants' motions merely invite this Court to

7  isolate these plus factors,[4] contradict or ignore the Complaint's factual allegations, and draw

8  inferences in their favor instead of Epic's. The Court should decline to do so.

9    ***Auto Blocker's Design and Timing Evidence a Conspiracy.*** The Complaint alleges that

10  Auto Blocker's design and timing suggest that it is the result of a conspiracy with Google.

11  Samsung's Auto Blocker is strikingly similar to Google's Unknown Sources flow. Both features

12  allow seamless downloads from the Play Store (and the Samsung Galaxy Store) while imposing

13  friction on competing distribution methods like EGS. They both (1) purport to enhance security

14  by making it more onerous for users to install rival app stores without considering whether the

15  stores contain actual security risks; (2) scare users with a pop-up warning about "security"

16  without ever substantiating that warning; (3) employ a method of multi-step friction proven to

17  reduce the number of users who install rival stores; and (4) provide no way for users to designate

18  rival stores as "authorized" or their apps as "known", much less for a competitor to do so.

19  (Compl. ¶ 106.) Samsung set Auto Blocker to be "on" by default a few months after Epic filed a

20  proposed injunction that would have prevented Google from using the Unknown Sources flow as

21  _____

22  ample fact discovery, which has not occurred in this case". *Markson v. CRST Int'l, Inc.*, 2019
   WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019). In *Markson*, the court rejected the notion that
23  "[p]laintiffs must specifically allege which persons, on behalf of Defendants, consummated the
   conspiracy and exactly when they did so" at the pleading stage. *Id.*

24    [4] Google's argument that a court "analyzes each purported plus factor in isolation"
   misstates the law. (Google Br. 7.) Google truncates language from Ninth Circuit precedent,
25  where the court observed it would consider plus factors "in turn". *In re Musical Instruments &*
   *Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). Google omits the part of the
26  sentence confirming that the Ninth Circuit analyzes plus factors both sequentially "and
   cumulatively", not in isolation. *Id.* After all, the "character and effect" of every conspiracy will
27  be different; if some plus factors are not enough to establish plausibility in one case, those same
   plus factors might, when considered alongside other factors or in a different context, support
28  plausibility in a different case. *Sunday Ticket Antitrust Litig.*, 933 F.3d at 1152.

1   an anticompetitive tool.  In other words, Samsung has carried forward Google's strategy.

2          Google argues that parallel conduct is a prerequisite for inferring an agreement and that

3   Auto Blocker cannot parallel the Unknown Sources flow because that flow had been in place for

4   years before Auto Blocker.  (Google Br. 6–7.)  That argument misunderstands the elements of

5   antitrust conspiracy and elevates form over substance.  Parallel conduct might be evidence of a

6   conspiracy, but it is not required.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798

7   F.3d 1186, 1193 (9th Cir. 2015) ("Under *Twombly*, parallel conduct, such as competitors

8   adopting similar policies around the same time in response to similar market conditions, *may*

9   *constitute circumstantial evidence* of anticompetitive behavior." (emphasis added)); *Cason-*

10  *Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 626 (E.D. Mich. 2012) (observing that,

11  while parallel conduct is often at issue, "this Court is aware of no case law—nor have

12  Defendants identified any—that mandates that a plaintiff's portfolio of circumstantial evidence

13  in a [Section] 1 case *must* include proof of parallel conduct").  Whether Auto Blocker is labeled

14  "parallel" or not, the details and circumstances of its implementation reasonably suggest a

15  conspiracy.  That is all that is needed.  *Cf. Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th

16  Cir. 2000) (toy store illegally colluded with manufacturers to boycott competitor stores without

17  taking direct parallel action against competitor stores).

18         Regardless, Auto Blocker and the Unknown Sources flow *are* parallel conduct.  The

19  Complaint alleges that based on a common scheme, since 2024, at least one of Google and

20  Samsung has employed a functionally identical (*i.e.*, parallel) mechanism to foreclose

21  competition in app distribution on Samsung devices.  *See PLS.com, LLC v. Nat'l Ass'n of*

22  *Realtors*, 32 F.4th 824, 843 (9th Cir. 2022) (explaining it "makes no difference" whether a

23  conspirator adopted a policy voluntarily before its coconspirators; the question is whether the

24  conspirators "adhered to a common scheme").  One can reasonably infer that by mirroring

25  Google's specific exclusionary method, Samsung agreed to carry forward Google's

26  anticompetitive strategy and sidestep this Court's forthcoming injunction, now that Google itself

27  has come under antitrust scrutiny.

28         ***Google and Samsung's Common Motive To Conspire.***  The Complaint also alleges

motive to conspire: Google wants to maintain the monopoly profits on its Play Store and knows Samsung can help it do so, and Samsung wants to continue receiving payments from Google rather than try to earn its own profits by competing.

