1  VICTORIA F. MAROULIS, SBN 202603
   victoriamaroulis@quinnemanuel.com
2  Quinn Emanuel Urquhart & Sullivan, LLP
   555 Twin Dolphin Drive, 5th Floor
3  Redwood Shores, CA 94065
   Telephone: (650) 801-5000
4  Facsimile: (650) 801-5100

5  ADAM B. WOLFSON, SBN 262125
   KEVIN Y. TERUYA, SBN 235916
6  adamwolfson@quinnemanuel.com
   kevinteruya@quinnemanuel.com
7  Quinn Emanuel Urquhart & Sullivan, LLP
   865 S. Figueroa St., 10th Floor
8  Los Angeles, CA 90017
   Telephone: (213) 443-3000
9  Facsimile: (213) 443-3100

10 DEBRA BERNSTEIN (*pro hac vice* pending)
   debrabernstein@quinnemanuel.com
11 Quinn Emanuel Urquhart & Sullivan, LLP
   1200 Abernathy Road NE, Building 600, Suite 1500
12 Atlanta, GA 30328
   Telephone: (404) 482-3502
13 Facsimile: (404) 681-8290

14 *Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| EPIC GAMES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC.; and GOOGLE LLC, <br><br> Defendants. | Case No. 3:24-cv-06843-JD <br><br> **REPLY IN SUPPORT OF MOTION TO DISMISS BY SAMSUNG DEFENDANTS** <br><br> Judge: Hon. James Donato <br> Action Filed: September 30, 2024 |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..........................................................................................................................1

ARGUMENT .................................................................................................................................2

I. EPIC IS UNABLE TO EVADE THE IMMUNITY *ALLIED ORTHOPEDIC* PROVIDES FOR PRODUCT IMPROVEMENTS ................................................................2

II. EPIC'S CONSPIRACY STILL FAILS TO MAKE ANY ECONOMIC SENSE .................5

III. PLUS FACTORS DO NOT APPLY HERE FOR LACK OF PARALLEL CONDUCT, BUT IN ANY EVENT, THEY WEIGH AGAINST PLAUSIBILITY ............6

IV. EPIC DOES NOT ALLEGE A GROUP BOYCOTT AND BINDING LAW FORECLOSES ITS ARGUMENTS TO THE CONTRARY ...............................................8

V. EPIC'S TRADE LIBEL CLAIM FAILS ................................................................................9

VI. EPIC FAILS TO STATE A CARTWRIGHT ACT OR UCL VIOLATION ......................10

CONCLUSION ............................................................................................................................10

# TABLE OF AUTHORITIES

Page

## Cases

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
    141 F.3d 947 (9th Cir. 1998) ................................................................................................ 5

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ..................................................................................... 1, 2, 3, 4

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) ............................................................................................................. 4

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
    691 F. App'x 389 (9th Cir. 2017) ......................................................................................... 6

*In re Cedar Shakes & Shingles Antitrust Litig.*,
    2020 WL 832324 (W.D. Wash. Feb. 20, 2020) ................................................................... 8

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021) ................................................................................................ 9

*Crowder v. LinkedIn Corp.*,
    2023 WL 2405335 (N.D. Cal. Mar. 8, 2023) ....................................................................... 3

*Dreamstime.com LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) .............................................................................................. 3

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) .............................................................................................. 7, 8

*Epic Games, Inc. v. Apple Inc.*,
    67 F.4th 946 (9th Cir. 2023) ............................................................................................ 1, 4

*Fiss v. California Coll. of the Arts*,
    2025 WL 91181 (N.D. Cal. Jan. 14, 2025) .......................................................................... 6

*Forrett v. Gourmet Nut, Inc.*,
    634 F. Supp. 3d 761 (N.D. Cal. 2022) ............................................................................... 10

*Franklin Fueling Sys., Inc. v. Veeder-Root Co.*,
    2009 WL 2462505 (E.D. Cal. Aug. 11, 2009) ................................................................... 10

*In re German Auto. Manufacturers Antitrust Litig.*,
    612 F. Supp. 3d 967 (N.D. Cal. 2020) ............................................................................. 4, 9

