Shaneeda Jaffer (SBN 253449)
sjaffer@beneschlaw.com
Lily A. North (CA 260709)
lnorth@beneschlaw.com
**BENESCH FRIEDLANDER COPLAN &
ARONOFF LLP**
100 Pine Street, Suite 3100
San Francisco, California
Telephone: (628) 600-2250
Facsimile: (628) 221-5828

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO.  LTD; SAMSUNG ELECTRONICS AMERICA, INC.; and GOOGLE LLC, <br><br> Defendants. | Case No. 3:24-cv-06843-JD <br><br> **EPIC GAMES, INC.'S OPPOSITION TO GOOGLE LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** <br><br> Hon. James Donato <br><br> Hearing:    September 11, 2025 <br>            10:00 a.m. <br>            Courtroom 11 |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

I.    GOOGLE HAS FAILED TO ESTABLISH CLAIM PRECLUSION. ..................................... 4

    A.    Epic's Claims Have a Different Transactional Nucleus than *Google I*. ....................... 5

    B.    None of the Other Claim Preclusion Factors Is Met. ...................................... 8

II.   EPIC HAS PLAUSIBLY ALLEGED TRADE LIBEL. ........................................................ 9

III.  EPIC HAS PLAUSIBLY ALLEGED TORTIOUS INTERFERENCE CLAIMS. ................. 11

    A.    Epic Has Plausibly Alleged Contracts and Cognizable Economic Relationships. ........................................................................................ 11

    B.    Epic Has Plausibly Alleged Google's Knowledge and Intent. ................. 13

    C.    Epic Has Plausibly Alleged Disruption and Damages. ............................ 14

    D.    Epic Has Plausibly Alleged Independent Wrongful Conduct. .................. 15

CONCLUSION ....................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altera Corp. v. Clear Logic, Inc.*,
424 F.3d 1079 (9th Cir. 2005) ...........................................................................13

*Aryeh v. Canon Bus. Sols., Inc.*,
55 Cal. 4th 1185 (2013) ......................................................................................6

*Balu v. Druckman*,
2025 WL 50420 (N.D. Cal. Jan. 7, 2025) ........................................................7, 8

*Blatty v. New York Times Co.*,
42 Cal. 3d 1033 (1986) ......................................................................................10

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002) ...............................................................................5

*Church of Scientology of California v. Flynn*,
744 F.2d 694 (9th Cir. 1984) .............................................................................10

*Clark v. Yosemite Cmty. Coll. Dist.*,
785 F.2d 781 (9th Cir. 1986) ...............................................................................8

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
141 F.4th 1075 (9th Cir. 2025) ............................................................................4

*Evans v. California Comm'n on Peace Officers Standards & Training*,
2023 WL 8091823 (E.D. Cal. Nov. 21, 2023) ....................................................8

*Feminist Women's Health Center v. Codispoti*,
63 F.3d 863 (9th Cir. 1995) .................................................................................7

*Fortinet, Inc. v. Forescout Techs., Inc.*,
2021 WL 5565836 (N.D. Cal. Nov. 29, 2021) ..................................................11

*Frank v. United Airlines, Inc.*,
216 F.3d 845 (9th Cir. 2000) ...............................................................................7

*Franklin Fueling Sys., Inc. v. Veeder-Root Co.*,
2009 WL 2462505 (E.D. Cal. Aug. 11, 2009) ..................................................11

*Garity v. APWU Nat'l Lab. Org.*,
828 F.3d 848 (9th Cir. 2016) ...............................................................................9

*Gopher Media LLC v. Melone*,
2023 WL 8790266 (S.D. Cal. Dec. 19, 2023) ..................................................11

*Guess, Inc. v. Superior Ct.*,
   176 Cal. App. 3d 473 (2d Dist. 1986) .................................................................6

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
   403 F.3d 683 (9th Cir. 2005) ...........................................................................5

*Howard v. City of Coos Bay*,
   871 F.3d 1032 (9th Cir. 2017) .........................................................................6

*In re Google Play Store Antitrust Litig.*,
   --- F.4th ----, 2025 WL 2167402 (9th Cir. July 31, 2025) ......................................10

*Ingrid & Isabel, LLC v. Baby Be Mine, LLC*,
   70 F. Supp. 3d 1105 (N.D. Cal. 2014) ...............................................................15

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   9 Cal. 5th 1130 (2020) ..................................................................................11

*J.B. Hughes & Assocs. v. Giunio Santi Eng'g*,
   2016 WL 11920884 (S.D. Cal. Nov. 18, 2016) .....................................................13

*Janda v. Madera Cmty. Hosp.*,
   16 F. Supp. 2d 1181 (E.D. Cal. 1998) ...............................................................12

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ................................................................................11

*Logistik, Inc. v. AB Airbags, Inc.*,
   543 F. Supp. 3d 881 (S.D. Cal. 2021) .....................................................11, 12, 14

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
   590 U.S. 405 (2020) ......................................................................................5

*McClain v. Apodaca*,
   793 F.2d 1031 (9th Cir. 1986) .........................................................................4

*Media Rights Techs., Inc. v. Microsoft Corp.*,
   922 F.3d 1014 (9th Cir. 2019) ..............................................................5, 6, 7, 8

*Moore v. Apple, Inc.*,
   73 F. Supp. 3d 1191 (N.D. Cal. 2014) ...............................................................14

*Nevada DeAnza Fam. LP v. Tesoro Refin. & Mktg. LLC*,
   474 F. Supp. 3d 1087 (N.D. Cal. 2020) .............................................................14