Defendants argue that a motive to maximize profits is not sufficient. (Google Br. 9; Samsung Br. 11–12.) But a motive to maximize profits *through anticompetitive means* suggests a conspiracy. *See City of Long Beach v. Standard Oil Co. of Cal.*, 872 F.2d 1401, 1407 (9th Cir. 1989) (holding that evidence showing defendants "had substantial incentives to conspire" could support "an inference of agreement"). The Complaint alleges that Samsung has "ced[ed] to Google its monopoly position in exchange for a cut of Google's monopoly rents". (Compl. ¶ 78.) Google promised Samsung billions of dollars in revenue flowing from Samsung devices under the RSA. During negotiations over the RSA, Google told Samsung to "more and more . . . start acting as one unit to the market". (*Id.*) With billions in revenues from Google, Samsung has every reason not to compete. By using Auto Blocker to ensure the Play Store's dominance, Samsung maintains Google's profits, and gets paid in turn. (*Id.* ¶¶ 112, 118.)

Defendants do not seriously dispute that a cut of Google's monopoly rents would give Samsung a "rational motivation to conspire" with Google. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1090 (9th Cir. 2015). Samsung instead responds that these monopoly rents could not have come from the RSA in particular, because that agreement promises revenues from Google's search business rather than its app business. (Samsung Br. 7–10.) But money is fungible. It does not matter whether the money is formally tied to search revenue, app store revenue or anything else; there are a multitude of ways for conspirators to structure a payment. The billions that are paid provide Google's end of the anticompetitive bargain. *Cf. Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021) (millions in funds and loans from one competitor to another supported inference of agreement). And the fact that the RSA does not explicitly reference the Play Store is no surprise. As one Google executive testified, if there were a handshake agreement between Defendants to reduce competition between their stores as a part of the RSA, "we wouldn't see it in the documents". (Compl. ¶ 79.) He also testified that Samsung assured Google that it would not compete on store

content, and wrote at the time that Google would not enter an agreement without assurances that Samsung would not compete on pricing. (*Id.* ¶¶ 74, 77.) Samsung in fact has not seriously competed in app distribution in the years following the RSA, which suggests the RSA was indeed a pretense to explain away Samsung's cut of Google's monopoly rents. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) ("Courts have held that a conspiracy to fix prices can be inferred from an invitation, followed by responsive assurances and conduct."); *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 734 (8th Cir. 2014) ("Tellingly, although the written non-compete agreement permitted the wholesalers to compete in each other's regions for new and existing customers, *neither one actually did so*." (emphasis in original)).

**Turning Auto Blocker "On" by Default Is Against Samsung's Self-Interest.** The Complaint also alleges that by failing to compete with the Play Store and choosing not to block the Play Store, Samsung has acted against its self-interest. Auto Blocker's pop-up screen even refers users to Google's store as an authorized source *before* Samsung's own store—a preferencing which would make little sense if Samsung were actively competing against the Play Store. (Compl. ¶¶ 93, 105 ("You can only install apps from authorised sources such as the Play Store or Galaxy Store.").) By prioritizing its competitor, Samsung's actions are "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action" with Google. *DRAM*, 28 F.4th at 47. Samsung contends that it would have nothing to gain from conspiring with Google at a time when this Court was poised to unlock new opportunities for competitors. (Samsung Br. 7–8.) But Samsung mischaracterizes the standard. The plus factor does not ask whether it is in Samsung's interest to conspire but whether the challenged conduct would be in Samsung's interest absent a conspiracy. When viewed through that lens, Samsung's argument only supports the plus factor. The Complaint alleges that Samsung has believed it beneficial not to compete for years—and continues to believe it beneficial not to compete despite the opportunity to capitalize on an injunction—which does not make sense absent a conspiracy. Despite being pre-installed on almost half of all Android smartphones, users almost never download apps from Samsung's Galaxy Store. (Compl. ¶ 52.) Samsung has done nothing to

change that disparity.  It has not pursued obvious strategies like offering exclusive deals for major game titles on the Galaxy Store or charging less than Google's 30% take on in-app purchases.  (*Id.* ¶ 78.)  And now, when the injunction was poised to unlock competition, Samsung declined to take advantage of that opportunity and instead doubled down on its strategy of supporting Google's monopoly.  It is hardly a stretch to infer that absent Google's ten-figure payments, Samsung would not have done so.  *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1479–80 (9th Cir. 1986) (finding that a refusal to enter into profitable sales can "support an inference of concerted action"); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) ("If parties agree to fix prices, one expects that as a result they will not compete in price—that's the purpose of price fixing.").