*Gibson v. Jaguar Land Rover N. Am., LLC*,
    2020 WL 5492990 (C.D. Cal. Sept. 9, 2020) .................................................................. 10

*Gopher Media LLC v. Melone*,
    2023 WL 8790266 (S.D. Cal. Dec. 19, 2023) ................................................................. 10

*HomeLight, Inc. v. Shkipin*,
    694 F. Supp. 3d 1242 (N.D. Cal. 2023) ........................................................................... 8

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023) ............................................................................................ 8

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959). ................................................................................................... 8-9

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ............................................................................. 7

*Mann v. Quality Old Time Service, Inc.*,
    120 Cal. App. 4th 90 (2004) .......................................................................................... 10

*Memjet Tech. Ltd. v. Vanguard Graphics Int'l, LLC*,
    2024 WL 3798392 (S.D. Cal. Aug. 13, 2024) ............................................................... 10

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ......................................................................................... 6

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ............................................................................................ 9

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ......................................................................................... 5

*U.S. v. Google*
    2024 WL 3647498 (D.D.C. Aug. 5, 2024) ...................................................................... 4

**Rules/Statutes**

California Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.* ........................................ 2, 10

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq* ........................... 2, 10

Sherman Act, 15 U.S.C. § 1 & 2 ................................................................................................ 8, 10

**INTRODUCTION**

Epic's Opposition tries to sidestep multiple, fundamental problems with its claims and, in so doing, shows why dismissal is appropriate.

As an initial matter, Epic relegates its *Allied Orthopedic* response to the back of its brief, demonstrating that it knows the product improvement doctrine is a major problem. Epic concedes that turning Auto Blocker on by default provides unquestioned security-enhancing benefits. Opp. 21. Because Epic attacks Auto Blocker in its entirety, yet also concedes that it provides a product improvement, *Allied Orthopedic* immunizes Samsung from antitrust scrutiny for that design change. Epic's argument to the contrary is that it alleges Samsung agreed to make the change at Google's behest, and this somehow makes the change "associated anticompetitive conduct." *Id.* 22. Epic identifies no case law supporting such a conclusion, and cannot do so because such an arrangement implicates the rule of reason. But that test (as *Epic Games v. Apple* instructs) is precisely what the Ninth Circuit said in *Allied Orthopedic* a court **cannot** perform regarding product improvements, else courts unnecessarily stifle innovation. Epic's attempt to assert exceptional "associated anticompetitive conduct" would thus swallow the rule—and, in any event, does not actually identify the type of conduct the Ninth Circuit has explained qualifies for that exception.

Next, Epic does not contest that its own allegations make clear Samsung refused to "get out of the [app] store business" (¶75) and has no agreement with Google to receive a portion of Google's Play Store revenues or profits. Again and again, Epic tries to argue Samsung receives a portion of "Google's monopoly profits," but it consistently elides that the profits in question come from **search** revenues. Thus, Epic never grapples with the core illogic of its conspiracy allegations—*i.e.*, that Samsung supposedly harmed itself, at a point where it stood to benefit most from not helping Google, for no additional gain, through a change to a product feature that Epic concedes presents no competitive harms if turned on voluntarily rather than by default. This makes no economic sense and the law holds that dismissal follows from such an inherently implausible theory.

Perhaps recognizing this, Epic spends the majority of its time arguing about plus factors. But plus factors only apply when there is parallel conduct, and Epic does not allege Samsung's original introduction of Auto Blocker in 2023, or the later change to "default on" in 2024, was parallel in

timing or substance to anything Google did. Regardless, Epic's plus factor discussion ignores the law and points Samsung actually made, attacking strawmen or making irrelevant counterarguments. Such a response does not suffice, and does not circumvent the broader problem—that the alleged conspiracy makes no economic sense.

Similarly, Epic's group boycott arguments ignore that, in order to state a group boycott claim, one must actually allege a boycott. Throughout its Complaint and Opposition, Epic alleges that Auto Blocker increases "***friction***," but it nowhere alleges the feature completely prevents users from sideloading apps. Even according to Epic, a user can opt to never turn Auto Blocker on or later decide to turn it off. That is not a boycott, let alone a *per se* illegal group boycott.