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
   360 F. Supp. 3d 994 (N.D. Cal. 2018) ...............................................................12

*Qwest Commc'ns Corp. v. Herakles, LLC*,
   2008 WL 783347 (E.D. Cal. Mar. 20, 2008) ............................................................12

*R Power Biofuels, LLC v. Chemex LLC*,
   2016 WL 6663002 (N.D. Cal. Nov. 11, 2016) ............................................................6

*Rincon Band of Luiseno Mission Indians v. Flynt*,
   70 Cal. App. 5th 1059 (4th Dist. 2021) .....................................................................15

*Rosen v. Uber Techs., Inc.*,
   164 F. Supp. 3d 1165 (N.D. Cal. 2016) .....................................................................12

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
   348 F.3d 1116 (9th Cir. 2003) .....................................................................................4

*Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*,
   2013 WL 12244056 (C.D. Cal. June 12, 2013) .........................................................14

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
   983 F. Supp. 1303 (N.D. Cal. 1997) ..........................................................................12

*Soil Retention Products, Inc. v. Brentwood Industries, Inc.*,
   521 F. Supp. 3d 929 (S.D. Cal. 2021) ........................................................................15

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
   322 F.3d 1064 (9th Cir. 2003) .....................................................................................7

*Timboe v. Clark*,
   2022 WL 991721 (N.D. Cal. Mar. 31, 2022) ..............................................................6

*Trindade v. Reach Media Group*,
   2013 WL 3977034 (N.D. Cal. July 31, 2013) ............................................................13

*Turtle Island Restoration Network v. U.S. Dept. of State*,
   673 F.3d 914 (9th Cir. 2012) .......................................................................................7

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
   42 Cal. App. 4th 507 (5th Dist. 1996) ........................................................................12

*Yeager v. Cingular Wireless LLC*,
   627 F. Supp. 2d 1170 (E.D. Cal. 2008) .......................................................................4

**Other Authorities**

Restatement (Second) of Judgments § 24 (1982) ..........................................................5

## INTRODUCTION

Epic filed its First Amended Complaint (Dkt. 95, "FAC") to put a stop to its injuries from Google's Unknown Sources install flow.  In response, the primary focus of Google's motion to dismiss ("MTD") is that, because Unknown Sources formed one aspect of Google's multi-pronged scheme to monopolize the market for Android app distribution, as proven in *Epic v. Google*, Case No. 3:20-cv-05671-JD (N.D. Cal.) ("*Google I*"), Epic is precluded from challenging it in a new action.  But Epic now challenges subsequent conduct that continues after *Google I*, and that now harms Epic both as a developer *and* as an owner of the Epic Games Store ("EGS"), which had not yet launched on Android when the jury reached its verdict.  Nothing about *Google I* immunizes this later-occurring conduct.  And contrary to Google's claims, Epic does not "resurrect" litigated claims, but rather brings new claims targeting new, ongoing harm.  Epic targets false statements Google makes *now* about its apps, its store and the apps it distributes through that store.  That harm accrues every time a user tries to download an Epic product (or a third-party product from EGS) and is deterred by Unknown Sources, and that harm is qualitatively and temporally separate from the harm addressed by the antitrust claims in *Google I*.  The Ninth Circuit is clear that, as long as Google continues to trample Epic's rights under California law, Epic can seek relief in a new action addressing new (ongoing) conduct.

Equally meritless are Google's challenges to Epic's claims for supposed pleading deficiencies.  Google challenges the trade libel claim by recycling arguments Samsung already made and this Court already rejected.  And Google misstates the law on tortious interference; Epic need not *name* the parties interfered with, nor does the fact that Google instituted Unknown Sources a decade ago absolve it of its knowledge of *continuing* harm to Epic.

## BACKGROUND

Epic owns and operates some of the world's most popular games, including *Fortnite*, *Fall Guys* and *Rocket League*.  (FAC ¶ 12.)  Epic also owns and operates EGS, a distribution platform for Epic's and third-party developers' games.  (*Id.*)  Epic has over 800 million user accounts, which are used in its games across platforms, as well as to make purchases in EGS.  (*Id.* ¶¶ 12, 90–92.)  Epic has sought to gain traction on Android by making its games available for direct

download from Epic-owned websites and, more recently, from EGS.  (*Id.* ¶ 41.)  *Fortnite* became available for direct download through Epic's website in 2018.  (*Id.*)  Epic launched EGS for Android on August 16, 2024, offering initially only Epic's own games.  (*Id.* ¶ 92.)  As of July 7, 2025, EGS on Android offered around 90 third-party games from 35 developers.  (*Id.*)

Google uses Unknown Sources to deter consumers from directly downloading Epic's apps, including EGS, and from downloading apps from EGS.  (FAC ¶ 67.)  Unknown Sources presents consumers who try to download apps from Epic's websites or from EGS with scare screens warning them of the supposed dangers of proceeding with their downloads.  (*Id.* ¶ 68.)  For example, the scare screens state that the app the user is trying to download from Epic "might be harmful", is "unknown", or may put the user's "phone and data at risk".  (*Id.* ¶¶ 66, 68, 133, 134.)  These statements are knowingly false, as Google is well aware of Epic's reputation for safety and that Epic's apps are safe—and the Unknown Sources process conducts no analysis to suggest otherwise.  (*Id.* ¶¶ 69, 135–36.)  Unknown Sources further deters consumers from completing downloads from Epic's websites and EGS by requiring them to take well over a dozen steps to complete the download, including clicking through multiple scare screens and implementing changes to their phones' settings.  (*Id.* ¶¶ 41, 65–66, 151–52.)