**_Defendants' History of Anticompetitive Collusion Is a Blueprint for Conspiracy._**  The Complaint also alleges a long history of anticompetitive understandings between Google and Samsung.  Unlike many Section 1 cases, here it is no secret that Defendants have cooperated anticompetitively in the market for Android App Distribution, including recently.  Google has described the companies as "close family members" and "very close collaborators".  (Compl. ¶ 113.)  Samsung has told competitors like Microsoft that it is "highly dependent" on Google, such that it tries to appease Google.  (*Id.* ¶ 69.)  Samsung assured Google, point blank, that "[w]e definitely don't want to compete with Play Store".  (*Id.* ¶ 73.)  And in the lead-up to Project Banyan and the RSA that followed it, Samsung promised Google that exclusive game launches on the Galaxy Store—one effective way app stores can differentiate and compete—"would not be a part of [Samsung']s core strategy going forward".  (*Id.* ¶ 74.)  This ongoing conspiracy "provide[s] the blueprint for and motivating force behind the nascent" Auto Blocker scheme.  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1149 (N.D. Cal. 2009) (citing *United States v. Andreas*, 216 F.3d 645, 665 (7th Cir. 2000)).

Defendants maintain that their "track record of anticompetitive agreements" could not pertain to Auto Blocker because that track record predates the launch of Auto Blocker by several years.  (Samsung Br. 9, 12; Google Br. 11.)  The law imposes no such time limit.  In this Circuit, "evidence concerning a prior conspiracy may be relevant and admissible to show the background

and development of a current conspiracy". *Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1149. Historical conduct is especially probative when it "involve[s] the same alleged coordination and actors". *DRAM*, 28 F.4th at 53. The Ninth Circuit has credited a conspiracy which "occurred approximately twenty years ago" as a plus factor supporting the plausibility of a later conspiracy. *Id.* The Complaint alleges that Defendants' anticompetitive history is ongoing and that the Auto Blocker decision responded to the threat of an injunction endangering their common scheme. Defendants' attempt to put that conspiracy in the rear view mirror is simply inconsistent with the allegations in the Complaint.

> ***Defendants' Atypical Communications Bolster the Conspiracy.*** The Complaint alleges specific emails, documents and testimony saying Defendants "definitely don't want to compete" and expressing the "desire between the parties to reduce competing services". (Compl. ¶ 113). *Cf. Optronic*, 20 F.4th at 481 (emails saying smaller competitor wanted to "avoid conflict" and "reduce conflicts" with larger competitor were "quintessential evidence of a market allocation conspiracy"). Samsung and Google scrapped Project Banyan—a written noncompete proposal— only after concluding reluctantly that they would face an "unacceptable legal risk" if they signed an overt agreement to "[p]revent unnecessary competition" in Android app distribution. (Compl. ¶¶ 5, 76, 77.) These are "facts reflecting consciousness of guilt or acknowledgements by co-conspirators that their conduct is anticompetitive". *Flextronics Int'l USA, Inc. v. Panasonic Holdings Corp.*, 2023 WL 4677017, at *2 (9th Cir. July 21, 2023) (highlighting communications stressing that "utmost care" was needed in document exchange, warning that communications could present "a compliance violation" and flagging that meetings "put the company at risk of being deemed as taking part in antitrust activities"). One can infer from these statements that Defendants have grown more careful about their continued conspiracy—rather than more competitive—now that their prior conduct has been exposed.

On this point, Google's citation to the Sixth Circuit's opinion in *Hobart-Mayfield* is distinguishable. (Google Br. 8, 10 (citing *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656 (6th Cir. 2022).) Although Google cites that case to argue that the Court should consider plausible safety explanations for Auto Blocker and avoid

inferring collusion from timing allegations, *Hobart-Mayfield* simply came down to weighing a much barer set of circumstantial allegations than Epic has pleaded.  *See Hobart-Mayfield*, 48 F.4th at 667–68.  There, the plaintiff alleged the defendants' cooperation amounted to trade show attendance and general safety communications, offering nothing like the circumstances here.

      Defendants protest that the Complaint has not cited specific communications about their anticompetitive partnership since 2020, and that the cited communications are too old to be relevant because Samsung introduced Auto Blocker in 2023.  (Samsung Br. 12; Google Br. 10–11.)  But the RSA at issue was signed in July 2020 for a term of four years, meaning it likely expired the very same month that Samsung set Auto Blocker "on" by default in July 2024.  The testimony cited in the Complaint concerning the lack of competition between the Defendants was elicited in (and true as of) November of 2023.  And of course, Defendants' extraordinary communications are probative because they discuss the same market (Android App Distribution) and overall conduct (suppressing competitors' app stores) as here.  Communications in the same market and on the same topics provide the "opportunity and means to develop" a future agreement.  *Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1148.  Moreover, Defendants' communications were not one-off or sporadic; they were a series of consistent communications stretching back more than a decade.  And even then, emails from 2019 and 2020 are only a few years old and far more recent than communications found to support plausibility in other antitrust cases.  *See id.* at 1143 (citing to particular communications and meetings from over a decade before complaint was filed).  Finally, fact discovery in *Epic v. Google* ended in 2020, so it is no surprise that Epic has not yet seen more recent confidential communications.  The pleading stage, where "plaintiffs have conducted no discovery", does not require identifying every specific communication between defendants up through the day of filing the Complaint.  *Text Messaging Antitrust Litig.*, 630 F.3d at 629.