Epic's trade libel arguments are similarly farfetched. Pointing to generic statements about "keep[ing] your phone safe" from "unauthorized" or "unknown" sources, Epic argues that the "reasonable implication" is that these are about Epic, even though they clearly apply to thousands upon thousands of sources of sideloaded apps. That is not a basis for a trade libel claim. And Epic fails to identify specific lost customers and business, as required by the law (which Epic tries to evade by invoking the *Play Store* litigation result, which it concedes was based on discovery ending in 2020—three years before Auto Blocker existed).

Finally, Epic's arguments against dismissal of its UCL and Cartwright Act claims hinge almost entirely on its implausible previous claims, and they fail to grapple directly with *Sonner*.

## ARGUMENT

### I. EPIC IS UNABLE TO EVADE THE IMMUNITY *ALLIED ORTHOPEDIC* PROVIDES FOR PRODUCT IMPROVEMENTS

Epic does not contest that, absent "associated anticompetitive conduct," a product design change "that improves a product by providing a new benefit to consumers" is immune from Section 2 liability under *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-99 (9th Cir. 2010). It does not contest that the supposed competitive problem at issue in this case is Auto Blocker, and that Auto Blocker provides several security enhancements and protections. Epic does not contest that it has no issue with the majority of these different enhancements. Epic also does not contest that implementing Auto Blocker in a way where users can

voluntarily turn it on provides a product improvement. Epic's objection is just that the improvement is "pretextual" if Auto Blocker is turned on by default. Opp. 21. This is not a viable claim under *Allied Orthopedic*, and none of Epic's arguments to the contrary lead to a different conclusion.

First, Epic argues that "setting Auto Blocker 'on' by default . . . lacks a legitimate security basis." *Id.* But this still fails the plausibility test. As noted, the Complaint and public materials it incorporates[1] make clear that Auto Blocker blocks apps from unknown sources, stalls voice phishing attacks, blocks malware images in messaging apps, detects and prevents the installation of malware, and prevents harmful commands by USB cable. ¶¶90 n.2, 91 n.3. As confirmed in its Opposition (at 21), Epic does not allege Samsung lacked a "legitimate security basis" to turn the vast majority of Auto Blocker features on by default. Nor can it because there are clear reasons why a smartphone manufacturer would implement these protections for its users.

The Ninth Circuit instructs that the Court must analyze anticompetitive conduct according to Epic's own framing. *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1140 (9th Cir. 2022). By attacking Auto Blocker but also failing to explain why Auto Blocker does not provide "new benefit[s] to consumers" (and, indeed, incorporating materials that show Auto Blocker unquestionably *does* provide new benefits), Epic cannot escape the inevitable conclusion its own allegations provide: that it seeks to impose antitrust liability for a product improvement that is immune under *Allied Orthopedic*. *See Crowder v. LinkedIn Corp.*, 2023 WL 2405335, at *7 (N.D. Cal. Mar. 8, 2023) (dismissing complaint where plaintiffs identified design improvements and failed to adequately allege absence of benefits to product).

Even if this were not the case and the Court focused just on the "unauthorized source" portion of Auto Blocker, it defies logic to argue that warning users of and protecting them from the risks associated with downloading unknown software from the internet **by default** does not improve security. Auto Blocker may introduce easily-avoided, minor "frictions," but it also indisputably provides benefits. ¶¶90 n.2, 91 n.3. Epic's argument is akin to saying that having antivirus protections on by default is not an improvement to device security.

---

[1] Epic faults Samsung for citing to its own public statements, but the Complaint cites and incorporates those public statements. *See* ¶¶90 n.2, 91 n.3.

-3-

Faced with this problem, Epic's next gambit is to argue that it plausibly alleges "associated anticompetitive conduct," which *Allied Orthopedic* recognized could render product improvements actionable. 592 F.3d at 1000. But such conduct must be "***associated with***"—rather than ***itself***—the "introduction of a new and improved product design," and it must be "an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market." *Id.* (emphasis added). Epic alleges the opposite. It does not contend Samsung has any monopoly (or even market) power to abuse/leverage. *See* ¶48 (only Google has power in the relevant market). And Epic alleges users can turn Auto Blocker off in three steps, making it just a "friction" rather than a predatory or exclusionary act. ¶96.