Google employees have acknowledged that Unknown Sources causes a "[p]oor", "abysmal" user experience.  (FAC ¶¶ 41, 71.)  Google also knows the scare screens and frictions diminish the number of completed downloads from Epic websites and EGS, that fewer downloads mean fewer transactions between Epic and consumers, and that Unknown Sources therefore harms Epic's revenue and reputation.  (*Id.* ¶¶ 65, 151.)

Google also is aware that many of the Android users attempting to download Android apps from Epic websites or from EGS maintain contractual relationships with Epic.  (FAC ¶ 148.)  For example, all Android users who have played *Fortnite* on another platform would have executed the *Fortnite* End User License Agreement ("EULA"), and all Android users who are patrons of EGS sign the Epic Games Store EULA.  (*Id.*)

Finally, Google knows that Unknown Sources interferes with Epic's ability to attract developers to EGS for Android.  (FAC ¶ 152.)  Epic has a track record of growing EGS; for

example, the PC version of EGS went from hosting just four games to hosting thousands.  (*Id.* ¶¶ 93, 150.)  Epic has stated publicly, including in *Google I*, that it wants EGS on Android to grow "in the same way" as it has on PC.  (*Id.* ¶ 150.)  In the same vein, Epic's website states that "[d]evelopers can launch their games through our store on mobile with all the same great benefits and programs as PC".  (*Id.*)  And this Court's injunction put Google on notice that Epic seeks to establish "business relationships" with third-party developers.  (*Id.* ¶ 87.)  Yet with full knowledge of these goals, Google deploys Unknown Sources to deter third parties from distributing apps on EGS, lest their apps be labeled unknown and potentially unsafe.  (*Id.*)  Moreover, by deterring consumers, Unknown Sources limits developers' prospective revenue, reducing their incentives to distribute on EGS.  (*Id.* ¶¶ 54–55.)

*        *        *

Epic filed its Complaint in *Google I* in August 2020, alleging violations of the Sherman Act and of California's Cartwright Act and Unfair Competition Law.  (FAC ¶¶ 6, 61.)  Epic's case in *Google I* focused, in one part, on how Google maintained monopoly power in the market for Android app distribution through a multitude of anticompetitive practices.  Those included agreements with OEMs requiring them to preference the Play Store, paying OEMs not to compete, paying developers not to compete, and imposing frictions on consumers' downloads from competitive distribution channels, including through Unknown Sources.  (*Id.* ¶¶ 55, 87.)  In December 2023, a jury found Google had illegally monopolized the Android App Distribution Market.  (*Id.* ¶ 87.)  On October 7, 2024, the Court issued a permanent injunction against Google.  In the injunction, the Court did not directly address Unknown Sources, instead electing to tackle Google's monopolistic conduct through other means.  (*Id.*)  The injunction is currently administratively stayed by the Ninth Circuit.  (*See In re Google Play Store Antitrust Litigation*, Case No. 3:21-md-02981-JD (N.D. Cal.), Dkt. No. 1086.)

On September 30, 2024, after the verdict in *Google I* but before the injunction, Epic filed its original Complaint in this matter.  Epic asserted claims against both Google and Samsung related to Samsung's Auto Blocker feature, which Epic alleged had similar effects to Google's Unknown Sources.  (Dkt. 1.)  The Court denied Google's and Samsung's motions to dismiss on

1    May 8, 2025, including as to the California trade libel claim against Samsung.  (Dkt. 69.)

2            Throughout the pendency of *Google I*, and following the verdict and the injunction,

3    Google has continued to apply Unknown Sources to downloads of Epic's apps, including EGS

4    once launched.  (FAC ¶ 10.)  On May 27, 2025, Epic therefore moved to file the proposed FAC,

5    adding claims against Google pertaining to Unknown Sources.  (Dkt. 87.)  On July 3, 2025, the

6    Court granted Epic's motion to amend over Google's objection.  (Dkt. 94.)  Epic then filed the

7    FAC.  (Dkt. 95.)  Shortly thereafter, following a settlement with Samsung alone, Epic voluntarily

8    dismissed all claims in the FAC related to Samsung's Auto Blocker, but maintained the

9    California state law claims pertaining to Unknown Sources.  (Dkt. 96.)

10   ## ARGUMENT

11           "When considering a motion to dismiss", the Court "accept[s] all facts alleged in the

12   complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving

13   party.  At this stage, a plaintiff need only state a facially plausible claim, such that a court can

14   draw the reasonable inference that the defendant is liable".  *CoStar Grp., Inc. v. Com. Real Est.*

15   *Exch., Inc.*, 141 F.4th 1075, 1083–84 (9th Cir. 2025) (citations and quotation omitted).

16   **I.    Google Has Failed to Establish Claim Preclusion.**

17           Google contends that Epic's claims concerning Unknown Sources are precluded because

18   Google's download frictions were also at issue in *Google I*.  (MTD at 5.)  Google is wrong on

19   both the law and the facts.

20           At the outset, Google fails to acknowledge that "[c]laim preclusion is an affirmative

21   defense".  *Rotec Indus., Inc. v. Mitsubishi Corp.*, 348 F.3d 1116, 1119 (9th Cir. 2003).  It is

22   "highly unusual for a court to dismiss a complaint on the basis that a defendant has proven an

23   affirmative defense".  *Yeager v. Cingular Wireless LLC*, 627 F. Supp. 2d 1170, 1177 (E.D. Cal.