      ***Samsung's Sudden and Unexplained Change in Behavior Evidences a Conspiracy.***
Samsung's reversal of Auto Blocker's default setting was sudden and unexplained.  When it first released Auto Blocker in October 2023, Samsung kept the setting "off" by default.  At that time, Samsung recognized the "many benefits to intentional sideloading, such as enhanced

customization and control over a device's functionality", and promised that "[t]hose who love to safely sideload will experience no change as the feature is off by default". (Compl. ¶ 97.) Yet eight months later, in July 2024, Samsung reversed course and turned Auto Blocker "on" by default. (*Id.* ¶ 91.) This about-face is the type of "abrupt and unexplained shift in behavior" suggesting Samsung's "acts were not entirely independent". *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428 (4th Cir. 2015). Samsung's reversal came several months after the *Epic v. Google* verdict established that Google is an illegal monopolist in this very market, at which point Epic sought an injunction to dismantle that monopoly, including by stopping Google's Unknown Sources flow. (Compl. ¶ 111.) The timing of Auto Blocker suggests that Samsung agreed to guard against new competitors who could challenge Google's dominance.[5]

***Auto Blocker Lacks a Legitimate Business Purpose Beyond an Anticompetitive Agreement.*** The Complaint alleges that there is no legitimate purpose for changing the setting for Auto Blocker from "off" by default to "on" by default. Although Auto Blocker touts security benefits, it authorizes only the Play Store and the Galaxy Store (both known to contain malware) and blocks "well known and reputable stores" from competitors including Amazon, Microsoft and Epic. (Compl. ¶ 120.) Auto Blocker's purported security justifications are baseless. Samsung did not investigate the security of these other stores before blocking them. (*Id.* ¶ 92.) And it offers no way for competitors like Epic to show that their stores are safe. (*Id.*) These security justifications are "pretextual reasons for . . . output restrictions, which also supports an inference of concerted action". *TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1116.

***Highly Concentrated Market.*** The concentration of the Android App Distribution

---

[5] Quibbling with this timing, Google observes Auto Blocker was turned on by default more than a year after Microsoft had announced its intent to launch an app store, yet before Epic launched its own app store and remedy proceedings had concluded in *Epic v. Google*. (Google Br. 9–10.) Google parses the events too narrowly. Regardless of when it first announced its plans, Microsoft *launched* its store on Android in 2024, the same year Auto Blocker was turned on by default. (Compl. ¶ 89.) Moreover, the Complaint does not allege that Microsoft's entry alone would open up the market—Google's Unknown Sources flow still restricts Microsoft's ability to succeed. What matters is Defendants knew that the looming remedy in *Epic v. Google*—whatever its ultimate form—would attempt to open up the market for new competitors. (*See id.* (describing how other developers like Microsoft "welcomed the promise" of the outcome in *Epic v. Google*).) As alleged, Defendants timed their action in order to counteract that anticipated remedy.

Market makes it especially ripe for collusive abuse. *See DRAM*, 28 F.4th at 52 (noting "[e]xtreme market concentration may suggest conspiracy"). Google has a monopoly over Android App distribution, accounting for over 80% of all downloads globally (excluding China). *See Black & Decker*, 801 F.3d at 432 (citing cases where market control exceeded 80% as a plus factor, and explaining that "[f]ewer 'minds' must 'meet' in a concentrated market"). That market concentration has remained largely unchanged for years, in part due to network effects— the mutual attraction between large numbers of users and developers on existing platforms—that Google enjoys. (Compl. ¶¶ 34, 52–54.) The only other competitor who enjoys access to similar network effects is Samsung, whose Galaxy Store is pre-installed on almost half of all Android smartphones. *See Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1144–45 (noting synergies between plus factors including "market concentration" and "high barriers to entry"). Given this broad access to users, one would expect Samsung to have taken an appreciable market share from Google over the years. But Samsung has not competed, and the most reasonable inference from this failure is that Samsung has agreed not to compete. *See Text Messaging Antitrust Litig.*, 782 F.3d at 876 (reasoning that "inflexibility of the market leaders' market shares over time" indicates "a possible agreement among them not to alter prices"). Samsung merely responds that industry structure alone does not suffice. (Samsung Br. 12.) But courts consider plus factors cumulatively, and the highly concentrated market for Android app distribution makes it more plausible that its two major players reached an anticompetitive agreement. *See Sunday Ticket Antitrust Litig.*, 933 F.3d at 1152–53.

**The Complaint Adequately Pleads Google's Involvement in the Conspiracy.** Finally, Google asserts that the Complaint fails to allege Google "took any action related to Auto Blocker at all or took any step that could be considered 'active participation' in the alleged conspiracy". (Google Br. 5.) Not so. The Complaint alleges that Google actively participated in a quid pro quo with Samsung: Google agreed with Samsung that Samsung would increase friction to protect Google's monopoly rents, in return for money from Google. (Compl. ¶¶ 78–79.)