Epic's response is to thus argue Samsung's "associated anticompetitive conduct" is the supposed conspiracy between Samsung and Google. Opp. 22. But Epic cannot circumvent the product improvement doctrine by pointing to an alleged conspiracy when the alleged agreement is ***to implement a product design change***. Even in the conspiracy context, the balancing test the Court must apply is the exact same as that which *Allied Orthopedic* prohibits; *i.e.*, "balancing the benefits or worth of a product improvement against its anticompetitive effects." 592 F.3d at 1000; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (Sections 1 and 2 balancing tests are the same). To credit Epic's argument would be completely contrary to *Allied Orthopedic*'s substance based on form alone.[2]

Epic's argument (Opp. 22) that coordinating a product improvement is as equally subject to condemnation as price fixing is also farfetched. As Epic's own citation shows, agreements about a general approach to product design are not *per se* illegal. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500-01 (1988); *see also In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 978 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (refusing to apply *per se* standard in case where auto manufacturers coordinated on their approaches to auto designs because of "procompetitive effects" associated with coordinated "standard setting"). Here,

---

[2]  Epic's reliance on *U.S. v. Google* to try to distinguish *Allied Orthopedic* is unavailing. In *Google*, the court considered whether an exclusivity agreement, not a product improvement, foreclosed competition. 747 F. Supp. 3d 1, 153-56 (D.D.C. 2024).

where the Ninth Circuit has spoken on how to address *specific* design changes (as opposed to general design approaches), it is telling that Epic cannot point to any case establishing that an agreement to implement a product design change is analyzed differently than a unilateral decision to do so.

## II.     EPIC'S CONSPIRACY STILL FAILS TO MAKE ANY ECONOMIC SENSE

Given another chance to explain how its case makes economic sense, Epic fails to do so. This requires dismissal because "[a]ntitrust claims must make economic sense," *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998), and conspiracy claims in particular must identify a non-conjectural "rational motivation to conspire." *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1090 (9th Cir. 2015).

Epic declares (without citation or explanation) that "Samsung committed not to compete with Google in Android app distribution; Google paid Samsung billions of dollars in exchange." Opp. 1. But Epic does not seriously contest that the Complaint is replete with examples of Samsung competing with Google's Play Store. Samsung pre-installs its Galaxy Store (the world's second largest Android app store) on every smartphone it manufactures, is the only Android OEM that provides its own app store in competition with the Play Store, and *rejected* the Project Banyan proposal to not offer a competing app store in exchange for hundreds of millions of dollars. ¶¶2, 5, 39, 51, 56. ***Most notably, Epic does not dispute that, in 2024, Samsung was the Android app distribution competitor that most stood to benefit from the Court's impending injunction. A "rational motivation to conspire" would therefore include something that outweighed this benefit.***

Epic still identifies none. In search of a financial motive, Epic imbues the Samsung-Google RSA with great significance, stating again and again that it allowed Samsung to enjoy a portion of Google's "monopoly rents." *See, e.g.*, Opp. at 11, 12, 17, 19. But monopoly profits from which market? And what does the Complaint allege changed from that preexisting agreement, which Epic concedes the parties entered in 2020? ¶78. The short answer is nothing.

As the Complaint itself makes clear, the RSA only concerns revenues from Google's online search revenues; not the Play Store. *Id*. Epic **never** alleges that the RSA in any way obligated Samsung to develop or introduce or change the operation of Auto Blocker. Furthermore, the Complaint alleges Google paid Samsung "monopoly rents" from its search operations under the

RSA, *regardless* of any actions around Auto Blocker. *Id*. Epic thus continues to argue that Samsung decided to take actions that benefitted Google and the Play Store in exchange for nothing more than ***what Google already owed***, and for no revenue share from Play Store. This makes no economic sense. A competitor with no benefit from conspiring has no "rational motivation to conspire."