24   2008).  Google has failed to show this case warrants such "highly unusual" dismissal.

25           For "[t]he doctrine of claim preclusion" to apply, a subsequent suit must be on "the same

26   cause of action".  *McClain v. Apodaca*, 793 F.2d 1031, 1033 (9th Cir. 1986).  To determine

27   whether two cases target the same cause of action, courts look to "(1) whether rights or interests

28   established in the prior judgment would be destroyed or impaired by prosecution of the second

1    action; (2) whether substantially the same evidence is presented in the two actions; (3) whether

2    the two suits involve infringement of the same right; and (4) whether the two suits arise out of

3    the same transactional nucleus of facts". *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403

4    F.3d 683, 690 (9th Cir. 2005) (citation omitted).  "The last of these criteria is the most

5    important", *id.* (citation omitted), and therefore it is addressed first below.  But in any event,

6    none of these factors supports the application of claim preclusion.

7        **A.  Epic's Claims Have a Different Transactional Nucleus than *Google I*.**

8        To determine if two cases share a transactional nucleus, courts consider "whether the

9    facts are so woven together as to constitute a single claim" as shown in part by their "relatedness

10    in time, space, origin, or motivation".  *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d

11    1014, 1027 (9th Cir. 2019) (quoting Restatement (Second) of Judgments § 24 (1982)).  The

12    Ninth Circuit has held that courts "must narrowly construe the scope of th[e] earlier action" for

13    purposes of determining a transactional nucleus.  *Cent. Delta Water Agency v. United States*, 306

14    F.3d 938, 953 (9th Cir. 2002).  This case does not share the same transactional nucleus as

15    *Google I* because the conduct at issue is severed in time from the conduct in *Google I*.

16        "[C]laim preclusion does not apply to claims that were not in existence and could not

17    have been sued upon—*i.e.*, were not legally cognizable—when the allegedly preclusive action

18    was initiated." *Media Rights*, 922 F.3d at 1021 (collecting cases).  The allegedly preclusive

19    action here, *Google I,* was initiated on August 13, 2020.  (FAC ¶ 6.)  Epic then filed this case on

20    September 30, 2024, targeting conduct that occurred after *Google I* was filed, including conduct

21    that occurred after the verdict and injunction in that case.  (*Id.* ¶¶ 7, 10.)  Accordingly, Google is

22    wrong to suggest (*see* MTD at 6) that Epic's decision not to bring trade libel and tortious

23    interference claims as part of *Google I* in August 2020 means that Epic has lost the right to bring

24    such claims for all time.  Epic may seek recovery for Google's subsequent wrongful conduct

25    because "[c]laim preclusion generally does not bar claims that are predicated on events that

26    postdate the filing of the initial complaint".  *Lucky Brand Dungarees, Inc. v. Marcel Fashions*

27    *Grp., Inc.*, 590 U.S. 405, 414 (2020) (quotation omitted).

28        Moreover, the Ninth Circuit has made clear that "claim preclusion does not apply to

claims that accrue after the filing of the operative complaint." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040 (9th Cir. 2017). Epic's state law claims accrue upon "the occurrence of the last element essential to the cause of action". *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1191 (2013) (citation omitted).[1] Here, that means Epic's claims accrue every time (i) a user abandons a download from an Epic website or EGS; or (ii) a developer who was otherwise inclined to distribute apps on EGS declines to pursue such distribution—in each case, where those decisions were due to the frictions imposed by Google. (FAC ¶¶ 202, 216, 227, 240–41.) Consequently, given the relevant limitations periods, *all* the conduct the FAC targets accrued into cognizable claims "after the filing of the operative complaint" in *Google I*, with most of it occurring after the verdict in that case.[2] *Howard*, 871 F.3d at 1040. The August 2024 launch of EGS underscores this point. Unknown Sources is now targeting new relationships—EGS distribution and downloads—that did not exist during *Google I*. (FAC ¶ 94.)[3]

Google tries to distinguish this clear precedent to no avail. Google argues that *Howard* is distinguishable because it dealt with "new and distinct conduct". (MTD at 7 n.4.) But *Howard* focused on the fact that additional conduct occurred—and new claims accrued—*after* the prior litigation commenced, and thus was not addressed in that prior action. In other words, it focused on the timing; nothing in *Howard* requires that the after-occurring conduct be different in kind from the original conduct to be considered "new and distinct". In fact, the Ninth Circuit has observed that *Howard* is consistent with a long line of precedent holding that "[a] claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim." *Media Rights*, 922 F.3d at 1021 (quoting

---

[1] The accrual of Epic's trade libel and tortious interference claims is governed by California law. *See Timboe v. Clark*, 2022 WL 991721, at *4 (N.D. Cal. Mar. 31, 2022).

[2] The relevant limitations period is two years. *See R Power Biofuels, LLC v. Chemex LLC*, 2016 WL 6663002, at *15 (N.D. Cal. Nov. 11, 2016) (tortious interference); *Guess, Inc. v. Superior Ct.*, 176 Cal. App. 3d 473, 479 (2d Dist. 1986) (trade libel).

[3] Google quotes Epic's counsel for the proposition that the FAC is "not . . . limited" to EGS. (MTD at 7 n.5.) But whether Epic's claims are limited to EGS is of no consequence to whether its claims are temporally severed from the claims in *Google I*. Epic does indeed claim that Unknown Sources has affected apps available for download from Epic's website (and not just from EGS), but targets downloads attempted after *Google I*—which could not have been tried during *Google I*.

1  *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000)).