The caselaw offered by Google only highlights the strength of the Complaint. In *Credit Bureau Services*, for example, the plaintiff did not allege that "anyone" at one supposed

conspiring company "ever communicated with or even was in the same room as anyone at" another conspiring company, "let alone that their communications involved an illicit agreement". *Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, 2013 WL 3337676, at *8 (C.D. Cal. June 28, 2013). And in *D'Augusta*, the plaintiffs alleged a "global oil conspiracy" between the President of the United States, multiple foreign nations and oil companies to cut oil prices, but failed to identify any particular oil companies involved. *D'Augusta v. Am. Petrol Inst.*, 117 F.4th 1094, 1101, 1104 (9th Cir. 2024). By contrast, Epic's Complaint identifies specific communications between Defendants, for example, planning to "[p]revent unnecessary competition" and "to have a single voice in the ecosystem", and an agreement between them to prevent competition through Auto Blocker, now that Google itself is about to be enjoined from foreclosing competitors from Android App Distribution. (Compl. ¶¶ 75–76.) Google's cases involved no understandings of the sort.

### B. Epic Has Plausibly Alleged a Conspiracy to Monopolize Under Section 2.

Defendants argue that if Epic failed to plead an anticompetitive agreement under Sherman Act Section 1, then Epic has failed to plead a Section 2 claim for conspiracy to monopolize. (Samsung Br. 13; Google Br. 13–14.) This argument can be discarded for the reasons immediately above—the Complaint alleges facts sufficient to show an anticompetitive agreement between Google and Samsung. *See Twombly*, 550 U.S. at 570.

Defendants' further contention that the Complaint fails to allege "specific intent" to monopolize is likewise without merit. The Complaint alleges that Samsung agreed with Google to implement Auto Blocker to maintain Google's monopoly in Android App distribution. (Compl. ¶¶ 8–9, 101.) Samsung suggests the Complaint must allege specific intent for *Samsung* to control prices or unreasonably destroy competition in the relevant market. (Samsung Br. 13.) But the Complaint pleads a claim for conspiracy to maintain *Google's* monopoly. The Complaint only needs to allege facts showing Samsung "specifically intended that *one of the parties* to the agreement would obtain or maintain monopoly power" in the relevant market. *Optronic*, 20 F.4th at 481 (emphasis in original). The Complaint alleges that Auto Blocker's default setting is meant to maintain Google's dominance in the market so Samsung can receive

1    some of Google's monopoly rents rather than fight for profits in the marketplace.  (Compl. ¶¶ 78,

2    117–18.)  This affirmative behavior by Samsung is a far cry from "generic allegations of profit

3    motive" or "a mere willingness to go along with a monopolist's plan".  (Samsung Br. 13.)

4         Google says it does not possess specific intent to monopolize either, because motivation

5    to "receive monopoly profits on its store" and "grow its business" is not actionable.  (Google

6    Br. 14 (citations omitted).)  This argument makes no sense; Google has already been found to

7    possess specific intent given that it was found liable for monopoly maintenance in *Epic v.*

8    *Google.*  The Complaint alleges that Google does not just want to continue receiving monopoly

9    profits; it wants to "maintain and entrench" those profits through anticompetitive agreements and

10   the introduction of anticompetitive friction—the same conduct it has already been found liable

11   for once.  (Compl. ¶¶ 124, 150.)  That intent is both specific and actionable.

12       **C.    Epic Has Plausibly Alleged a Group Boycott Claim Under Section 1.**

13       Defendants also contend that the Complaint does not plead a group boycott claim, and

14   that, even if it does, the claim is not entitled to *per se* treatment.  (Samsung Br. 13–14; Google

15   Br. 12–13.)  Neither argument has merit.

16       Epic has adequately alleged a group boycott claim.  "A group boycott, as its name

17   suggests, is an agreement among multiple firms not to deal with another firm . . . ."  *Honey Bum,*

18   *LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 820 (9th Cir. 2023).  That is exactly what the

19   Complaint alleges.  Group boycott is "a very broad label for divergent types of concerted

20   activity".  *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 453 n.5 (9th Cir. 2021).  For well

21   over a decade, Google has erected barriers to competing distribution methods on Android,

22   including by applying the Unknown Sources flow to deter users from adopting direct downloads

23   and third-party stores as well as by imposing restrictions on the pre-installation of alternative

24   stores.  Google and Samsung have agreed for Samsung to follow suit by applying Auto Blocker

25   by default to all new Samsung phones, thus fortifying the anticompetitive wall against direct

26   downloading and third-party app stores.  (Compl. ¶¶ 61–68, 80–82, 105–06.)  And when Google

27   maintains that Auto Blocker cannot constitute a boycott because users "remain fully able" to

28   download apps from competitors' stores (in theory), it ignores the Complaint's allegations

1    regarding the already-established effects of friction.  (Google Br. 13; *contra* Compl. ¶¶ 61–68.)