Auto Blocker's actual operation and implementation also renders Epic's alleged conspiracy economically nonsensical. As Samsung noted in its opening brief, the Complaint noted that Auto Blocker was defaulted to "on" only with new phones. Mot. 1, 3-4; ¶91 n.3. Epic responds by arguing that the "rate that consumers replace or upgrade smartphones" means "that the number of Samsung phones running Auto Blocker as default 'on' will quickly overtake those that do not." Opp. 23. This factual claim is nowhere in the Complaint and therefore not permitted on a motion to dismiss. *Fiss v. California Coll. of the Arts*, 2025 WL 91181, at *8 (N.D. Cal. Jan. 14, 2025). But the issue Epic's scrambling highlights is that, if Samsung were to receive billions to modify Auto Blocker to harm competition, the rational economic motive would have been to apply the change as widely as possible (*i.e.*, turn Auto Blocker on for all phones), and make Auto Blocker difficult to disable—all to increase Play Store profits Epic does not allege Samsung gets. Instead, Samsung did the opposite: modest rollout, retained settings for existing phones, and easy to disable. *See* Mot. 3-4; ¶91 n.3.

### III. PLUS FACTORS DO NOT APPLY HERE FOR LACK OF PARALLEL CONDUCT, BUT IN ANY EVENT, THEY WEIGH AGAINST PLAUSIBILITY

Epic's heavy reliance on plus factors ignores that economic irrationality is an overarching problem requiring dismissal, regardless of plus factor allegations. *See supra*. But Epic also has a problem in that "'[p]lus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants." *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) (*citing In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193-94 (9th Cir. 2015)). Epic does not plausibly identify any such conduct.

Epic uses the word "parallel" when discussing Google's Unknown Sources feature and Auto Blocker, but this label plainly does not apply. The Complaint makes clear: there are major product differences (17 steps to work around versus 3 to disable (¶¶40, 96)); unlike Unknown Sources, Auto Blocker is optional and easily disabled (¶¶93, 96); and the timing is nowhere close, with Samsung

introducing Auto Blocker in 2023 and updating it to "default on" for new phones in 2024 (¶¶90-91) while Unknown Sources dates to at least *2014* (¶64). Indeed, Epic does not allege that Auto Blocker's introduction in 2023 was "parallel" to any Google conduct; it just supposedly became "parallel conduct" when Samsung turned Auto Blocker on by default nearly a year later.

Without any non-conclusory allegation of parallel conduct, Epic cannot rely on plus factors. Even if it could, the factors weigh strongly against inferring a plausible conspiracy. Auto Blocker's "design and timing" (Opp. 9-10) demonstrate independent action because, beyond Epic's claim that both impose "frictions," they are concededly *dissimilar* in function, operation, and timing. The only "common motive" Epic identifies is financial (*id.* 10-11), and courts routinely hold that financial motive alone plausibly implies collusion. *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd* 741 F.3d 1022 (9th Cir. 2014).[3] Epic cannot explain how Auto Blocker constitutes "extreme action against self-interest" when protecting users from malware is obviously economically rational for a *smartphone manufacturer*. *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 50 (9th Cir. 2022).

The conclusory statements about Samsung and Google's "history" of anticompetitive agreement ignore both authority holding that a conspiracy cannot be plausibly pleaded based on past misconduct and Epic's own allegations documenting Samsung's extensive *refusals* to agree to not compete. Mot. 8-10. Epic also contradicts itself on this front, discussing how Samsung "permitted [users] for over a decade" to directly download competing app stores (Opp. 2, 6)—strange conduct indeed for a company that supposedly has a long history of conspiring against competition. Next, Epic calls communications between Samsung and Google "atypical," but does not explain why it is at all curious that a smartphone manufacturer would regularly communicate with the developer of the OS that runs on its devices, or would want a close relationship with that developer when they are competing with a very large, powerful competitor: Apple. Epic bizarrely even claims that Samsung *refusing* to enter into a non-compete proposal "reflect[s] consciousness of guilt" (and editorializes without support that this decision was arrived at "reluctantly"). *Id.* 14.

---

[3] Epic never alleges that Samsung stood to gain more from collecting supposed "monopoly rents" than from competing vigorously in the ways Epic says it should have but did not.