2  Google also attempts to distinguish *Media Rights* by arguing that it relied on "[t]he

3  copyright-specific separate-accrual rule[, which] does not apply to Epic's claims". (MTD at 7

4  n.4.) That is a red herring. The "separate-accrual rule" allows successive violations of the *same*

5  right to "accrue" separately at the date of each violation. *Media Rights*, 922 F.3d at 1023. The

6  *Media Rights* court considered the "separate-accrual" rule because it was faced with an ongoing,

7  repeated infringement of the *same* copyright. *Id.* Here, there is no question that there are

8  different incidents of "accrual" from *Google I*. None of the interference Epic challenges in this

9  action could have accrued during *Google I* because the FAC targets Epic's relationships with:

10  (i) users who tried to download apps from Epic's website or EGS after the *Google I* Complaint;

11  and (ii) developers with respect to EGS, which was launched after the *Google I* verdict.

12  Finally, Google's other precedent is inapposite. In *Turtle Island*, for example, the

13  plaintiff was precluded from a second effort to challenge the same agency guideline (under a

14  different statute), because it cited new certifications issued under the guideline "only as an

15  'example'" of the same claims raised in the prior suit. *Turtle Island Restoration Network v. U.S.

16  Dept. of State*, 673 F.3d 914, 918–19 (9th Cir. 2012). In that context, those certifications were

17  "new only in the sense that they are made annually [under the same guideline] and involve

18  different countries". *Id.*; *see also Media Rights*, 922 F.3d at 1024 (distinguishing *Turtle Island*

19  on the same basis). Similarly, *Tahoe-Sierra* involved challenges to agency actions that "were

20  non-discretionary", "were established years before and were beyond [the defendant's] control".

21  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1080 (9th Cir.

22  2003). By contrast, "discretionary decision[s]" do "support a new legal claim". *Id.* Here,

23  continued deployment of Unknown Sources is entirely discretionary—Google could stop

24  applying Unknown Sources to Epic websites and EGS at any time. (FAC ¶ 66.)[4]

25

26  [4] Google's other authorities are even further afield as they involve conduct that did not
post-date the plaintiff's first case. In *Feminist Women's Health Center v. Codispoti*, the plaintiff
27  filed seriatim lawsuits in state and federal courts arising out of the same underlying fires. 63
F.3d 863, 866 (9th Cir. 1995). And in *Balu v. Druckman*, the plaintiff brought civil rights claims
28  "based on the same underlying criminal investigation and prosecution" that had ended years

**B.  None of the Other Claim Preclusion Factors Is Met.**

The other three factors relevant to claim preclusion—impairment of existing rights, identity of evidence and identity of rights—are not met either.

*The relief sought does not impinge on any rights set out in Google I.*  Google argues that the injunctive relief issued in *Google I* would somehow be impaired by this suit.  (MTD at 8.) That is not true.  The Ninth Circuit has made clear that "the doctrine of res judicata does not necessarily preclude all future actions with regard to continuing conduct simply because the previous action sought prospective relief."  *Clark v. Yosemite Cmty. Coll. Dist.*, 785 F.2d 781, 789 (9th Cir. 1986).  And in any event, Google, as the losing party in *Google I*, has not secured any rights in *Google I* that could be impinged on by the current action.  This Court determined in *Google I* that it could address Google's illegal monopolization through remedies addressing aspects of Google's conduct other than Unknown Sources, but nothing in that decision secured Google a *right* to continue implementing Unknown Sources with impunity, even if it tortiously interferes with Epic's relationships or spreads libel about Epic's apps.[5]

*The evidence is not the same as in Google I.*  To determine whether two actions involve the same evidence, courts consider whether a plaintiff would be required to establish the same legal elements.  *See Evans v. California Comm'n on Peace Officers Standards & Training*, 2023 WL 8091823, at *8 (E.D. Cal. Nov. 21, 2023).  In *Google I*, Epic proved antitrust violations that required it to define a market, show Google possessed monopoly power in that market, and show that Google's conduct, including Unknown Sources, harmed competition in that market so as to maintain Google's monopoly.

Here, by contrast, Epic will not need to define a market or to establish monopoly or even market power.  Epic also will not need to prove that Unknown Sources affects competition in any

---

before the plaintiff sued either time.  2025 WL 50420, at *1 (N.D. Cal. Jan. 7, 2025).  Neither of these cases alters the commonsense rule that "[t]he filing of a suit does not entitle the defendant to continue or repeat the unlawful conduct with immunity from further suit."  *Media Rights*, 922 F.3d at 1025 (citation omitted).

[5] It is unclear why Google references its proposed settlement with consumer and State plaintiffs to argue preclusion.  Epic is not involved in that settlement, which in any event has not yet been approved by this Court.

1    market, or that it protects Google's market power.  Instead, Epic will prove that Unknown

2    Sources presents consumers with information that is false *as to Epic*; that *Epic* has agreements

3    with users; that *Epic* has a real prospect of creating economic relationships with specific users

4    and developers; and that Unknown Sources interferes with *Epic's* contracts and prospective

5    economic relationships.  These elements are entirely different.  Google's predictions about

6    potential overlap between the evidence used in *Google I* and evidence to be used in this Action is

7    entirely speculative.  Discovery is ongoing, Google has not yet produced a single document

8    (except allowing the use of *Google I* documents), depositions have not begun and expert reports

9    have not been served.  If anything, Google's predictions simply confirm the pitfall of pressing an

10   affirmative defense at the pleading stage.