2        Defendants also argue that this case concerns only an individual boycott because Epic has

3    not alleged that *Google* boycotted Epic or other app stores.  That is meritless.  Not every co-

4    conspirator is required to directly effectuate the boycott under Section 1.  Participation in the

5    *agreement* to boycott is enough.  *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207,

6    212–14 (1959) (finding group boycott when manufacturers and distributors conspired with a

7    retailer with market power to deprive plaintiff retailer of access to product lines even though

8    defendant retailer did not itself refuse to sell to a competitor).

9        Samsung also makes a premature argument regarding whether the *per se* standard applies

10   the group boycott claim.  (Samsung Br. 14.)  Courts often decline to decide whether the *per se*

11   rule applies at the pleading stage because that determination is factual.  *See Lumber Liquidators,*

12   *Inc. v. Cabinets To Go, LLC*, 415 F. Supp. 3d 703, 714 (E.D. Va. 2019) (collecting cases).  In

13   any event, Epic's group boycott claim is *per se*.  A group boycott "generally falls into the *per se*

14   category if the boycotting firms possess a dominant position in the relevant market, they cut off

15   access to a supply, facility, or market necessary to enable the boycotted firm to compete, and the

16   practice is not justified by plausible arguments that it was intended to enhance overall efficiency

17   and make markets more competitive."  *PLS.com*, 32 F.4th at 835 (brackets and quotation marks

18   omitted).  "At the same time, a concerted refusal to deal need not necessarily possess all of these

19   traits to merit per se treatment."  *Id.* (quotation marks omitted).  Samsung makes no attempt to

20   engage with these factors.  (Samsung Br. 14.)  The Complaint easily meets them:  Google and

21   Samsung exploit their dominant control of smartphone settings to bottleneck downloads of

22   products from Epic and other competitors.  (Compl. ¶¶ 139–43.)

23       Samsung's attempt to remove this case from the *per se* framework by again claiming that

24   "Auto Blocker provides security . . . so it has a purpose other than disadvantaging the target"

25   again misses the mark.  (Samsung Br. 14 (citation omitted).)  The Complaint pleads that

26   Samsung's security justification is a front for its anticompetitive goals, and Samsung cannot

27   present contradictory facts on a motion to dismiss.  (*See, e.g.,* Compl. ¶¶ 94, 104, 106, 117, 120.)

28

**D.    Auto Blocker Is Not Immune from Antitrust Scrutiny.**

Samsung separately argues that its decision to implement Auto Blocker by default is immune from antitrust scrutiny under the "product improvement" doctrine.  Under the doctrine, "a design change that improves a product by providing a new benefit to consumers does not violate Section 2 *absent some associated anticompetitive conduct*".  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999–1000 (9th Cir. 2010) (emphasis added).  That doctrine does not apply to this case for two reasons:  setting Auto Blocker "on" by default both lacks a legitimate security basis and *is* part of an anticompetitive scheme.[6]

*First*, the Complaint alleges that setting Auto Blocker "on" by default has no legitimate business purpose and does not benefit users.  (*See, e.g.*, Compl. ¶ 94 (Auto Blocker's prompt "mislead[s]" users about security).)  Auto Blocker is therefore not a product improvement.  Yet Samsung ignores these allegations and creates its own counter-allegation that Auto Blocker "indisputably" is a product improvement that enhances security for Android users.  (Samsung Br. 4; *see also* Google Br. 8.)  Samsung cites to its own public statements about *other* purported benefits of Auto Blocker (such as, apparently, stopping voice phishing attacks) that are nowhere discussed in Epic's Complaint.  The Complaint did not discuss those statements for good reason: these purported benefits have nothing to do with downloading apps or app stores.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 64–65 (D.C. Cir. 2001) (explaining that courts evaluate the "specific" and "suspect" aspects of a product design that are challenged as anticompetitive, not the product as a whole).  Even if they were relevant, Samsung's statements are pretextual and the truth of their assertions is not cognizable on a motion to dismiss.  *See, e.g.*, *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 990 F. Supp. 2d 996, 1005 (N.D. Cal. 2013).

---

[6] Google does not join Samsung in invoking the product improvement doctrine.  Google tried to use this refrain of security justifications when it moved to dismiss in *Epic v. Google*.  It claimed its Unknown Sources flow was simply "a product feature or improvement to address malware risks and other security threats" and therefore "does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result".  Mot. to Dismiss, *Epic v. Google*, Dkt. No. 91, at 18 (citing *Allied Orthopedic*, 592 F.3d at 999–1000).  Google ultimately did not pursue this motion, and the jury proceeded to find Google liable based on the anticompetitive friction created by that very "feature".  The Complaint alleges analogous conduct in the same market involving the same frictions by the same players; the result should be the same.

1    As *Allied Orthopedic* itself demonstrates, the product improvement doctrine applies only where

2    there is *no factual dispute* that the product provided improvements for consumers.  592 F.3d at

3    1001–02 (decided at summary judgment with an evidentiary record).