The Opposition's attempt to portray the decision to turn Auto Blocker on by default as "sudden and unexplained" is also contrary to the Complaint, which cites the announcement in which Samsung quite literally explained how and why it was turning Auto Blocker on by default. ¶91 n.3. Nor was the decision to slightly modify the operation of Auto Blocker—from default off to default on—a "sudden" shift sufficient to infer conspiracy. *See DRAM*, 28 F.4th at 51-52. Finally, Epic's retreat to "market concentration" as evidence of collusion is a sure act of desperation. *See In re Cedar Shakes & Shingles Antitrust Litig.*, 2020 WL 832324, at *10 (W.D. Wash. Feb. 20, 2020).

The failure to adequately allege an agreement also dooms Epic's Section 2 claim. Mot. 13. With respect to the intent requirement for a Section 2 claim, Epic concedes that it must allege that Samsung had the "specific intent" for "one of the parties" to possess a monopoly (Opp. 18), and it has failed to do so. Epic proceeds as if the jury's prior findings regarding Google said ***anything*** about Samsung, which they did not.[4] Epic's Complaint does not allege that Samsung entered into an agreement at all, but even assuming that it had, any agreement to turn Auto Blocker on by default would hardly be one intended to "control prices or unreasonably destroy competition." *See HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1253 (N.D. Cal. 2023).

### IV. EPIC DOES NOT ALLEGE A GROUP BOYCOTT AND BINDING LAW FORECLOSES ITS ARGUMENTS TO THE CONTRARY

As Epic itself concedes, a "boycott" is a decision "not to deal with another firm." Opp. 19 (quoting *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 820 (9th Cir. 2023)). But Epic itself also alleges that Auto Blocker just creates a "friction" on Samsung phones; allegedly making it harder for Epic to compete on those phones, but ***still able to compete***. Opp. 20. By definition, this is not a boycott. Samsung still allows users to install Epic software on its phones. Because Epic's own allegations and arguments show there is no boycott, there can be no group boycott claim.

Epic's own citations (*id.*) make this point. In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, the defendants conspired to "either not to sell to [plaintiff] or to sell to it only at discriminatory prices

---

[4] Likewise, Epic falsely states that "[a] jury has already looked behind the curtain and found a pattern of collusion between Samsung and Google in this very market." Opp. 25. In reality, the jury made no finding of any collusion between Samsung and Google in *Play Store*. Epic's repeated efforts to transform that verdict into an indictment of Samsung are utterly baseless.

and highly unfavorable terms." 359 U.S. 207, 209 (1959). Similarly, in *PLS.com, LLC v. Nat'l Ass'n of Realtors*, plaintiff alleged that it was pushed out of the market completely. 32 F.4th 824, 831 (9th Cir. 2022). By definition, a "friction" does not cut someone off or foreclose the ability to compete. Epic pays nothing for the ability of users to install its Games Store on Samsung phones, so it cannot—and does not—allege it is subject to "discriminatory prices [or] highly unfavorable terms." *Klor's*, 359 U.S. at 209. The contrast between actual boycotts and what Epic alleges is stark, and Epic offers no reason, factual or legal, for this Court to permit a "group boycott" claim to proceed.

But, even if a "boycott" were at issue, Epic has no response to the fact that its attempt to shoehorn its case into the "**group** boycott" framework violates *City of Oakland*. As Epic notes (Opp. 19), *City of Oakland* did observe that "group boycott" is a "broad label"; however, it also squarely held that "[c]ollective action ***in support of an individual boycott*** is not the same as a group boycott." 20 F.4th 441, 453 (9th Cir. 2021) (emphasis added). Because the plaintiff only alleged an agreement for one defendant to refuse to deal with it, its group boycott claim failed. *Id.* at 453-54. Here, the only basis for Epic's group boycott claim is Samsung's Auto Blocker—not Google's Unknown Sources flow, or anything else Google implements as part of its Android OS. *Id.* That simply does not describe a "group" boycott and therefore is not actionable as such. *Id.* at 453. Furthermore, courts have declined to apply the *per se* framework in cases that allege a conspiracy involving product design choices, even where they involve—unlike here—direct evidence of agreement. *See In re German Auto.*, 612 F. Supp. 3d at 978 ("an agreement to only use certain technical solutions" does not plausibly support alleged anticompetitive conspiracy).