11        *The rights addressed are not the same as in Google I.*  For two cases to involve

12   "infringement of the same rights", they must satisfy "a basic matching exercise".  *Garity v.*

13   *APWU Nat'l Lab. Org.*, 828 F.3d 848, 856 (9th Cir. 2016); *see also Sidhu v. Flecto Co.*, 279

14   F.3d 896, 900 (9th Cir. 2002) (explaining that "rights asserted in the two actions [we]re different"

15   because they concerned different contract provisions).  The rights here do not match.  *Google I*

16   focused on Epic's right to be free of antitrust injury, *i.e.*, an injury that flows from Google's

17   unlawful conduct to frustrate competition in the Android app distribution market.  That right

18   encompassed not only Epic's right not to be foreclosed from competing in that market (alongside

19   others), but also its right as an app developer to enjoy the fruits of competition in that market,

20   such as lower prices, more choice and more innovations.

21        Here, by contrast, Epic seeks to vindicate its right to be free from harm to its reputation

22   and to enter into or enhance economic relationships with consumers and developers without

23   interference.  That set of rights is separate and different from the rights at issue in *Google I*, even

24   if they overlap in some respects.  This factor too therefore weighs against preclusion.

25   **II.    Epic Has Plausibly Alleged Trade Libel.**

26        Google's MTD recycles the arguments Samsung made, and the Court rejected, in

27   Samsung's motion to dismiss Epic's trade libel claims against Samsung.  (*Cf.* Dkt. 49 at 14–15.)

28   The arguments should fare no better coming from Google.

*First*, Google maintains that Unknown Sources does not make any specific statements about Epic.  (MTD at 9.)  However, "[u]nder California law, there is no requirement that the person defamed be mentioned by name.  It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff."  *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697 (9th Cir. 1984) (cleaned up).  Epic alleges that Google warns users attempting to download Epic's apps (or a third-party app from EGS) that the download is "unknown" and may "put [their] phone and data at risk".  (FAC ¶ 10.)  This allegation suffices because the statements refer to Epic "by reasonable implication".  *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1046 (1986).[6]  The clear implication is that Google's scare screens concern the app coming from Epic or EGS that the user is trying to download when she receives the warning.

*Second*, Google insists that the scare screens are not false because Google is not familiar with all third-party apps available on EGS, and Google does not know that all of those apps are safe.  (MTD at 9.)  Google again misses the mark.  Epic alleges that Google knows that EGS is a reputable and safe store.  (FAC ¶¶ 69, 93, *see also id.* ¶ 127 (alleging that EGS is a well-known store, along with stores from other major companies like Microsoft and Amazon).)  Yet when a consumer tries to download a third-party app from EGS, Unknown Sources not only disparages the app itself, but also identifies EGS as the "source" of the "unknown" app, and states that "[i]nstalling apps from *this source* [*i.e.*, EGS] may put your phone and data at risk".  (*Id.* ¶ 134.)  Unknown Sources therefore derides EGS as an unsafe source, even though Google knows that not to be true.[7]  That is trade libel against Epic, regardless of whether Google knows or does not know any specific third-party app.

*Third*, Google claims that Epic cannot allege damages because it does not identify "particular consumers or developers" from whom Epic lost business.  (MTD at 9–10.)  However,

---

[6] Google maintains that *Blatty* establishes that an alleged falsehood cannot apply by reasonable implication when it "concerns a group" of more than 25 individuals.  (MTD at 9.)  Google's scare screens, however, do not refer generally to a group—they pop up specifically in response to the app that the user is trying to download.  (FAC ¶ 67.)

[7] As the Ninth Circuit observed, the "scare screens do not reflect any security assessment of the intended download sources; these screens appear whether the intended download source is a trusted developer's website or a hypothetical 'illstealyourinfo.com.'"  *In re Google Play Store Antitrust Litig.*, --- F.4th ----, 2025 WL 2167402, at *3 (9th Cir. July 31, 2025).

such particularity is not required when plaintiffs "proceed on a theory of loss of market or general business loss where they can plead the loss with reasonable certainty and eliminate other causes". *Gopher Media LLC v. Melone*, 2023 WL 8790266, at *10 (S.D. Cal. Dec. 19, 2023); *see Franklin Fueling Sys., Inc. v. Veeder-Root Co.*, 2009 WL 2462505, at *5–6 (E.D. Cal. Aug. 11, 2009). Epic has proceeded on this theory by alleging lost profits from identifiable instances of consumers abandoning installation of its apps because of Unknown Sources. (FAC ¶¶ 202–03.) Epic also alleges a measurable 35% of consumers dropped off after encountering the first Unknown Sources warning alone. (*Id.* ¶ 130.) Epic's case is therefore comparable to *Franklin Fueling*, where the plaintiff pled special damages by alleging that it had "suffered lost sales" from libelous marketing materials and identifying a rough estimate of its decreased market share "from 95% to 50%–75%". *Franklin Fueling*, 2009 WL 2462505 at *6.

## III. Epic Has Plausibly Alleged Tortious Interference Claims.

Epic alleges two types of tortious interference: tortious interference with contracts and with prospective economic relationships. These claims require (1) "a valid contract" or a prospective "economic relationship"; (2) "knowledge"; (3) an "intentional acts designed to induce a breach *or* disruption"; (4) "breach *or* disruption"; and (5) "resulting damage". *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020) (emphases added). Epic must also show that "defendant's conduct was wrongful by some legal measure other than the fact of interference itself". *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003) (quotation omitted). Epic has plausibly alleged these elements.