4        *Second*, even if Auto Blocker did provide security benefits to users, it is still actionable.

5    It is connected to "associated anticompetitive conduct" because Samsung and Google allegedly

6    conspired to use it to block competing app distribution methods and app stores.  *Id.* at 999–1000;

7    *see Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 n.5 (9th Cir. 2023) (observing that

8    "Section 2 also encompasses certain concerted action—*i.e.*, 'conspiring with any other person or

9    persons' to monopolize a market").  Samsung does not cite a single case extending the product

10   improvement doctrine from one competitor's unilateral conduct to several competitors'

11   conspiracy.  That is because collusion is the "supreme evil" of antitrust law.  *Verizon Commc'ns*

12   *Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  Put another way, two

13   competitors—here, Samsung and Google—generally cannot *agree* to implement supposed

14   product improvements (let alone ones that foreclose competition) any more than they can agree

15   on price.  *See, e.g.*, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500–01

16   (1988) (scrutinizing as anticompetitive a concerted decision to set private safety standards for

17   electrical products).  Samsung does not grapple with the illegality of this concerted action.

18       Samsung also argues that Auto Blocker cannot harm Epic or other competitors because

19   users can turn it "off".  That argument fails because "consumers are unlikely to switch a default

20   setting off, even setting aside scare tactics such as those used by Auto Blocker to deter users

21   from making such a change".  (Compl. ¶ 123 (citing testimony from Google's CEO).)  Courts

22   recognize this reality, too.  Restrictions that make alternatives "unpleasant . . . for users", and

23   therefore "deter[] consumers from using" them, may substantially foreclose a nominally

24   available channel of distribution.  *Microsoft*, 253 F.3d at 64–65; *see United States v. Google*

25   *LLC*, --- F. Supp. 3d ----, 2024 WL 3647498, at *106 (D.D.C. Aug. 5, 2024) (remarking that

26   Samsung's cited case, *Allied Orthopedic*, does not "stand for the broad proposition that there is

27   no market foreclosure when a dominant firm leaves *some* alternative ways for customers to

28   access rivals").  Even if Auto Blocker is subsequently turned "off", the act of receiving an initial

warning adds friction that will cause some portion of users to stop downloading.  (Compl. ¶ 123.)
As a jury found, Google's similar Unknown Sources flow serves anticompetitive ends even
though users can (eventually) turn it "off".  (*Id.*)  Nor are the effects of Samsung's conduct
minor.  Samsung has a substantial share of Android smartphones (over 40%), and its users
contribute an even larger share of app-related revenue.  (*Id.* ¶ 122.)

Finally, Samsung contends that its update to Auto Blocker's settings cannot be
widespread because it does not apply to phones that use older Samsung software.  (Samsung
Br. 3–4, 6.)  That contention ignores the fact that the settings change will affect *every* new
Samsung smartphone capable of the change.  The Complaint identifies 17 different phone
models where Samsung has already implemented One UI 6.1.1.  (Compl. ¶ 99.)  Given the rate
that consumers replace or upgrade smartphones, it is reasonable to infer that the number of
Samsung phones running Auto Blocker as default "on" will quickly overtake those that do not.

## II.    Epic Has Plausibly Alleged a Trade Libel Claim.

Samsung challenges elements of Epic's trade libel claim (Samsung Br. 14), but the
Complaint's allegations are plausible and straightforward.  Auto Blocker's pop-up screen tells
users seeking to download Epic's applications (including EGS) that Epic's products are unknown
and that downloading them may make those users' phones and data unsafe.  (Compl. ¶ 126–27.)
That statement is false.  Epic's apps are "known" to Samsung; they were listed on the Galaxy
Store for years.  (*Id.* ¶ 128–29.)  Moreover, these apps are as "safe" as any downloaded through
Google's or Samsung's own stores, if not more so.  (*Id.* ¶ 120.)  Samsung knows that many users
will react to this scare screen by declining to download Epic's products.  (*Id.* ¶¶ 130–31.)

Samsung's contrary arguments are unavailing.  *First*, Samsung argues there is no harm to
Epic because users previously received the same message if they turned "on" Auto Blocker, yet
Epic did not sue Samsung.  As a threshold matter, Epic's decision not to sue on a previous
version of Auto Blocker does not mean that Epic was not injured by that previous version, nor
does it immunize Samsung from suit today.  The same statement is simply more harmful now
that Samsung forces it upon users by default—because that same false statement will reach more
users.  And the fact that some users may opt to turn Auto Blocker "on" does not mean those

1    users have opted to receive false statements.