## V.     EPIC'S TRADE LIBEL CLAIM FAILS

The Opposition confirms that Epic's trade libel claim suffers from numerous fatal defects. Epic pivots away from the Complaint, which contends that "***[b]y turning Auto Blocker <u>on by default</u>***," Samsung committed trade libel (¶130 (emphasis added)), to saying that Auto Blocker's statements are libelous, no matter what. Opp. 23-24. But Epic cannot rewrite its own allegations through Opposition. Moreover, Epic fails to explain how the Auto Blocker statements of "keep[ing] your phone safe" from "unauthorized" or "unknown" sources are in any way false or specific to Epic. *See* ¶93. Epic's argument that Auto Blocker's language refers to Epic "by reasonable

implication" (Opp. 24)—to satisfy the requirement that a statement actually be about the plaintiff—fails under applicable law, which requires "a clear or necessary inference." *See Memjet Tech. Ltd. v. Vanguard Graphics Int'l, LLC*, 2024 WL 3798392, at *3 (S.D. Cal. Aug. 13, 2024) ("reasonable implication" is more than plausibly about a specific business).[5] Here, the statement applies to any unauthorized source, and Epic provides no allegations why it, among the thousands of sideloading sources on the internet, is the single one that users would think of in response to these statements.

Epic attempts to evade its failure to identify required customers and transactions by pointing to *Play Store* findings, but Epic's claim that Auto Blocker is "similar to Google's Unknown Sources flow" is false under its own allegations. The former involves 3 simple steps, and the latter 17 (¶¶40, 96). Auto Blocker also can be disabled in the startup wizard (¶91 n.3) whereas Google's Unknown Sources flow is alleged to have been labyrinthian, with no toggle option during start-up. Epic has no basis for asserting "loss with reasonable certainty and eliminat[ing] other causes" (Opp. 24) such that it is excused from identifying customers and transactions. *See, e.g.*, *Mann v. Quality Old Time Service, Inc.*, 120 Cal. App. 4th 90, 109 (2004) (requiring particularity as to "special damages").

## VI.  EPIC FAILS TO STATE A CARTWRIGHT ACT OR UCL VIOLATION

Epic's Cartwright and UCL claims fall with its Sherman Act claims. *See* Mot. at 13, 15. Regarding the separate grounds for dismissal of its UCL claim under *Sonner*, all Epic says in response is that some courts have found it to have "minimal application" at the pleading stage. Opp. 25. Perhaps, but many courts have applied this binding precedent to dismiss on the pleadings actions that suffer from the same flaws contained in Epic's Complaint. *See, e.g.*, *Forrett v. Gourmet Nut, Inc.*, 634 F. Supp. 3d 761, 768-69 (N.D. Cal. 2022) (dismissing UCL claim on this basis); *Gibson v. Jaguar Land Rover N. Am., LLC*, 2020 WL 5492990, at *3-4 (C.D. Cal. Sept. 9, 2020).

## CONCLUSION

For the foregoing reasons, Samsung respectfully requests dismissal of the Complaint in full.

---

[5] Epic's citations to *Gopher Media* and *Franklin Fueling* (Opp. 24) offer no support. Both held a plaintiff can only avoid the heightened pleading standard if it alleges market loss with "reasonable certainty" **and** "allege[s] other factors did not cause their loss." *Gopher Media LLC v. Melone*, 2023 WL 8790266, at *11 (S.D. Cal. Dec. 19, 2023). Indeed, *Gopher Media* dismissed the trade libel claim on this basis. In *Franklin Fueling*, unlike here, special damages were adequately alleged.

Dated: March 11, 2025   By: */s/ Victoria F. Maroulis*
VICTORIA F. MAROULIS, SBN 202603
victoriamaroulis@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

ADAM B. WOLFSON, SBN 262125
KEVIN Y. TERUYA, SBN 235916
adamwolfson@quinnemanuel.com
kevinteruya@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

DEBRA BERNSTEIN (*pro hac vice* pending)
debrabernstein@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
1200 Abernathy Road NE, Building 600, Suite 1500
Atlanta, GA 30328
Telephone: (404) 482-3502
Facsimile: (404) 681-8290

*Attorneys for Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*