### A. Epic Has Plausibly Alleged Contracts and Cognizable Economic Relationships.

Google does not deny valid contracts exist for Epic's interference with contract claim. It contends only that Epic's prospective economic relationships claims are too "speculative" by not identifying consumers or developers by name. (MTD at 13–14.) Google again misstates the law.

"[I]dentification of a specific customer is unnecessary" to state a tortious interference claim. *Fortinet, Inc. v. Forescout Techs., Inc.*, 2021 WL 5565836, at *25 (N.D. Cal. Nov. 29, 2021). Epic need only allege "sufficient facts to allow the Court to plausibly infer some real third-party—named or unnamed—existed and expected to partake in [an economic or

contractual] relationship". *Id.* (quotation omitted).  For example, in *Logistik, Inc. v. AB Airbags, Inc.*, allegations identifying the third parties as "consumers of [p]laintiff's disposable load bars" were deemed sufficient, because the plaintiff asserted "specific facts putting the defendant on notice that a third-party, indeed, existed".  543 F. Supp. 3d 881, 889–90 (S.D. Cal. 2021).  Likewise, allegations "that [a plaintiff] had relationships with prospective customers who were in the market for the services [plaintiff] provides" and that those customers "had taken steps toward engaging" were found to be sufficient.  *Qwest Commc'ns Corp. v. Herakles, LLC*, 2008 WL 783347, at *11 (E.D. Cal. Mar. 20, 2008).  Epic has made precisely those types of allegations: It alleges that consumers who intend to download Android apps from its websites or EGS take steps toward doing so, but are then deterred from completing the download; and that developers in the market for distribution services of the type EGS provides do not enter into agreements with Epic due to Unknown Sources.  (FAC ¶¶ 148–52, 213–15, 225, 238.)

Google relies on *Silicon Knights* to claim that Epic must identify a "specific third party". (MTD at 14 (citing *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303 (N.D. Cal. 1997)).)  But that was not the issue in *Silicon Knights*.  The plaintiff there *had* named specific third parties in its complaint.  *See Silicon Knights*, 983 F. Supp. at 1312.  But the plaintiff's allegations there failed for a different reason; they were "conclusory", with no evidence of "disruption"—*i.e.*, no plausible facts giving rise to an inference that any of the named third parties would have engaged with the plaintiff but for the alleged conduct.  *Id.*[8]  By contrast, Epic alleges Unknown Sources is the cause of lost transactions on Epic's apps and EGS; in fact Unknown Sources has resulted in user drop-off.  (FAC ¶¶ 130, 151.)  Likewise, Epic has alleged that developers are deterred from contracting with EGS *because* of these frictions for users and

---

[8] In the other cases cited by Google (MTD at 14), the plaintiffs made no effort to identify a particular group of customers at all.  *See Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 522–23 (5th Dist. 1996) (alleging a "purely hypothetical relationship"); *Janda v. Madera Cmty. Hosp.*, 16 F. Supp. 2d 1181, 1189–90 (E.D. Cal. 1998) (permitting allegations about lost "existing patients", but dismissing allegations of "potential patients" with leave to amend); *Rosen v. Uber Techs., Inc.*, 164 F. Supp. 3d 1165, 1178–79 (N.D. Cal. 2016) (making allegations about the general "passenger public"); *see also Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1016 (N.D. Cal. 2018) (failing to establish at summary judgment that prospective relationships were reasonably probable).

the reputational costs they pose to developers. (*Id.* ¶ 152.) In fact, EGS on Android has been much slower to gain traction than has EGS on PC, specifically because of the challenges in attracting users posed by Unknown Sources' frictions. (*Id.* ¶¶ 54–55, 93, 150.)

### B. Epic Has Plausibly Alleged Google's Knowledge and Intent.

Next, Google argues that Epic has not sufficiently asserted Google's knowledge or intent to interfere because: (i) Unknown Sources predates the launch of EGS, (ii) the allegations about Google's intent are too "generalized", and (iii) Google has "alternative business explanations" for deploying Unknown Sources. (MTD at 11–12.) None of these arguments has merit.

*First*, regardless of when Google launched Unknown Sources, Epic has sufficiently alleged that Google knows about the ongoing impacts of Unknown Sources on Epic's relationships with consumers and developers—yet continues to deploy Unknown Sources to downloads from Epic websites and EGS. (FAC ¶¶ 148–50.)[9] In fact, the exhibits that Google offers for judicial notice confirm this knowledge. For example, at trial in *Google I*, Epic introduced emails showing that Unknown Sources had impeded EGS from expanding to Android (Dkt. 99 (Goodman Decl.), Ex. 7); Google "knew exactly who Epic was" despite warning of "unknown" apps (*id.*, Ex. 4); and Epic's CEO testified that "these scare screens[] make it too cumbersome to install a competing app store" such that "most users are deterred" (*id.*, Ex. 6). Even if it could somehow claim ignorance prior to *Google I*, Google can no longer do so now.

*Second*, Google's attack on "generalized" allegations of intent falls flat. "[T]he defendant need not know exactly who is a party to the contract, so long as he knows he is interfering with a contractual relationship." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005).[10] Epic plausibly alleges that Google knows of Epic's contracts and potential economic

---

[9] Google argues that *J.B. Hughes* shows a "course of dealing" cannot establish intent (MTD at 12), but that case did not hold that a "course of dealing" can never demonstrate intent, only that the plaintiff there did not "show any acts of interference much less knowledge". *J.B. Hughes & Assocs. v. Giunio Santi Eng'g*, 2016 WL 11920884, at *5 (S.D. Cal. Nov. 18, 2016). Epic alleges (and cites Google documents showing) that Google investigated and knew about Unknown Sources' interference.