2        *Second*, Samsung contends the trade libel claim must fail because the Complaint does not

3 identify particular customers and transactions.  But such particularity is not required when

4 plaintiffs "proceed on a theory of loss of market or general business loss where they can plead

5 the loss with reasonable certainty and eliminate other causes".  *Gopher Media LLC v. Melone*,

6 2023 WL 8790266, at *10 (S.D. Cal. Dec. 19, 2023); *see Franklin Fueling Sys., Inc. v. Veeder-*

7 *Root Co.*, 2009 WL 2462505, at *5–6 (E.D. Cal. Aug. 11, 2009).  Epic alleges that Auto Blocker,

8 similar to Google's Unknown Sources flow, prevents consumers generally from downloading

9 EGS.  (*See* Compl. ¶ 123 (alleging Epic "observed that 35% of users abandoned the installation

10 flow after encountering the first Unknown Sources warning").)

11        *Third*, Samsung proposes that groups with more than twenty-five members cannot show

12 that libelous statements are "of and concerning them" all.  (Samsung Br. 15.)  But regardless of

13 who else Samsung's statement might defame at other times, Samsung's scare screen refers to

14 Epic "by reasonable implication" when a consumer encounters it while trying to download

15 Epic's store or apps.  *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1046 (1986).  At that

16 moment, the offending scare screen language clearly concerns Epic's products alone.

17 **III.**    **Epic Has Plausibly Alleged Cartwright Act and UCL Claims.**

18        Finally, the challenges to Epic's Cartwright Act and UCL claims likewise fail.

19        Defendants argue that Epic's claim under California's Cartwright Act "fails for the same

20 reasons as its federal Sherman Act claims" and that the analysis under the Sherman Act is

21 "analogous" to analysis of the Cartwright Act claim.  (Samsung Br. 13; Google Br. 14.)  The

22 Court should therefore deny Defendants' motions to dismiss the Cartwright Act claims for the

23 same reasons as the Sherman Act claims.  (*See supra* Sections I, II.)

24        Defendants likewise do not dispute that Epic's UCL claims survive under the "unlawful"

25 prong if the corresponding Sherman Act, Cartwright Act or trade libel claims survive.  *See*

26 *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 851 (N.D. Cal. 2024).  Instead, citing the Ninth

27 Circuit's decision in *Sonner*, Samsung argues that Epic cannot seek injunctive relief under the

28 UCL because it failed to plead it lacks a remedy at law.  *See Sonner v. Premier Nutrition Corp.*,

971 F.3d 834, 844 (9th Cir. 2020) (dismissing claim for equitable restitution under the UCL for failure to demonstrate damages would be an inadequate remedy). That is wrong. The Complaint alleges that, absent an injunction, Epic will suffer irreparable injury similar to the irreparable injury it suffered in *Epic v. Google*. (Compl. ¶¶ 124, 138, 143, 153, 160.) *See Epic v. Apple*, 67 F.4th at 1002 (explaining that an injunction may issue only when an injury is irreparable and "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"). In any event, "[a] number of district court cases since *Sonner* have concluded that it has minimal application at the pleading stage". *See Murphy v. Olly Pub. Benefit Corp.*, 651 F. Supp. 3d 1111, 1129 (N.D. Cal. 2023) (collecting cases).

Alternatively, the Complaint pleads a UCL violation by alleging that Defendants' acts are independently "unfair". (Compl. ¶¶ 163, 165.) *See, e.g.*, *Beaver v. Tarsadia Hotels, Corp.*, 816 F.3d 1170, 1177 (9th Cir. 2016). "Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides and which usually cannot be made on demurrer." *In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1116 (S.D. Cal. 2011) (quotation marks omitted). Samsung concedes that the UCL authorizes courts to enjoin unfair conduct when it threatens an incipient violation of the antitrust laws. (Samsung Br. 15.) But conduct harming competitors is also unfair when it "violates the policy or spirit" of the antitrust laws "because its effects are comparable" or it "otherwise significantly threatens or harms competition". *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). Epic is a competitor of Samsung and Google because it offers a competing app store, and that Defendants' conduct violates the policy or spirit of the antitrust laws by harming competition for that product. (Compl. ¶¶ 83–88.)

## CONCLUSION

This is not a typical antitrust conspiracy case. A jury has already looked behind the curtain and found a pattern of collusion between Samsung and Google in this very market. Epic's Complaint plausibly alleges that pattern continues into the present day. Defendants' motions to dismiss should be denied.

1
2

Dated:  February 18, 2025

3

Respectfully submitted,

4

By:  _/s/ Gary A. Bornstein_

5

Gary A. Bornstein

6
7

**BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**

8

Shaneeda Jaffer (SBN 253449)
sjaffer@beneschlaw.com

9

Lily A. North (CA 260709)
lnorth@beneschlaw.com

10

100 Pine Street, Suite 3100
San Francisco, California

11

Telephone: (628) 600-2250
Facsimile:  (628) 221-5828

12
13

**CRAVATH, SWAINE & MOORE LLP**

14

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com

15

Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)

16

lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)

17

mzaken@cravath.com

18

Two Manhattan West
375 Ninth Avenue

19

New York, New York 10001
Telephone: (212) 474-1000

20

Facsimile:  (212) 474-3700

21

*Attorneys for Plaintiff Epic Games, Inc.*

22
23
24
25
26
27
28