[10] Google's reliance on *Trindade v. Reach Media Group* is far afield. While the *Trindade* court faulted the plaintiff for "not alleg[ing] that [the defendant] had knowledge of a specific relationship", the plaintiff had relied *only* on its "reputation" and "position" in the industry to establish the defendant's knowledge. 2013 WL 3977034, at *15 (N.D. Cal. July 31, 2013).

relations with users and developers, and knows about Unknown Sources' disruption of Epic's relationship with both groups. (FAC ¶¶ 67–71, 87, 135–38, 147–52.) It is hardly "speculative" (MTD at 13) to infer that a user would have entered into a relationship with Epic if that user already took concrete steps to download Epic's product.

*Third*, Google's proffered "alternative business explanations" are not a proper basis for a motion to dismiss. Epic, of course, does not allege that Google has a legitimate security explanation for Unknown Sources; on the contrary, Epic alleges that explanation is pure pretext, especially as it pertains to downloads from Epic's websites and EGS, which Google knows to be reputable and safe. (FAC ¶¶ 135, 152.) Moreover, intent can "be satisfied [even] if the actor does not act for the purpose of interfering with the contract" so long as the actor knows the interference is "substantially certain to occur as a result of his action". *Moore v. Apple, Inc*., 73 F. Supp. 3d 1191, 1203 (N.D. Cal. 2014) (quotations omitted). Google's reliance on *Nevada DeAnza Fam. LP v. Tesoro Refin. & Mktg. LLC*, 474 F. Supp. 3d 1087, 1095 (N.D. Cal. 2020), is therefore misplaced. There, the plaintiff failed to allege *both* that the defendant had a "specific purpose" (because there was "no apparent benefit" to the defendant in interfering) *and* that the defendant knew interference was substantially certain to occur. *Id.* Epic alleges both: (i) the specific purpose of Unknown Sources is to benefit Google by reducing competition with the Play Store (FAC ¶ 72), including (especially) from Epic; and (ii) Google knows that Unknown Sources is an "abysmal" friction that interferes with Epic's relationships (*id.* ¶¶ 41, 65, 147–52).

### C. Epic Has Plausibly Alleged Disruption and Damages.

Disruption of a contractual relationship occurs if the defendant "interferes with the contracting parties' expectations regarding their relationship, making the contract less valuable to the plaintiff". *Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, 2013 WL 12244056, at *35 (C.D. Cal. June 12, 2013). Breach of contract is not required. *Id.* Disruption of economic relationships can be inferred at the pleading stage if the defendant caused "economic harm" to a competitor by "making false and misleading representations". *Logistik*, 543 F. Supp. 3d at 892–93. Epic alleges both types of disruption by explaining why its contracts with developers and users are less lucrative and by describing how prospective Epic app and EGS users are less

willing to engage in downloads or purchases from Epic due to the misstatements Google makes through Unknown Sources, to weaken EGS's competition with the Play Store.  (FAC ¶¶ 151–52.)

Google argues that two cases show that Epic has not pled damages; neither applies. Google claims that *Rincon Band of Luiseno Mission Indians v. Flynt*, 70 Cal. App. 5th 1059 (4th Dist. 2021), establishes that "diverted revenue" cannot constitute damages.  (MTD at 13.)  But the *Rincon* court acknowledged that it is sufficient to allege that "[d]efendants made it more costly and burdensome for the [plaintiff] to operate" under the contract allegedly interfered with. 70 Cal. 5th at 1111.  The court held that the plaintiff failed to meet that standard only because the complaint alleged expenses unrelated to the contract interfered with—*i.e.*, having to pay "disproportionate amounts for public assistance programs and other community economic offsets".  *Id.* (emphasis omitted).  But here, Epic's lost revenues come directly from the relationships governed by the very contracts that Google disrupts.  (FAC ¶¶ 151–52.)  Google's reliance on *Soil Retention Products, Inc. v. Brentwood Industries, Inc.* fares no better.  The court there concluded *not* that "lost profits" could never form the basis for damages, but that the plaintiff had not sufficiently identified which lost profits it risked losing.  521 F. Supp. 3d 929, 960 (S.D. Cal. 2021).  Epic has identified the revenue it has lost—revenue from users and developers who would have contracted with Epic if not for Unknown Sources.  (FAC ¶¶ 213–16.)

### D.  Epic Has Plausibly Alleged Independent Wrongful Conduct.

Finally, Epic has alleged independently wrongful conduct.  "California courts have held that independently wrongful conduct includes actions which are independently actionable, violations of federal or state law or unethical business practices", including, for example, "trade libel".  *Ingrid & Isabel, LLC v. Baby Be Mine, LLC*, 70 F. Supp. 3d 1105, 1120 (N.D. Cal. 2014). As explained above (*supra* Section II), Epic has plausibly alleged a trade libel claim, and Google does not dispute that a claim for trade libel satisfies this element.  (*Cf.* MTD at 10.)

### CONCLUSION

Google's motion to dismiss should be denied.

Dated:  August 20, 2025

Respectfully submitted,

By:   _/s/ Gary A. Bornstein_
      Gary A. Bornstein

**BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**

Shaneeda Jaffer (SBN 253449)
sjaffer@beneschlaw.com
Lily A. North (CA 260709)
lnorth@beneschlaw.com
100 Pine Street, Suite 3100
San Francisco, California
Telephone: (628) 600-2250
Facsimile:  (628) 221-5828

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com

Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*